```
 1                    UNITED STATES BANKRUPTCY COURT
                    WESTERN DISTRICT OF NORTH CAROLINA
 2                          CHARLOTTE DIVISION

 3   IN RE:                      :    Case No. 20-30608 (JCW)
                                      (Jointly Administered)
 4   ALDRICH PUMP LLC, ET AL.,   :
                                      Chapter 11
 5        Debtors,               :
                                      Charlotte, North Carolina
 6                               :    Thursday, March 30, 2023
                                      9:30 a.m.
 7                               :
     : : : : : : : : : : : : : : : : : : : : : : : : : : : : :
 8
     OFFICIAL COMMITTEE OF       :    AP 22-03028 (JCW)
 9   ASBESTOS PERSONAL INJURY
     CLAIMANTS, on behalf of the :
10   estates of Aldrich Pump LLC
     and Murray Boiler LLC,      :
11
          Plaintiff,             :
12
                 v.              :
13
     INGERSOLL-RAND GLOBAL       :
14   HOLDING COMPANY LIMITED,
     et al.,                     :
15
          Defendants,            :
16   : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

17   OFFICIAL COMMITTEE OF       :    AP 22-03029 (JCW)
     ASBESTOS PERSONAL INJURY
18   CLAIMANTS, on behalf of the :
     estates of Aldrich Pump LLC
19   and Murray Boiler LLC,      :

20        Plaintiff,             :

21               v.              :

22   TRANE TECHNOLOGIES PLC,     :
     et al.,
23                               :
          Defendants,
24                               :
     : : : : : : : : : : : : : : : : : : : : : : : : : : : : :
25
```

```
 1
    ARMSTRONG WORLD INDUSTRIES,   :     Miscellaneous Pleading
 2  INC. ASBESTOS PERSONAL INJURY        No. 22-00303 (JCW)
    SETTLEMENT TRUST, et al.,      :     (Transferred from District
 3                                       of Delaware)
         Plaintiffs,              :
 4
              v.                  :
 5
    ALDRICH PUMP LLC, et al.,      :
 6
         Defendants,              :
 7  : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8  AC&S ASBESTOS SETTLEMENT :     :     Miscellaneous Pleading
    TRUST, et al.,                       No. 23-00300 (JCW)
 9                                 :     (Transferred from District
         Petitioners,                    New Jersey)
10                                 :
              v.                  :
11                                 :
    ALDRICH PUMP LLC, et al.,
12                                 :
         Respondents,              :
13                                 :
    VERUS CLAIM SERVICES, LLC,
14                                 :
         Interested Party,         :
15                                 :
    NON-PARTY CERTAIN MATCHING
16  CLAIMANTS,
                                   :
17       Interested Party.
    : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :
18

19                       TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE J. CRAIG WHITLEY,
20                  UNITED STATES BANKRUPTCY JUDGE

21  APPEARANCES:

22  For Debtors/Defendants,      Rayburn Cooper & Durham, P.A.
    Aldrich Pump LLC and Murray  BY:  JOHN R. MILLER, JR., ESQ.
23  Boiler LLC:                        MATTHEW TOMSIC, ESQ.
                                       C. RICHARD RAYBURN, JR., ESQ.
24                                227 West Trade St., Suite 1200
                                  Charlotte, NC  28202
25
```

```
 1   APPEARANCES (continued):

 2   For Debtors/Defendants,         Jones Day
     Aldrich Pump LLC and Murray     BY:  BRAD B. ERENS, ESQ.
 3   Boiler LLC:                          MORGAN R. HIRST, ESQ.
                                     110 North Wacker Dr., Suite 4800
 4                                   Chicago, IL  60606

 5                                   Jones Day
                                     BY:  DAVID S. TORBERG, ESQ.
 6                                   51 Louisiana Avenue, N.W.
                                     Washington, D.C.  20001
 7
                                     Evert Weathersby Houff
 8                                   BY:  C. MICHAEL EVERT, JR., ESQ.
                                     3455 Peachtree Road NE, Ste. 1550
 9                                   Atlanta, GA  30326

10                                   Evert Weathersby Houff
                                     BY:  CLARE M. MAISANO, ESQ.
11                                   111 South Calvert St., Suite 1910
                                     Baltimore, MD  21202
12
                                     ROBERT H. SANDS, ESQ.
13                                   ALLAN TANANBAUM, ESQ.

14

15   Audio Operator:                 COURT PERSONNEL

16

17   Transcript prepared by:         JANICE RUSSELL TRANSCRIPTS
                                     1418 Red Fox Circle
18                                   Severance, CO  80550
                                     (757) 422-9089
19                                   trussell31@tdsmail.com

20

21   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
22

23

24

25
```

```
 1  APPEARANCES (continued):

 2

    For the ACC:                Caplin & Drysdale
 3                              BY:  SERAFINA CONCANNON, ESQ.
                                One Thomas Circle, NW, Suite 1100
 4                              Washington, DC  20005

 5                              Robinson & Cole LLP
                                BY:  NATALIE RAMSEY, ESQ.
 6                                   DAVIS LEE WRIGHT, ESQ.
                                1201 N. Market Street, Suite 1406
 7                              Wilmington, DE  19801

 8                              Robinson & Cole LLP
                                BY:  ANDREW A. DePEAU, ESQ.
 9                              280 Trumbull Street
                                Hartford, CT  06103
10
                                Winston & Strawn LLP
11                              BY:  DAVID NEIER, ESQ.
                                     CRISTINA I. CALVAR, ESQ.
12                              200 Park Avenue
                                New York, NY  10166-4193
13
                                Hamilton Stephens
14                              BY:  ROBERT A. COX, JR., ESQ.
                                525 North Tryon St., Suite 1400
15                              Charlotte, NC  28202

16  For the FCR:                Orrick Herrington
                                BY:  JONATHAN P. GUY, ESQ.
17                                   DANNY BAREFOOT, ESQ.
                                1152 15th Street, NW
18                              Washington, D.C.  20005-1706

19  For Certain Insurers:       Duane Morris LLP
                                BY:  RUSSELL W. ROTEN, ESQ.
20                              865 S. Figueroa St., Suite 3100
                                Los Angeles, CA  90017-5440
21
    For Individual Fiduciary    Brooks Pierce
22  Duty Defendants:            BY:  JIM W. PHILLIPS, JR., ESQ.
                                     JEFFREY E. OLEYNIK, ESQ.
23                              P. O. Box 26000
                                Greensboro, NC  27420
24

25
```

```
 1   APPEARANCES (continued):

 2   For Trane Technologies          McCarter & English, LLP
     Company LLC and Trane          BY:  GREGORY J. MASCITTI, ESQ.
 3   U.S. Inc.:                     825 Eighth Avenue, 31st Floor
                                    New York, NY  10019
 4
                                    McGuireWoods, LLP
 5                                  BY:  BRADLEY R. KUTROW, ESQ.
                                    201 North Tryon St., Suite 3000
 6                                  Charlotte, NC  28202

 7                                  Cordes Law, PLLC
                                    BY:  STACY C. CORDES, ESQ.
 8                                  1800 East Boulevard
                                    Charlotte, NC  28203
 9
     For Asbestos Trusts:           Ward and Smith, P.A.
10                                  BY:  LANCE P. MARTIN, ESQ.
                                    P. O. Box 2020
11                                  Asheville, NC  28802-2020

12                                  Ballard Spahr LLP
                                    BY:  BETH MOSKOW-SCHNOLL, ESQ.
13                                  919 North Market St., 11th Floor
                                    Wilmington, DE  19801-3034
14
     For the Verus Trusts:          Moon Wright & Houston, PLLC
15                                  BY:  ANDREW T. HOUSTON, ESQ.
                                    212 N. McDowell Street, Suite 200
16                                  Charlotte, NC  28204

17                                  Lowenstein Sandler LLP
                                    BY:  LYNDA A. BENNETT, ESQ.
18                                  One Lowenstein Drive
                                    Roseland, NJ  07068
19
     For Verus Claims Services,     Bradley Arant Boult Cummings LLP
20   LLC:                           BY:  ANNA-BRYCE HOBSON, ESQ.
                                    214 North Tyron St., Suite 3700
21                                  Charlotte, NC  28202

22                                  Anselmi & Carvelli LLP
                                    BY:  ZACHARY D. WELLBROCK, ESQ.
23                                  West Tower, Fifth Floor
                                    56 Headquarters Plaza
24                                  Morristown, NJ  07960

25
```

```
1   APPEARANCES (continued):

2   For Robert and Marcella      Maune Raichle
    Semian:                      BY:   CLAYTON L. THOMPSON, ESQ.
3                                150 West 30th Street, Suite 201
                                 New York, NY  10001
4
                                 Waldrep Wall
5                                BY:   JAMES C. LANIK, ESQ.
                                 370 Knollwood Street, Suite 600
6                                Winston-Salem, NC  27103

7   For Non-Party Certain        Hogan McDaniel
    Matching Claimants:          BY:   DANIEL K. HOGAN, ESQ.
8                                1311 Delaware Avenue
                                 Wilmington, DE  19806
9
                                 Waldrep Wall
10                               BY:   DIANA SANTOS JOHNSON, ESQ.
                                 370 Knollwood Street, Suite 600
11                               Winston-Salem, NC  27103

12  For DCPF:                    Alexander Ricks PLLC
                                 BY:   FELTON PARRISH, ESQ.
13                               1420 E. 7th Street, Suite 100
                                 Charlotte, NC  28204
14
                                 Young Conaway
15                               BY:   KEVIN A. GUERKE, ESQ.
                                 1000 North King Street
16                               Wilmington, Delaware  19801

17
    ALSO PRESENT:                JOSEPH GRIER, FCR
18                               Grier, Wright & Martinez, PA
                                 521 E. Morehead St, Suite 440
19                               Charlotte, NC  28202

20

21  APPEARANCES (via telephone):

22  For Non-Party Certain        Stark & Stark, PC
    Matching Claimants:          BY:   JOSEPH H. LEMKIN, ESQ.
23                               P. O. Box 5315
                                 Lawrenceville, NJ  08648
24

25
```

```
 1    APPEARANCES (via telephone continued):

 2    For Travelers Insurance        Steptoe & Johnson LLP
      Companies, et al.:             BY:  JOSHUA R. TAYLOR, ESQ.
 3                                   1330 Connecticut Avenue, N.W.
                                     Washington, D.C.  20036
 4
      For Verus Claims Services,     Anselmi & Carvelli LLP
 5    LLC:                           BY:  ANDREW ANSELMI, ESQ.
                                     West Tower, Fifth Floor
 6                                   56 Headquarters Plaza
                                     Morristown, NJ  07960
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2      (Call to Order of the Court)

3          THE COURT:  Have a seat, all.  Good morning.

4      (Counsel greet the Court)

5          THE COURT:  Okay.  It looks like we've got a bit of

6  business to do this morning.  So we'll try to do that with

7  dispatch.

8          Let's go ahead and get appearances.  If we can start

9  with the major constituencies and have the lead attorney

10 announce as many of his people as possible, I'd appreciate

11 that.

12         Mr. Erens?

13         MR. ERENS:  Thank you, your Honor.

14         Brad Erens, E-R-E-N-S, of Jones Day on behalf of the

15 debtors.  Also for Jones Day here today, Morgan Hirst and David

16 Torberg.  From North Carolina co-counsel Rayburn Cooper, we

17 have Rick Rayburn, Jack Miller, and Matt Tomsic.  Special

18 counsel for the debtor the Evert Weathersby firm, we have

19 Michael Evert and Clare Maisano, and from the debtors

20 themselves we have Allan Tananbaum and Robert Sands.

21         THE COURT:  Okay.

22         How about from the Committee?

23         MS. RAMSEY:  Thank you, your Honor.

24         Natalie Ramsey, Robinson & Cole, on behalf of the

25 Asbestos Claimants' Committee, and we have quite a number of

1    people here today with us, Davis Lee Wright and Andrew DePeau,

2    also from Robinson & Cole; Serafina Concannon from Caplin &

3    Drysdale; David Neier and Cristina Calvar from Winston &

4    Strawn; and Rob Cox from Hamilton Stephens.

5              THE COURT:  Okay.

6              FCR?

7              MR. GUY:  Good morning, your Honor.  Jonathan Guy for

8    the FCR.  Mr. Grier is here with me in the courtroom.  And my

9    colleague, Mr. Danny Barefoot.  Thank you for granting his

10   recent *pro hac* request.

11             THE COURT:  Sure.

12             MR. GUY:  Thank you.

13             THE COURT:  How about the Affiliates?

14             MR. MASCITTI:  Good morning, your Honor.  Greg

15   Mascitti, McCarter & English, on behalf of Trane Technologies

16   Company LLC and Trane U.S. Inc., as well as the Non-Debtor

17   Defendants in the active adver, adversary proceedings.  And I'm

18   joined by our local counsel, Brad Kutrow and Stacy Cordes.

19             THE COURT:  Okay.

20             Others in the courtroom that have not previously

21   announced?  Anyone?

22             MR. PHILLIPS:  Your Honor, Jim Phillips and Jeff

23   Oleynik on behalf of the Individual Fiduciary Duty Defendants.

24             THE COURT:  Okay.

25             MR. MARTIN:  Good morning, your Honor.  Lance Martin

1    and Beth Moskow-Schnoll on behalf of the Asbestos Trusts.

2                THE COURT:  Okay.

3                Mr. Roten?

4                MR. ROTEN:  Morning, your Honor.  Russell Roten, Duane

5    Morris, for Certain Insurers.

6                THE COURT:  Mr. Houston.

7                MR. HOUSTON:  Good morning, your Honor.  I'm Andy

8    Houston on behalf of the eight Verus Trusts.  My co-counsel,

9    Lynda Bennett from the Lowenstein Sandler firm, is here, too.

10   She's been recently admitted *pro hac vice*.

11               THE COURT:  Okay.  Welcome.

12               MS. BENNETT:  Thank you, your Honor.

13               THE COURT:  All right.

14               MS. HOBSON:  Your Honor, Anna-Bryce Hobson here for

15   Verus Claims Services.  I'm joined with my co-counsel, Zachary

16   Wellbrock, who's also been recently admitted *pro hac*.

17               THE COURT:  Okay.  Welcome.

18               MR. WELLBROCK:  Good morning, your Honor.

19               MR. THOMPSON:  Good morning.  Clay Thompson, Maune

20   Raichle Hartley French & Mudd, on behalf of Robert and Marcella

21   Semian.  I'm here with my co-counsel from North Carolina, Jim

22   Lanik, with Waldrep & Wall.

23               THE COURT:  Okay.

24               MR. GUERKE:  Good morning, your Honor.  Kevin Guerke

25   from Young Conaway, here on behalf of the Delaware Claims

1   Processing Facility.  I'm here with local counsel, Felton

2   Parrish.

3              THE COURT:  Okay.

4              MS. SANTOS JOHNSON:  Good morning, your Honor.  Diana

5   Santos Johnson with Waldrep Wall Babcock & Bailey.  We're local

6   counsel to Dan Hogan, who's in the courtroom today.  He is lead

7   counsel for the Non-Party Certain Matching Claimants in that

8   Miscellaneous Proceeding that was transferred from Delaware.

9              We are also local counsel to Joseph Lemkin, who is on

10  the phone, and he is lead counsel for the Non-Party Certain

11  Matching Claimants in the Miscellaneous Proceeding that was

12  transferred from New Jersey.

13             THE COURT:  Okay.

14             Anyone else in the courtroom?

15       (No response)

16             THE COURT:  Are there those on the telephone who have

17  not either, that need to announce and have not been previously

18  announced by, by your co-counsel?  Star 6 gets you unmuted.

19             Anyone?

20             MR. TAYLOR:  Good, good morning, your Honor.  Joshua

21  Taylor from Steptoe & Johnson on behalf of the Travelers

22  Insurance Companies.

23             THE COURT:  Anyone else?

24             MR. ANSELMI:  Good morning, your Honor.  Andrew,

25  Andrew Anselmi from Anselmi & Carvelli on behalf of Verus.

1          THE COURT:  All right.

2          Anyone else?

3      (No response)

4          THE COURT:  Anyone else?

5      (No response)

6          THE COURT:  Please, on, those who are on the phone, if

7   you would, keep your receivers muted until it's time to speak.

8          Given the number of people involved today and the

9   number that are on the telephone, it would be helpful to all

10  if, if you reannounced your, your name before you spoke this

11  morning.

12          Quite a bit of business to, to do this morning.  Have

13  the parties had any occasion to talk about a batting order and

14  how they'd like to approach this?

15          MR. ERENS:  Your Honor, yeah, we thought about this in

16  putting together the agenda.  There are a number of parties

17  here who are only here for one item --

18          THE COURT:  Uh-huh (indicating an affirmative

19  response).

20          MR. ERENS:  -- but we didn't really want to play

21  favorites or make it look like we're strategically putting the

22  agenda in any particular order.  So we listed it simply in the

23  order chronologically that, I think, is the default rule for

24  the agenda.  We're happy to go in that order.  If parties want

25  to go in a different order, we can discuss that as well, or

1  whatever your Honor would prefer.

2          THE COURT:  Does anyone have a different way of,

3  proposed way of approaching this?

4          Mr. Houston?

5          MR. HOUSTON:  Yes, sir, your Honor.  Andy Houston for

6  Verus Trusts.

7          I'm not going to comment broadly on everything that's

8  on the agenda, but I will point out a few things --

9          THE AUDIO OPERATOR:  Mr. Houston?

10         MR. HOUSTON:  -- which are -- I'm not sure that I have

11  the most recent version, but --

12         THE AUDIO OPERATOR:  Mr. Houston?

13         THE COURT:  Better go over here, Mr. Houston, so we

14  get a good recording.

15         THE AUDIO OPERATOR:  Yes, thank you.

16         MR. ERENS:  Your Honor, if I may before, just so we're

17  all looking at the same agenda, we did file a final agenda this

18  morning at about 8:15 at Docket 1677.  There were some filings

19  that came in on the last day or two.  So those have been added.

20  Otherwise, you know, it's the same as was filed previously.

21         THE COURT:  Mr. Houston, what'd you have to say?

22         MR. HOUSTON:  Yes, your Honor.  I am just looking to

23  cross-reference the numbers.  It looks like they are probably

24  the same.  Just to  point out a few matters.

25         Matters -- I only represent the Verus Trusts, who are

1    the matter, in Matter No. 3 and that case was transferred from

2    New Jersey.  There's also Matters 4 and 5, which are related to

3    protective order motions.

4              THE COURT:  Uh-huh (indicating an affirmative

5    response).

6              MR. HOUSTON:  From our standpoint, those matters are

7    not properly on for hearing today.  They weren't noticed for

8    hearing.  The first time that we knew that these were going

9    forward was when we got whatever the first iteration of this

10   agenda was.  We certainly did not notice them for hearing.

11   Without arguing the point, we believe they're moot because we

12   believe there is an agreement between the Verus Trusts and the

13   debtors related to your Honor's 10 percent sampling ruling.

14   So we did not think that those were properly going forward

15   today.

16             Just in terms of commentary, we filed a motion to

17   adjourn in the --

18             THE COURT:  Uh-huh (indicating an affirmative

19   response).

20             MR. HOUSTON:  -- other --

21             THE COURT:  Right, in the Delaware action.

22             MR. HOUSTON:  -- Miscellaneous Proceeding that is

23   Matter No. 7 on the calendar, Docket No. 58.  Those matters are

24   related, even though they cross different cases on some level.

25             So we would only ask, really, that our motion to

1    adjourn be heard before any of those other matters.

2          That's it.

3          THE COURT:  Mr. Hirst.

4          MR. EVERT:  Your Honor, Michael Evert on behalf of the

5    debtors.  And I'm only rising instead of Mr. Erens 'cause this

6    was sort of my bailiwick.

7          THE COURT:  Okay.

8          MR. EVERT:  So I think there are a couple of things

9    here.  There, there are a lot of filings in regard to the

10   Trusts and we were going to try to tackle those before the

11   Court in a, in a coordinated order.

12         I think what Mr. Erens is referring to is there's a,

13   there's a Non-Debtor Affiliates' motion that's out there.

14   That's the only thing, I think, some people are here for and

15   there's a, there's a lift stay motion that, I think, some

16   people are here only for that.

17         So I -- I real -- I think, really, the open question

18   is whether either of those parties would like to try to

19   expedite their, their particular item so that they can get out

20   of here early.  I'm sure no one would like to get out earlier

21   than your Honor, but there, there may be some --

22         THE COURT:  I think I'm here for the duration, or

23   better be.

24         MR. EVERT:  But I think that's really the issue.

25         THE COURT:  Okay.

1          MR. NEIER:  Good morning, your Honor.  David Neier on

2     behalf of the Committee.

3          Your Honor, we're dead last on the agenda.  So of

4     course, we have, we have an issue with it, but I would just

5     point out that there are some motions from the base case that

6     involve estate, people who are billing the estate.

7          THE COURT:  Uh-huh (indicating an affirmative

8     response).

9          MR. NEIER:  And then there's us at the very bottom,

10    but we're fine with the agenda as it is.  We have no objection.

11    We just, you know, if there, if there's a way that the, the

12    trust discovery is going to be handled in a coordinated fashion

13    or an expeditious fashion, that might make things easier.

14         THE COURT:  I understand that these overlap a lot.

15         Does -- from the debtors' perspective -- I guess y'all

16    were the party responding and -- is there a belief that 3, 4,

17    and 5 are a go today?

18         MR. EVERT:  Yes, your Honor.

19         THE COURT:  Okay.

20         All right.  Here's the way I'd like to look at it.

21    I'd like to get as many of you on your way as I can and, and so

22    your clients don't have to suffer from that.

23         With that in mind, I agree.  I'd like to get the

24    single-shot matters that don't get into the flowing morass of,

25    of reconsideration motions and quash motions out of the way as

1   possible.  So my thinking would be we, we take up the status in

2   No. 1, then we pick up the Semian motion for relief from stay

3   in No. 2; briefly step over 3, 4, and 5 and see where we are on

4   that as well as the, the matters to strike pleadings in the two

5   Miscellaneous Proceedings that have been removed to this Court,

6   the motions to strike pleadings, continue hearings, and the

7   like; and instead, go over, and the motion for rehearing by the

8   debtor itself.

9          My reason for doing that is if we don't reach this

10  afternoon, all those motions to continue are kind of moot

11  because we'll have to continue, anyway.  So let's save that

12  time until we see whether it's really necessary and then I want

13  to pick up with the discovery procedures and then we'll circle

14  back around and see where we are, okay?  Let's do it that way.

15         So let's start with No. 1.  We were talking about

16  Mr. Guy's motion for sampling and we've been discussing that

17  and we're back again.

18             MR. ERENS:  Your Honor, if, if I may, we also had a

19  brief status, although we can do that at the end or we can do

20  it at the beginning.  It's not very long.

21             THE COURT:  Anyone opposed to hearing a status from

22  the parties?

23      (No response)

24             THE COURT:  Mr. Erens, lead off.

25             MR. ERENS:  Okay.  Thank you, your Honor.  Yeah, just

1 | a couple of points.

2 | So want to let the Court know that on mediation, we do

3 | have an initial mediation date of May 15th. We've notified all

4 | the parties. It will be virtual. So the parties will not be

5 | getting together. We'll see how that one goes. We do believe

6 | based on scheduling of the parties or the schedules of the

7 | parties that we're probably not likely to meet again for

8 | several weeks, call it late June or early July, but we'll be

9 | discussing that in more detail at the May 15th initial kickoff

10 | for mediation.

11 | THE COURT: Okay.

12 | MR. ERENS: Secondly, proofs of claim and PIQs. You

13 | may recall, your Honor, you entered an order, I believe, at the

14 | last hearing allowing the debtors to file omnibus proof of

15 | claim objections, mostly to the extent that the objection was

16 | that prior to the bankruptcy the claim was paid and released --

17 | THE COURT: Uh-huh (indicating an affirmative

18 | response).

19 | MR. ERENS: -- but that was with the condition that

20 | the debtors meet and confer with claimants or their counsel

21 | prior to filing the omnibus objection.

22 | So we are now in the process -- we just started -- of

23 | meeting, or reaching out to plaintiffs' counsel for meet,

24 | firms. That's where that stands.

25 | On PIQs, you may recall the PIQs had a deadline of

1    late December for arrival.  We have been reviewing the PIQs

2    since then, probably since the beginning of the year.  I

3    believe there are, roughly, 5,000 of them.  So a good amount

4    of, of detail.  We are in the, I think, final stages, or close

5    to the final stages of fully reviewing those PIQs to the extent

6    necessary to move to the next step.  Our intent next is to

7    reach out to counsel who we believe filed deficient or

8    incomplete PIQs to start that discussion.  Our hope and intent

9    is to not burden the Court with any disputes of that matter, or

10   at least certainly narrow any disputes or discussions.

11          So we'll be starting that process soon and you may be

12   hearing about that again down the road.

13          Finally, on estimation, you may recall the ACC sent us

14   a document request, discovery request some time ago.  We've

15   already produced some time ago about 160,000 documents in

16   response to that request.  The ACC and the debtors a couple of

17   weeks ago agreed on search terms for electronic searches.

18   We're in the process of our initial review of about 20,000

19   documents, first-level review, and we expect in the, the next

20   few weeks, whatever that means, we will start production on a

21   rolling basis with documents to follow.

22          So that's pretty much the update on the estimation

23   document discovery.

24          I think that's pretty much it unless your Honor has

25   questions.

1          THE COURT:  Not at the moment.

2          MR. ERENS:  Okay.  Thank you.

3          THE COURT:  Anything from the ACC either by way of

4    comment to that or other update?

5          MS. RAMSEY:  No, your Honor.  Thank you.

6          THE COURT:  How about the FCR?

7          MR. GUY:  No, sir.

8          THE COURT:  Affiliates?  Anyone else got anything to

9    say?

10      (No response)

11         THE COURT:  Okay.  Let's go back to the docket, then,

12   and pick up with No. 1.  This is the FCR's motion to establish

13   a protocol for sampling.

14         MR. GUY:  Good morning, your Honor.  Jonathan Guy for

15   the FCR.

16         It's tradition for me to put up the fee chart and

17   there is relevance to it.  You can see that Aldrich is catching

18   up with DBMP at 74 million total and DBMP is 75.  And Bestwall

19   is way ahead, $227 million.  The one that hasn't changed, of

20   course, is Paddock because that case went effective in '22.

21         And the fees are relevant to the update, your Honor.

22   It's not a shortage of lawyers and professionals that is

23   stopping the sampling protocol getting agreed to.  We filed our

24   sampling motion back in September of '22 and you'll remember

25   then that it was in response to the Court's concerns about the

1   claims files and privilege issues and the burden that would be

2   addressed in reviewing too many of those files.  The relief

3   sought was very modest.  We simply asked that the parties be

4   ordered to negotiate and if they couldn't do it within 90 days,

5   then come back to the Court.  At the time both the ACC and the

6   debtors said, "Trust us.  We'll get it done.  We don't need an

7   order.  We're talking and we'll get back to you and tell you

8   when we've got it done."  So we're now, you know, nearly in

9   April and I can tell you that -- and I want the debtors and the

10  ACC to confirm this because they're the ones who've been in

11  direct discussion.  They've kept the FCR informed, but it's

12  really their agreement to make and ours to, you know, say,

13  "Yes, that seems to work," but after talking to our experts.

14          Both the debtors and the ACC acknowledged back in

15  October that, "If we couldn't get it done, then we should come

16  back to the Court and, and an order might be appropriate."  The

17  debtors said:

18          "If it appears the parties are unable to reach

19          agreement, the parties and the Court can later revisit

20          settling guidelines, setting deadlines to ensure that

21          the sampling issue is properly resolved at the

22          appropriate time."

23          The ACC took the same tact:

24          "Should the parties at some point reach an impasse in

25          the discovery process and discussions regarding

1          sampling, the Committee or another party will seek

2          guidance from the Court."

3          So we've been very patient, your Honor.  I can tell

4    you that there is no agreement.  I can tell you that there was

5    what we thought was an agreement fairly recently and I don't

6    want to characterize those discussions in any way.  So I'm

7    going to ask both Ms. Ramsey and Mr. Erens to clarify, but my

8    understanding is that the ACC and the debtors were very close

9    on the key details of a sampling protocol which would obviate

10   the problems that we saw in <u>Bestwall</u>, but when the debtor have

11   revisited the issue of the trust discovery the ACC's response

12   was, "Well, that put," as my mother would say, "The cat among

13   the pigeons," "and we're not really sure we want to agree to

14   sampling a'tall."  And I'll let Ms. Ramsey clarify if I've

15   misstated that in any way.

16         So we have a bit of a problem with that, your Honor,

17   for obvious reasons.  We don't think they should be linked, but

18   we'll let the ACC talk to that.  For sure, the ACC didn't say

19   back in October, "We'll never agree to a sampling protocol for

20   the claims files if we cannot get an agreement on the trust

21   discovery."  That wasn't the issue a'tall.  But now they seem

22   to be linked.

23         So I, I will leave it at that and I would just like to

24   return to the Court once we've heard from the, the, the debtors

25   and the ACC with what I think might be an appropriate remedy in

1  light of the impasse.

2         Thank you, your Honor.

3         THE COURT:  Okay.

4         Debtor?  ACC?  Ms. Ramsey.

5         MS. RAMSEY:  Thank you, your Honor.  Natalie Ramsey

6  for the record.

7         Your Honor, we -- we are -- we have made substantial

8  progress.  I think we had reported that to the Court on

9  February 14th.  There has been, there's been an impediment that

10 has been created to the precise sample that, that we were

11 talking about by the debtors' motion because the sampling

12 protocol and the strata and even the number was informed by the

13 background that there was a limitation on trust discovery.  And

14 so we have not said we're walking away from sample discussions

15 if the debtor is successful in connection with its motion for

16 rehearing.  What we have said is that would change some of the

17 bases upon which we were discussing a sample.

18        There's also an additional issue that came up in

19 communications.  I think Mr. Evert sort of forecasted at the

20 last hearing that there was a feature of our proposal that the

21 debtor had some concerns about.  We've had some preliminary

22 further dialogue about that.  That is also unresolved and it,

23 it's a question, again, of, of proportionality.

24        Some of this, I don't want to get into 'cause I don't

25 want to start the argument right now on the motion for

1 | rehearing, but a lot of this has to do with, fundamentally, the

2 | question of the goal of, we understood the FCR's motion, was to

3 | create a universe that would enable the parties to all be

4 | working on what I'll call a level playing field and that is

5 | still our goal.  We still think that a sample makes sense, but

6 | there are a couple of issues that are, right now, preventing us

7 | from having reached agreement and one of them is awaiting the

8 | Court's determination on the motion for rehearing.

9 | Thank you.

10 | THE COURT:  Okay.

11 | Mr. Evert.

12 | MR. EVERT:  Your Honor, Michael Evert for the debtors.

13 | I, I don't have a whole lot to add.

14 | The -- the -- we were -- we don't think the two issues

15 | are linked.  We don't think they should be linked.  From our

16 | perspective, they've, they've never been linked, but, you know,

17 | obviously, these are, these are negotiations and people can

18 | take the position that they want to take.  But from our

19 | perspective, what we're talking about here are two different

20 | issues.  We've said many, many times that the trust discovery,

21 | in our view, is analogous to our claims database, which we

22 | produced in its entirety, and, and the claims file discovery is

23 | a whole different kettle of fish.  It's -- it's -- it's paper

24 | files.  It's tens of thousands of e-mails.  It's, it's lawyers.

25 | It's everywhere.

1          THE COURT:  Right.

2          MR. EVERT:  So we don't think the two issues are

3   related.  If -- if -- I think if we can get over that, then we

4   could get back to our negotiations on the two remaining issues

5   Ms. Ramsey identified.  And I agree with her.  It's not

6   appropriate to get in with you about where we are and all that.

7          But we -- we were -- we don't think they're linked and

8   don't think they should be linked.

9          MS. RAMSEY:  May --

10          THE COURT:  As I --

11          MS. RAMSEY:  May I respond very, very briefly, your

12   Honor, just, just because -- and I said -- I, I really am not

13   trying to accelerate the motion for rehearing, but I think it's

14   relevant to this discussion.

15          There's a declaration that, that Dr. Mullins [sic]

16   filed.  Part of that declaration indicates that the goal of the

17   use of trust discovery is to compare it with information in the

18   claim files and if that is going to be a, a universe of a

19   hundred percent and the Committee, on the other hand, is

20   limited to a universe of a portion of that, whatever percentage

21   that turns out to be, to us, that is a, that is an unfair,

22   unequal access to information that, that does present us a

23   problem.

24          And, and as Mr. Evert said, we, we, we'll continue to

25   have this dialogue.  A lot will be informed by what happens,

1   but we feel fairly strongly that our concern has always been

2   that the debtor came in to court.  It sought out this process.

3   It sought out estimation.  It has taken the position it has

4   taken with respect to how estimation, how it wants to approach

5   estimation, and to deny the Committee sufficient access to the

6   information that would inform the Committee's defense meanwhile

7   allowing the debtor to have a hundred percent information,

8   would, would put the parties at a disadvantage.

9        THE COURT:  To what extent do you think a ruling today

10  on the motion for reconsideration would move this along?  I

11  would assume there'd be some lag time no matter what I do.

12       MS. RAMSEY:  Yes.  I believe that's correct, your

13  Honor, but we, we've come a long way.  Our experts have

14  developed their own views of what would be necessary.

15       So I would think it would accelerate the process of us

16  being able to determine whether we can reach agreement or

17  whether we need for the Court to --

18       THE COURT:  Uh-huh (indicating an affirmative

19  response).

20       MS. RAMSEY:  -- decide the issue.

21       THE COURT:  And Mr. Guy, as I recall, your motion

22  didn't really advance the protocol itself.  It just encouraged

23  the other two parties to, to come to an agreement.

24       MR. GUY:  Exactly right, your Honor.  We weren't

25  taking it upon ourselves to tell them what was the exact

1  sampling protocol.  I can say, without getting into the details

2  of all the discussion, is we really thought that they were, if

3  not 98 percent done, 95 percent done, and then we've got this

4  new issue that's being teed up.

5       From the FCR's perspective, we want to get this case

6  focused on what's really important and try to --

7       THE COURT:  Uh-huh (indicating an affirmative

8  response).

9       MR. GUY:  -- put to the side these, what we see as

10 ancillary disputes, discovery disputes, which can be

11 streamlined.  That's why we did this.  We wanted to avoid like

12 the three or four years of Bestwall arguing about privilege

13 issues.  And you know, that's what we still want.  I think it

14 will be appropriate at this time -- the Court's been patient.

15 We've been patient.  There's been a lot of talk.  The goalposts

16 seem to be moving.  I think at this point it should be clear,

17 regardless of how the Court rules on the motion for rehearing,

18 that the debtors and the ACC have 30 days to figure out whether

19 they can agree to a sampling protocol and then, if they can't,

20 to present their differences to the Court and then we get a

21 decision on it.  And the benefit of that decision will be

22 assisting the Court in the claim file privilege issues.  That

23 was the genesis of the motion in the first instance.  I defer

24 to Ms. Ramsey and her arguments about the Trusts and sampling

25 on that.

1          But our motion was to eliminate the privilege -- not

2     eliminate 'cause we won't be able to do that -- but to minimize

3     the privilege disputes that we've presented to the Court.

4          THE COURT:  Have you considered amending your motion

5     and, and proposing your own protocol?

6          MR. GUY:  We could propose a protocol, but to be

7     honest, your Honor, it's, the data that the debtors have, the

8     data that the debtors want is the data that the ACC have and

9     the data that the ACC wants.

10          So we didn't want to force feed them with anything.

11          THE COURT:  I agree, but if they are not in a position

12    to agree --

13          MR. GUY:  If, if they're not in a position, we would

14    certainly have --

15          THE COURT:  You've got a foot in both boats here.

16          MR. GUY:  We would certainly be prepared to put

17    forward something that we think is fair and reasonable, your

18    Honor, and our expert's prepared to do that.

19          THE COURT:  Okay.

20          MR. GUY:  Thank you, your Honor.

21          MR. EVERT:  And your Honor, to that point, just to

22    respond briefly about what Ms. Ramsey said.

23          The issue that she described, it was controlled for by

24    agreement in Bestwall.  They found a way to -- and, and we

25    think we could get to that agreement here in this case.  And

1    in, in <u>Bestwall</u>, they got a hundred percent of the trust data,

2    but they, nevertheless, controlled for this issue in <u>Bestwall</u>.

3    So we, we think we can get there.

4          So yes, I believe that a court's decision on the

5    rehearing would be helpful in moving us along.

6          THE COURT:  Okay.

7          So -- well, we can do it a variety of ways.  All I've

8    got today is status, but I also have a live motion and the, the

9    motion needs to be decided at some point.  We've took what was

10   going to be a 30-day negotiation and turned it into 6 months

11   and, I mean, a 3-month negotiation turned it into 6 months.  I

12   feel like we need to get moving on this.  At the same time I

13   understand the rehearing also feeds into it.

14         So for now, I'm just going to carry the status hearing

15   over to next month and at the end of the calendar today,

16   depending on what happens otherwise, I might be in a position

17   to say we're going to have a substantive hearing if you don't

18   agree in April, okay?

19         So we'll see where we go on that later on, but

20   otherwise, we will at least touch base on status in, at the

21   April date, which is, what, the 27th?

22         MR. EVERT:  Yes, your Honor.

23         THE COURT:  All right.

24         MS. RAMSEY:  Yes.

25         MR. GUY:  Thank you, your Honor.

1          THE COURT:  Okay.

2          No. 2 on the matter is the Semian motion for, if I'm

3   saying that correctly -- I hope I am -- Robert Semian's motion

4   for relief from stay.

5          May need to make room.

6          MR. THOMPSON:  Thank you, your Honor.

7          THE COURT:  Looking at all of you looking for space

8   reminds me of conversations we had with, with the architects

9   who designed this Annex about seating and they thought three

10  counsel tables would be great and I was thinking, well, we

11  might need four or five if there was some way to get it.  And

12  we took what we could get.  We at least got you a podium, so.

13         All right.  If you would reannounce your appearances.

14         MR. THOMPSON:  Morning, your Honor.  Clay Thompson

15  with Maune Raichle Hartley French & Mudd.

16         MR. LANIK:  Your Honor, Jim Lanik with Waldrep Wall

17  Babcock & Bailey.

18         THE COURT:  All right.

19         MR. THOMPSON:  So my law firm represents --

20         THE COURT:  Hang on a second.

21         Mr. Rayburn, you're going to be arguing this for the,

22  for the debtors' side?

23         MR. RAYBURN:  I'm afraid to have to tell you so.  Yes,

24  your Honor.

25         THE COURT:  All right.

1        MR. RAYBURN:  I'll be arguing this for the debtor, but

2   also Mr. Mascitti has filed papers, also.

3        THE COURT:  Okay.

4        Go ahead, Mr. Thompson.

5        MR. THOMPSON:  Okay.

6        So, so my law firm represents several mesothelioma

7   claimants in this case.  We represent one of the committee

8   members.  I'm not speaking on behalf of that committee member

9   or the Committee.

10        THE COURT:  Uh-huh (indicating an affirmative

11   response).

12        MR. THOMPSON:  The Semians are asking you to lift the

13   stay so that they can amend their complaint that's pending in

14   the Philadelphia Court of Common Pleas --

15        THE COURT:  Uh-huh (indicating an affirmative

16   response).

17        MR. THOMPSON:  -- to add Murray Boiler.

18        Mr. Semian has a particularly unique claim in that he

19   worked for Trane for 26 -- I guess to use the, the naming

20   nomenclature that you used in your opinion of the ad --

21        THE COURT:  Uh-huh (indicating an affirmative

22   response).

23        MR. THOMPSON:  -- preliminary injunction -- he worked

24   for Old Trane in Dunmore, Pennsylvania for 26 years.  So his

25   claim, as I see it, would be against Murray Boiler that's

```
 1   protected by the automatic stay.  And so his claim against

 2   Murray Boiler that derives from his exposures to asbestos at

 3   Old Trane are based on a unique law in Pennsylvania that

 4   requires him to sue his employer in the tort system.

 5        So Pennsylvania, unlike most states, does not provide

 6   a workers' compensation remedy for someone with mesothelioma.

 7   So if Mr. Semian was exposed at a Trane facility in New York as

 8   an employee --

 9        THE COURT:  Uh-huh (indicating an affirmative

10   response).

11        MR. THOMPSON:  -- I wouldn't be able to sue Trane.  I

12   would have a remedy for him in the workers' compensation

13   system.  And interestingly in this proceeding, in your

14   preliminary injunction opinion of last August you noted that

15   workers' compensation remedies are outside of this case.

16        So if he had been a Trane employee in New York or New

17   Jersey where my firm has many cases, he would not be affected

18   by this, by this bankruptcy.

19        THE COURT:  Uh-huh (indicating an affirmative

20   response).

21        MR. THOMPSON:  So he has a unique state where because

22   the Pennsylvania compensation system does not provide a remedy

23   under Tooey v. AK Steel, which is a Supreme Court case from

24   about ten years ago in Pennsylvania, he has to sue his employer

25   in the tort system, which would be Murray.  And so what he's
```

1   asking for is to lift the stay so that he can amend his

2   complaint in the Philadelphia Court of Common Pleas and add

3   Murray to that tomorrow.

4          And I'll go through sort of the Philadelphia practice,

5   but essentially, he was exposed to asbestos at Trane from a

6   variety of products.  And so he worked with insulation

7   materials that were made by Johns Manville and Owens Corning.

8   There was insulation on pipelines that he worked on as, in the

9   Maintenance Department.  He also has asbestos exposures to

10  products defendants, not necessarily at Trane, from other work

11  that he did.  And so his lawsuit is pending against, in strict

12  liability, is pending against certain defendants like General

13  Electric and Westinghouse.  He's also filed trust claims with

14  the companies that he was exposed to at Trane and elsewhere.

15  And so what he's asking to lift the stay to accomplish is so

16  that he has the opportunity to try to agree with Murray about

17  the value of his liquidated claim.

18         So he's not suggesting that he requires a jury

19  verdict, but what he is asking for is the opportunity to try to

20  negotiate on what the value of his specific claim is and what

21  he's trying to do is quantify the value of his claim.  It's my

22  understanding that this is commonly done in other bankruptcies

23  when you have a car accident case or a workers' compensation

24  case.

25         So I'm not asking you to allow whatever the amount of

1   money is to flow out of the estate.  You'll decide when to do

2   that, but to quantify it is incredibly important in this case

3   because Murray is a significant defendant in this proceeding.

4   A substantial amount of his exposure occurred there.   And

5   there's two ways that a claim can be quantified.  It can be

6   quantified by agreement, which I'm happy to try to do, but if

7   not, it can be quantified by a jury.  And so I'm asking you to

8   lift the stay so that I can add Murray to the case in

9   Philadelphia so that Murray can join the proceeding as well as

10  the strict liability defendants that he's already named and

11  they can proceed in one proceeding.

12        So the applicable case here is Robbins, obviously, its

13  three factors.  I think everyone agrees on Robbins.  We also

14  believe that Curtis applies.  We think that Curtis is a more

15  onerous standard and we meet those, that as well.

16        Robbins has three factors.  The first is whether

17  issues pending in litigation involve only state law.  So

18  expertise of the bankruptcy court is unnecessary.  Second

19  factor is whether issues pending in litigation involve -- I'm

20  sorry.  I copied and pasted No. 2 twice.  I've got to scroll

21  down so I get the second factor.

22        The second factor is whether modifying the stay will

23  promote judicial economy and whether there would be greater

24  inter, interference with the bankruptcy court if, case if the

25  stay were lifted, not lifted, because matters would have to be

1   litigated in the bankruptcy court and then the third factor

2   is --

3            THE COURT:  Whether the estate can be protected.

4            MR. THOMPSON:  Yes, yeah.  You're, you're more

5   familiar with Robbins than I am, obviously.

6            And so speaking to the first factor, just to kind of

7   give you an overview of what's happened here.  So Mr. Semian

8   was officially diagnosed with mesothelioma of the tunica

9   vaginalis in September of 2022.  He underwent what's called a

10  radical orchiectormy in the spring that removed one of his

11  testicles.  They did a biopsy on it.  It was sent out and

12  eventually, it came back as a confirmed diagnosis of

13  mesothelioma.  It's a rare form of mesothelioma.  It's only

14  caused by asbestos exposure.

15           So he filed the lawsuit in the Philadelphia Court of

16  Common Pleas against the other defendants, not Murray, in the

17  fall and what that means in Pennsylvania is that he will have

18  an early 2024 trial date.  And so I attached one of the dockets

19  to my reply brief that sets that out.  Essentially, it's two

20  years from the date you file your case.

21           And so if you were to lift the stay today and I added

22  Murray tomorrow, what would happen is they would be able to

23  hire counsel to litigate the claim.  They would be able to

24  retain experts.  I've sent them his deposition transcripts.

25  I've sent them his interrogatory answers.  I will send them all

1   the proof of claims that he filed in his, with the Trusts and

2   they would be an active participant in the proceeding.

3          As you know from the Robbins case, that was a

4   complicated marital dispute where Judge Wooten sent it out to

5   have that issue resolved in state court and then the matter of

6   allowance came back to bankruptcy.

7          So what's indisputed, what's undisputed here is that

8   he has mesothelioma.  What's undisputed here is that Old Trane

9   estimated that its total liabilities were $547 million, all in,

10  future and current, total.  New Trane, this year 2023, is going

11  to take $600 million and they're going to give it away to

12  equity.

13         So this is a full-pay case.  This is a non-distressed

14  debtor.  They can pay everybody in full and you've heard

15  repeatedly in this case and I've heard repeatedly in all these

16  cases that the funding agreement can be depended upon and the

17  funding agreement can be honored and, therefore, Murray with

18  the funding agreement should not be looked at any differently

19  in terms of paying Mr. Semian's claim or the prejudice to

20  anybody else because they have the same capacity to pay as New

21  Trane.

22         And this is outside the specific issue today, but what

23  the Third Circuit did in J&J was they took LTL at its word.

24  "You say you have a funding agreement.  You're worth at least

25  61 billion.  You can pay everybody in full.  You're not in

1   distress."  And so ultimately, there's not any distress to,

2   there's not any prejudice to anyone in this proceeding.

3   There's not prejudice to other claimants.  None of them have

4   objected to Mr. Semian's motion.  There's no, there's no

5   prejudice to the debtor or the affiliates because everyone can

6   be paid in full.

7          Mr. Semian has a complicated, unique state law claim.

8   So if the stay were lifted, he would proceed in strict

9   liability against the General Electrics and Westinghouses of

10  the world.  He's filed his trust claims and his remedy, as I

11  mentioned, is, is against Trane in, in negligence.

12         Significantly in 2020, there was a Pennsylvania case

13  called Roverano v. John Crane.  And so what Roverano decided

14  before the Pennsylvania Supreme Court was that if a plaintiff

15  goes to trial against five strict liability defendants and,

16  let's say, four trusts -- I'm sorry -- settles with five strict

17  liability defendants, settles with four trusts, and he goes to

18  trial against the tenth entity, what Roverano held was that the

19  jury, upon appropriate proof of exposure to those other

20  entities, the jury can assign liability to all the settled

21  defendants so that the trial defendant --

22         THE COURT:  Uh-huh (indicating an affirmative

23  response).

24         MR. THOMPSON:  -- can point to the other parties,

25  okay?  And so Roverano held that trusts, asbestos trusts can go

1    on the verdict sheet, assuming that they can show exposure and

2    that that was a cause of the disease.

3         And so that makes Mr. Semian's case particularly

4    complicated and involving significant issues of state law

5    because he has a negligence claim against Murray.  He's got

6    strict liability claims against General Electric and others and

7    then he's got trust claims.  And so those determinations,

8    candidly, about what's the interplay between the Tooey

9    defendant, which is what I'm would refer to as Murray --

10        THE COURT:  Uh-huh (indicating an affirmative

11   response).

12        MR. THOMPSON:  -- and the strict liability defendants

13   and candidly, that's not been assessed by Pennsylvania.  They

14   need to be the ones to decide that issue, if it goes to trial,

15   and if it has to be brought up on appeal, a Pennsylvania trial

16   court judge, Pennsylvania appellate court, Pennsylvania law.

17        And so in, in response to these complicated state

18   issues Murray says that, "Congress enacted 524(g) because it

19   contemplated having the bankruptcy court, not individual state

20   courts, address and facilitate the comprehensive resolution of

21   asbestos claims."  And they cite the legislative history.  The

22   legislative history of 524(g) supports Mr. Semian's position

23   because it uses words like "overwhelming liability" and

24   "subjecting itself to the jurisdiction of the bankruptcy

25   court," none of which apply here.

1        New Trane and Murray, together with the funding

2   agreement, are billionaires.  They're not entitled to 524(g).

3   It doesn't apply to them.  This Court has jurisdiction to

4   estimate for purposes of allowance under 11 U.S.C. 502(c), but

5   under 28 U.S.C. 157(b), you lack jurisdiction to liquidate

6   individual personal injury claims like Mr. Semian's.  If he

7   passes away, the same would apply to a wrongful death claim.

8   Mr. Semian does not consent to having others negotiate on his

9   behalf, including the Committee or as part of a group.

10  Essentially, what, what New Trane is attempting here is a mass

11  removal of state law claims, especially complicated ones like

12  Mr. Semian, into a single proceeding in federal court, but

13  using the bankruptcy process as a sword to minimize

14  Mr. Semian's ability to make, to be made whole instead of a

15  shield to protect against financial distress.

16       The second factor under Robbins is whether modifying

17  the stay will promote judicial economy.  If you lift the stay

18  and I add Murray, he's going to have one proceeding.  So that

19  proceeding's going to go forward either way.  So the judge is

20  going to have to work on that case.  The jury, if it comes to

21  that, is going to have to work on the case.  And I should back

22  up and explain a little bit what happens procedurally.

23       So we don't have a precise trial date for him yet.

24  That will be determined this summer, but based on prior

25  practice I anticipate it's going to be early 2024, first half.

1          THE COURT:  Right.

2          MR. THOMPSON:  Before summary judgment motions are

3    ruled upon in Philadelphia, there's mandatory mediation.  I

4    want Murray to participate in mandatory mediation.  What's

5    going to happen in mandatory mediation, if they're in it, is

6    that Murray's going to try to blame General Electric and

7    General Electric's going to blame Murray and they're both going

8    to blame Manville and that's fine, but it's going to be

9    mediated in one proceeding and 90 percent of the time those

10   cases resolve.  We represent a lot of plaintiffs in

11   Philadelphia with these Tooey claims.  If it doesn't resolve,

12   then summary judgment motions are ruled upon by the presiding

13   judge.  There's one judge that presides over all asbestos cases

14   in Philadelphia.  She rules on all summary judgment motions.

15   If the case doesn't settle in mediation, then whichever

16   defendants are denied summary judgment, which Murray will be

17   able to make.  Mr. Semian, because there, it's not a workers'

18   comp claim, he's got to meet the negligence factors.  He's got

19   to meet the Pennsylvania causation factors.  If he meets his

20   burden at summary judgment, summary judgment's denied.  If the

21   case doesn't resolve, then Judge Fletman, who's the judge in

22   charge of all the Philadelphia asbestos cases, will send the

23   case out to be, you know, in this parlance, liquidated before a

24   jury and if the jury says that the liability is zero, then it's

25   zero and we've eliminated a claim.  If the jury says it's ten

1  million or if it says, whatever the number is, whatever the

2  quantification is, it won't be paid from the estate until you

3  allow it.  And it's, it's critically important to him and my

4  other clients if they at least know that their case is

5  resolved.  Even if it's not actually paid, he wants to know

6  that his wife is taken care of.  If you deny -- and -- and --

7  but in any event, it's one case.  If you deny the motion to

8  lift stay, I'm going to move to liquidate his claim against

9  Murray in the United States District Court.  I think it's

10 unclear where that trial would take place.  It would be before

11 a jury.  It would either be, I suspect, in this District, which

12 is where we're going to file the motion, or it would be in the

13 Eastern District of Pennsylvania.  But in any event, we got two

14 cases, instead of one.

15        The debtor notes at, at Paragraph 13 of its opposition

16 "Mr. Semian will need to prove his case in state court, anyway,

17 against the named defendants if and when he ever gets to trial,

18 which appears to be a significant time away."  Right, exactly.

19 He's got to prove his case against all the defendants and I

20 want to add Trane so I don't have to do it twice and that he

21 doesn't have to do it twice.

22        Some of their concerns are there's going to be a tidal

23 wave or a spate of, you know, if, if you lift the stay for

24 Mr. Semian, who's got a unique case, there's going to be

25 thousands of, of requests and I think that is purely

1  speculation.  This is the first request in any of these North

2  Carolina bankruptcy cases, first one, and I think there were

3  four or five in LTL Management and you recall the Vanklive

4  case, probably, when you had the case before you.  That was a

5  completely different situation where you were, you were

6  transferring the case to New Jersey and you were extending the

7  injunction to J&J for thousands of plaintiffs and you weren't

8  keeping the case.  Here, you're keeping the case.  This case

9  isn't going anywhere.  You're going to control allowance and

10  you're going to also be able to, to let him liquidate it.

11       The FCR, I'm surprised, has an opposition.  It doesn't

12  affect future claimants because all of them can be paid in

13  full.  Interestingly, the FCR cites a Law Review article by

14  Mark Behrens, who I'm sure is a nice enough guy, but he and I

15  view the world a little differently.  But the article that's

16  cited was advocating for disclosure of trust claims before the

17  trial date in the tort system, which is exactly what's happened

18  here.  Murray's entitled to point to all the other shares in

19  this case and I want to do that in one proceeding.

20       The FCR cited Federal-Mogul in 2012.  Federal-Mogul

21  did cover in detail all of the intractable pathologies of

22  asbestos litigation.  It went through all the history that I

23  went through in my motion and I won't bore you with now, but

24  they also concluded that Congress has to decide if anything is

25  to be done with asbestos litigation.  524(g) is not 28 U.S.C.

1  524(g).  It's not available to billionaires.  If companies are

2  in financial distress and overwhelmed by asbestos liabilities,

3  that's where you get 11:524(g) and neither Ortiz nor Federal-

4  Mogul, and as recently as J&J, Panel of 11 judges declined

5  rehearing because they're not in financial distress.  You have

6  to be in financial distress to invoke 524(g) and they, and

7  Murray and the FCR seem to act like it's a menu choice.

8  Tortfeasors with billions of dollars can just decide "We'd

9  rather pay less.  So we'd rather litigate in bankruptcy court

10  and stop and stay everyone's cases from proceeding."

11          Curtis, I'll cover briefly.  The movants sought relief

12  from stay -- that's a Utah District Court case that's been

13  cited as persuasive authority by bankruptcy courts in this

14  District and others.  We think that -- I'll, I'll cover the

15  Curtis factors that I think are most relevant:

16          1.  Whether relief will result in a partial or

17  complete resolution of issues.  It will result in relief of all

18  issues.

19          No interference with the bankruptcy case.  It will not

20  interfere with the bankruptcy case.  Murray's going to hire

21  different lawyers.  Murray's well represented.  They've got 30

22  lawyers on this case.  They got the Trane affiliates that are,

23  obviously, well represented.  What Murray's going to do

24  tomorrow, if you lift the stay, is they're going to call

25  Marshall Dennehey in Philadelphia, who represented Trane for

1    decades, and who's already involved in his case.  Marshall

2    Dennehey's already got lawyers representing other defendants in

3    Mr. Semian's case.  It's going to be different lawyers,

4    completely unaffecting this proceeding.  And again, there's no

5    burden to pay those lawyers because they can pay everybody in

6    full.  They're not in financial distress.  They're giving away

7    $600 million a year.

8         Whether a specialized tribunal has been established to

9    hear the particular cause of action.  That's the Philadelphia

10   Court of Common Pleas.  Thousands of cases are, have been filed

11   in Philadelphia and thousands have been resolved.  It's

12   specifically set up.  Pennsylvania, essentially, has divided

13   itself in two.  Pennsylvania has a well-established history of

14   asbestos litigation.  They have two large asbestos dockets, one

15   in Pittsburgh, one in Philadelphia.  Mr. Semian lives in

16   Scranton.  He was exposed near Scranton.  He filed the case in

17   Philadelphia.  There's a process for this case to be processed

18   efficiently.

19        Whether -- bankruptcy courts and federal courts are of

20   limited jurisdiction.

21        Whether litigation -- No. 7 is whether litigation in

22   another forum would prejudice the interests of other creditors

23   and the answer is no.  The ACC doesn't oppose this request.  No

24   other creditor opposes this request other than the FCR.  And

25   again, liquidating, quantifying Mr. Semian's claim does not

45

1   reduce what's available to pay everybody else.  Doesn't.

2   Merely quantifies what is owed to him specifically and he

3   cannot do worse in a chapter 11 reorganization than he can do

4   in a chapter 7 liquidation and he's entitled to know what he's

5   owed in a liquidation before he can vote on a plan.

6          Judicial economy, we've referenced that.

7          Whether the foreign proceeding has progressed to the

8   point where the parties are prepared for trial.  So if I was

9   bringing this motion in December, what I'd hear from Murray is,

10  "It's too late," you know.  "Your case is in two months,"

11  right?  So I'm moving, I'm doing it now because if they get

12  added now, it's March.  The trial is likely in April of next

13  year.  They got plenty of time to hire their experts, to review

14  the medicals, to digest all the information.  That's why I'm

15  moving for this now.

16         No. 12, the impact on the stay on the parties and the

17  "balance of hurt."  Mr. Semian has a constitutional right under

18  the Seventh Amendment to a jury determination of his claims.

19  He has a right under the Pennsylvania Constitution to a jury

20  determination of his claims, especially under Pennsylvania law.

21  He has a Pennsylvania-based claim against Murray that's unique

22  and only available.  He's entitled to have uncapped damages

23  against a non-distressed billionaire defendant.  So ultimately,

24  when you're balancing the harms, we have a debtor who wants to

25  overcome the tort system without the obligations of a

1   bankruptcy filing, which is what Jones Day's partner said at

2   the ABI Conference, who gives away 600 million to shareholders

3   or Mr. Semian, whose case can be quantified and paid in full

4   when you decide it to be paid and all he's asking is the

5   opportunity to try to agree to the quantification of his claim.

6          And with that, I'll sit down.

7          Thank you, your Honor.

8          THE COURT:  All right.

9          Mr. Rayburn?

10         MR. RAYBURN:  Good morning, your Honor.  Rick Rayburn

11  for the debtors in connection with the motion for relief from

12  stay filed by the Semian Parties.

13         First, your Honor, let me make clear.  This is not

14  just the motion for relief from stay.  It is, in part, a motion

15  for relief from stay.  The first part is to prosecute a claim

16  against the debtor, Murray, which you heard a lot about from

17  learned counsel on the other table.  It is also a motion to

18  prosecute a successor liability claim against Trane and a

19  motion, in addition, buried within it, is a motion to dissolve

20  the preliminary injunction prohibiting the claim against New

21  Trane as a protected party.  You haven't heard anything about

22  that.

23         The claim against New Trane has been assigned to the

24  ACC.  It's a successor liability claim.  Derivative standing

25  has been granted to the ACC.  The claim is being prosecuted.

1    The plaintiff cannot go forward on that claim for multiple

2    reasons, including the injunction.

3         The motion to dissolve is not supported by any unique

4    facts.   Now we've heard all kinds of arguments today about the

5    uniqueness of the claim, but in a motion to dissolve an

6    injunction what matters is changed circumstances in this case

7    that would justify dissolving the injunction.   We'll talk about

8    the legal standard in a moment.   And there is no attack in the

9    plaintiff's papers, nor should there be, in, on this Court's

10   order, Findings of Fact, Conclusions of Law on the PI Order.

11   Those stand and they are recited in our response for what they

12   are and what they mean about the fate of having multiple claims

13   prosecuted by individual claimants.

14        The standard for granting relief from a preliminary

15   injunction in the Fourth Circuit is a common-sense standard. It

16   is -- back in 1995 in a case none of us cite, it's a non, non-

17   reported decision called Multi-Channel TV Cable Company v.

18   Charlottesville Quality Cable Operating Company -- it's 1995

19   U.S. Appeal LEXIS 16798 (July 15, 1995) -- where it adopted,

20   uh-oh, a Third Circuit decision for the standard for modifying

21   a preliminary injunction from a case called Favia v. Indiana

22   University of Pennsylvania, which is 7 F.3d 332 (3rd Cir.

23   1993), and has recently been picked up by a case from the

24   District of Maryland in 2020 at 505 F. Supp. 3d 328.   That case

25   is the American College of Obstetricians and Gynecologists v.

1   <u>United States Food & Drug Administration</u>.

2          Now this, perhaps, this is much about, ado about

3   nothing, but the precise standard for relief from an existing

4   preliminary injunction is a change in circumstances that makes

5   the original injunction inequitable under the circumstances.

6   Well, the changes that the movant seeks to argue to you are

7   changes in the law of cases developed in other circuits and

8   originally, the citation to the <u>3M</u> case, the developments

9   there, and then in the reply, which we heard a lot about in

10  opening argument here, the new-found imposition of a test of

11  financial distress as a precondition to the granting of the

12  ability to create a chapter 11 case.  Well, this chapter 11

13  case is in the Fourth Circuit.  It is not subject to the

14  distress test yet.  The Supreme Court, we don't know whether

15  the Supreme Court will take *cert* in <u>LTL</u>.  We have no idea.

16         But as the law stands in this Circuit, what's

17  happening in the circumstances of this case are there's a plan

18  on the table.  There's a plan on the table put forward by the

19  FCR.  There's a plan on the table in which the plaintiffs are

20  going, the, the debtor and the FCR are moving the case as fast

21  as we can move it.  We are in estimation trying to get to

22  resolution and the, the, the hard thing to say here is we don't

23  know whether we can get to a 524(g) plan and pay this plaintiff

24  pursuant to a trust before he can ever recover in Pennsylvania.

25  We don't know the answer to that question.  We don't -- you can

1    predict whether we're going to have a confirmation before next

2    April when he would try his case, but, you know, there, as he

3    points out, there are multiple defendants and any number of

4    appeals that could be filed, etc., etc.

5           So we really don't know on the facts that are pled

6    whether the plaintiff is going to actually achieve payment of,

7    more rapidly, if he liquidates his claim in the Pennsylvania

8    case than if he liquidates it here.

9           So what's left, really, after looking at what's pled

10   is a motion for relief from stay under 362(d) for cause, which

11   is what has been argued here today.  As opposing counsel

12   pointed out, it's not A. H. Robins, which is miscited in some

13   brief.  It's the Harry Robbins case, which involved, as he

14   said, a dispute over the valuation of stock of Tweetsie

15   Railroad in connection with a Harry and Revalle divorce many

16   years ago in this Court in front of Judge Wooten and the test

17   that was developed there was the three-prong test that we still

18   apply here for relief from stay for cause.

19          And that test starts off, is, is there a need for

20   bankruptcy expertise?  As we say in our, as we say in our

21   papers, absolutely.  This is an estimation matter.  It, we do

22   not need a jury verdict in order to determine how much

23   liability the debtor has if, in fact, we can pay in full trust

24   claims pursuant to a negotiated settlement and presumably, a

25   negotiated plan.

1          The, the second question was judicial economy and I

2    cannot, I will give credit to the other side for their argument

3    that there's somehow judicial economy achieved by turning loose

4    their plaintiff to go try his case in, in the Court of Common

5    Pleas against 21, 22, 23 defendants -- I can't tell for sure --

6    if you include the trust claimants in his papers.  But we say

7    and the key judicial economy issue is the barndoor problem,

8    that if, if the Court were to grant relief from stay for this

9    claimant -- and he has done an excellent job today of trying to

10   argue the uniqueness of his claim -- he is, in fact, a claimant

11   with multiple tort defendants who he is suing from whom he can

12   recover without any restraint from this Court who, from whom he

13   can recover 20 plus shares of the liability and be paid without

14   any further work from this Court as opposed to what would

15   clearly happen here, that is, if you granted relief from stay

16   for one plaintiff to go forward, you can expect that the next

17   time we have an omnibus hearing you'll be hearing 20, 30, 40,

18   50 relief from stay motions.  We don't know, but it's not

19   speculation.  It happened in LTL.  I mean, as opposing counsel

20   already talked about, plaintiffs' firms were very quick in LTL

21   to move for relief from stay for, for cases and granting relief

22   from stay for one defendant here, one plaintiff here, looks, to

23   us, as if it would, in fact, destroy the judicial economy we've

24   achieved by having them all before you in an estimation

25   proceeding.

1           And then finally, whether the estate can be protected,

2    as you noted, in the third statement.  I'm not so, I'm not

3    sure.  How's the estate supposed to be protected against having

4    to defend and also having to defend in a context where the

5    plaintiff is seeking to liquidate his claim against New Trane,

6    which, of course, in liquidating an estate claim which is

7    already being litigated.

8           The Curtis factors, we responded in our papers, we

9    agree.  The Curtis factors are more stringent, we think, than

10   the three factors here.  We covered them in the brief.  I won't

11   repeat the brief.  I do want to make clear that the, the

12   plaintiff in this case has filed -- and the record is clear as

13   opposing counsel has argued -- that the plaintiff has

14   identified 17 sources of exposure in his Exhibit B.  In his

15   motion to add plaintiffs, he's up somewhere in the low 20s, as

16   he's articulated, if he goes forward in Pennsylvania.  It

17   sounds to me like he's going to have one empty chair out of 20,

18   somewhere between 20 and 25 chairs.  That doesn't result, that

19   doesn't create the kind of inequity that would cause the Court

20   to turn around and undo its preliminary injunction on the one

21   hand.  And secondly, it doesn't contemplate any "cause" that

22   would give rise to granting this plaintiff relief from stay.

23          If you have no further questions, I will, blessingly,

24   sit down.

25          THE COURT:  Okay.

1          Were there any other responses to this motion?

2          Mr. Guy.

3          MR. GUY:  Yes, your Honor.  Your Honor, Jonathan Guy

4    for the FCR.

5          Your Honor, Mr. Semian is an asbestos creditor and as

6    the movant told you, he's asking the Court to lift the stay to

7    liquidate, not pay, his claim in the Court of Common Pleas in

8    2024, maybe later, but that's the earliest date.  And the

9    reason why he wants that is he wants to avoid the harm of

10   waiting on the creation of an asbestos trust and he's very

11   candid about that.  Doesn't want to wait.

12         The movant's lawyers are from the Maune Raichle firm.

13   I just want to put up this chart that's been seen before.  The

14   Maune Raichle firm represents a creditor on the ACC in this

15   case.  They represent, as counsel said, I think 37 or 47

16   creditors in this case, asbestos creditors.  They also

17   represent the Asbestos Creditors' Committee in the DBMP case, a

18   creditor on the Committee, and they represent a creditor on the

19   Committee in Bestwall.  And critically, your Honor -- and this

20   is why I put the chart up that's been before you before -- is

21   they also represent a creditor on the Paddock case.  It won't

22   be lost on the Court and it isn't lost on the FCR that asbestos

23   creditors like Mr. Semian in Paddock -- and he may well have a

24   claim there, given what we heard about his exposure to

25   insulation products.  And you'll remember, your Honor, that

1  Paddock's asbestos liabilities arise from O-I Glass and they

2  made a very dirty, dusty product --

3          THE COURT:  Uh-huh (indicating an affirmative

4  response).

5          MR. GUY:  -- friable product -- he may well have a

6  claim there, given his work history.  Be able to get, to

7  liquidate his claim in that case and get paid on his claim in

8  that case this year.  Why?  Because that case has a fully

9  funded asbestos trust with $610 million approved by the ACC on

10  which the Maune Raichle firm sat.

11          Remember, also, your Honor, that that $610 million

12  came after a divisive merger, substantially identical to the

13  divisive merger that led to this case and the Bestwall cases

14  and the DBMP cases.  O-I Glass, your Honor, is the ultimate

15  parent of Paddock.  It's a publicly traded company.  In the

16  words of movant's counsel, it is a "non-distressed billionaire

17  defendant."  Its market cap as of yesterday was $3.39 billion

18  and that's after its contribution to the asbestos trust.  That

19  is a "non-distressed billionaire defendant."  You can tell I'm

20  frustrated, your Honor, and I know you know why.

21          The ACC there on which the Maune Raichle firm sat had

22  no problem with divisive mergers, a'tall.  No problem with non-

23  distressed billionaire debtors addressing their asbestos

24  liabilities in bankruptcy quickly, promptly, and fairly.  There

25  is no substantive difference between this case and the Paddock

1    case except for the fact that O-I Glass made a really dirty,

2    dusty, horrible product that had really toxic asbestos in it.

3            In this case, your Honor, there's only one party

4    that's standing away from a much better result in this case

5    than occurred in Paddock and I say a much better result because

6    we have $545 million on the table for an encapsulated product,

7    which is more than the Court and the ACC approved in Garlock

8    years ago.  The only party that's standing in the way of that

9    is the ACC on which the Maune Raichle firm sits.

10           Your Honor, the ACC -- movant said no creditor has

11   opposed it.  He did add the FCR, thankfully for that, but in

12   his papers he said no paper, no creditor has opposed it.  The

13   largest creditor constituency opposes it by many, many

14   multiples.  No creditor supports it, not one.  The silence from

15   the ACC is fairly informative.  The ACC, like the FCR, is

16   charged with protecting the class of people who've been

17   diagnosed with claims, the class, not individual claimants like

18   Mr. Semian, and ensuring that the class is treated fairly and

19   equally and paid promptly and that's, I think, why they don't

20   support this motion.  I applaud them for that.  I would have

21   liked them to have opposed it, but silence is better than

22   nothing.

23           Your Honor, I want to turn to the papers on the lift

24   stay motion and address some, how can I say, inaccuracies.

25           Your Honor, the movant says no twostep has ever

1    resulted in a confirmed plan.  It is true no Texas twostep has,

2    but a Delaware twostep has, <u>Paddock</u>, of course.  That, too, was

3    a divisive merger.  That, too, concerned a non-distressed

4    billionaire, solvent parent company.

5          Movant says companies with asbestos liabilities only

6    file for bankruptcy or should only be allowed to file for

7    bankruptcy when they've effectively run out of money.

8    That's -- I'm paraphrasing, of course, your Honor.  That's not

9    true.  This Court knows that.  Garlock and Coltec, Coltec

10   wasn't running out of money.  There was an asbestos trust

11   created to pay those claims and that asbestos trust has worked

12   exactly as -- as in -- was intended to.  Claims are being paid

13   and the payment percentages actually doubled since it was

14   created.

15         The movant says there's no plan on file.  That's not

16   true.  The debtors filed a plan back in 9/24/21.  It's modeled

17   on the same plan that the ACC and this Court approved in

18   <u>Garlock</u>.  The main difference is there's more money on the

19   table, but we get no assistance from the ACC.  We don't even

20   know what they think the right number is after three years.

21   Three years, and we still don't have a number from the ACC.

22         Movant says standard TDPs don't protect jury trial

23   rights.

24         Put it up.

25         What I'm going to put on the screen, your Honor, is a

1   section of the Paddock TDP, which the ACC agreed to and

2   approved in Paddock, and Maune Raichle sat on that ACC.

3   There's the language, your Honor.  It says, and this is very

4   standard language and it is designed to protect jury trial

5   rights.  I don't need to read it to, into the record, your

6   Honor, but you have it there.

7         But the bottom line is it allows any claimant who is

8   unhappy with the liquidation of his claim in the trust to go

9   back to the tort system.  If Mr. Semian has a claim in Paddock,

10  he's going to file it against the trust and he, like -- he may

11  well have one -- he'll file it against the trust.  The class

12  will, trust will process it the same as everybody else.  He'll

13  be treated the same as everybody else.  And I concur with

14  counsel for the movant, that his case is an unusual one.  There

15  aren't so many of these workers' comp claims that can go

16  forward outside of workers' comp.  If he wants extraordinary

17  claims review, he can ask for it.  If he's unhappy with that,

18  then he can go through a jury trial.  He has those rights.  The

19  only reason that isn't happening in this case -- the plan was

20  filed in 2021.  It could have been confirmed in '22 -- it's the

21  ACC and the law firms that control it who are preventing that

22  from happening.

23        The movant says the stay should be lifted because the

24  claim doesn't want to be, claimant doesn't want to be harmed by

25  waiting for the creation the asbestos trust.  As I've said,

1  your Honor, if we had gone the same path as <u>Paddock</u>, we would

2  already be done by now.  It's noteworthy that Mr. Semian

3  doesn't want to go to the asbestos trust route, even though he

4  does, doesn't even know what his recovery would be.  So

5  logically, the only reason he wants to liquidate his claim now

6  is because he thinks he will get more, liquidated at a higher

7  value, jumping the queue for everybody else.  I have a real

8  problem reconciling that with the fact that the same law firm

9  that is representing Mr. Semian is representing a creditor on

10  the Asbestos Creditors' Committee who has a fiduciary duty to

11  ensure that everybody in that class is treated the same, fairly

12  and equally.

13         Your Honor, I want to note with all the clamor about

14  jury trial rights and the whole history of Aldrich and Murray,

15  as far as I know -- and Mr. Evert can correct me -- there's

16  been one claim that went to trial, one out of tens of

17  thousands.  And that's the -- all the others settled and that's

18  exactly what an asbestos trust provides.  It provides offers of

19  settlement and if claimants are unhappy with it, they can go to

20  trial preserving their jury trial rights.

21         Your Honor, I, I would say the movant, I think, may be

22  confused about who the defendant is because as I understand it,

23  Murray stopped making asbestos blankets for their boilers in

24  the fifties.  So maybe he thinks -- maybe it should be Aldrich.

25  I don't know.  I just throw that out as a gift.

1      The movant says 524(g) doesn't apply to current

2  plaintiffs.  That's actually in the papers.  That

3  misunderstands the Bankruptcy Code.  Of course it applies to

4  current plaintiffs and there's 60 asbestos cases that have been

5  confirmed that have asbestos trusts that channel the claims of

6  current claimants to those trusts.  Of course it applies to

7  current claimants.  If, if it doesn't, that's good because then

8  I get to vote.

9      Your Honor says that allowing him, the movant says

10  that allowing him to pursue his claims will effectuate judicial

11  economy.  Aside from the clear risk of disparate treatment,

12  your Honor, the only way granting relief from the stay would

13  effectuate judicial economy would be if no other case followed

14  this one.  If the movant could guarantee that, okay, but

15  obviously, he can't.

16      The movant says the plaintiff will never vote for, for

17  a billionaire defendant if they're forced to negotiate in a

18  group without first liquidating their claims before a jury.

19  Well, that's curious because that's exactly what the Maune

20  Raichle creditors voted for in Paddock, exactly that.

21      Movant says, rather colorfully, that 524(g) is not a

22  menu choice for non-distressed billionaire tortfeasors.

23  There's nothing in the Bankruptcy Code that talks about

24  solvency before you file for bankruptcy and there's nothing in

25  542(g) that talks about that, nothing.  I'm a big, plain

1    language fan and I did read the Third Circuit ruling, your

2    Honor.  What was curious about that is it didn't talk about

3    524(g) a'tall, even though it was a 524(g) case.  But

4    regardless, the movant makes no attempt to distinguish O-I

5    Glass from what it considers to be the billionaire, non-

6    distressed tortfeasors in North Carolina.

7           Your Honor, we talk about the fact that, obviously,

8    creditors do oppose the motion, even though in their papers

9    they said none did.  Then it, movant says -- and we get into

10   the FCR now.  You -- I'm sure you read the reply.  I read it

11   closely, little surprised.  It says "no authority for the FCR

12   to bind future claimants in a full-pay case."  Well, Jim

13   Patton, who was the FCR in Paddock, a gentleman that we have a

14   great deal of respect for, did exactly that and the Maune

15   Raichle firm signed off on it.

16          Says the 524(g) only exists for companies who are

17   insolvent and that's a good thing for futures.  I want to focus

18   on that, your Honor, because there seems to be a misconception

19   about what's good for the futures and I feel that the FCR is

20   the best person to talk about what's good for the futures.

21          As the Supreme Court has noted, your Honor, current

22   plaintiffs, like Mr. Semian, want to be paid as much as

23   possible, as quickly as possible, and that tugs against the

24   interests of future claimants who want to be paid no less.  So

25   the plaintiffs' firms are saying, you know, "We have to wait

1    until you run out of money before you file for bankruptcy."

2    The result of that is a guaranteed disparate treatment for

3    future claimants.  They're looking at a much smaller corpus and

4    they're okay with that because that's consistent with their own

5    economic incentive.  It's not consistent with the FCR's.  Our,

6    we want our clients, the people we have a fiduciary duty to, to

7    be paid the same.  We don't want a limited cash pool.  We want

8    solvent companies to address their problems in bankruptcy and

9    create a fully funded trust because that's the only way you can

10   guarantee the futures are getting paid the same and everybody's

11   going to be treated equally under the procedures that do just

12   that.  If you wait until they run out of cash, the futures get

13   a very sharp end of the stick, your Honor, and it's worse than

14   that, worse than that.

15          You'll remember the number of times the FCR had said

16   to you, "Look what happens to these trusts when they're

17   created.  Look where the money goes.  Look how it gets sucked

18   out in the first two years to the current claimants and then

19   the futures are left holding the bag," over and over and over.

20   The majority of trusts end up lowering their payment

21   percentages.  So not only do they have a limited corpus, they

22   get the, the bag at the end of it.  Many of them run out of

23   money completely, your Honor.  You've heard me talk about the

24   THAN case.  That's a posterchild for how not to create an

25   asbestos trust.  Garlock is an exception.  Thank you, your

1   Honor.  That one works.

2           THE COURT:  Thought you'd like that one.

3           MR. GUY:  Your Honor, not only is it a problem waiting

4   till the companies run out of money and try to achieve the

5   policy objectives of 524(g), which is to treat everybody the

6   same, and fairly, not only is that, but in the tort system it's

7   not fair, either.  You saw in our filings way back in '21, your

8   Honor, and I'm not going to get into the details of

9   individuals, but I can tell you from the settlement database of

10  the debtors you have one lung cancer claimant and gets hundreds

11  of dollars, same job, could even be the same state, and another

12  one who gets hundreds of thousands.  You have the same massive

13  difference with meso claimants, hundreds, up to millions, and

14  those are people who have the same diseases, many who had the

15  exact same jobs, many of whom are the same age, and the

16  difference depends on your lawyer.  Mr. Semian's got a great

17  lawyer and I applaud him for fighting for his client.  I really

18  do, but its inconsistent with the interests of the class of

19  creditors in this case and what we're trying to achieve in this

20  case.  And there's a remedy for his client.  Tell his

21  colleagues on the ACC, "Do a deal."  He's laughing, but it's

22  not funny for the people who aren't getting paid.

23          Your Honor, the movant also threw out a number of

24  remarks about the ACC, about his, the FCR's opinion not

25  mattering.  Obviously it does, that he's not zealously

1    protecting the rights of future claimants.  Well, I think your

2    Honor will be the judge of that.  And is -- this is the doozey

3    -- "only advancing the agenda of the Chamber of Commerce,"

4    whatever agenda that might be.  I'm not going to respond to

5    that, your Honor.  We've been before you many times, as has the

6    FCR.

7         The bottom line is the FCR, alone, negotiated a plan

8    for futures and creditors, all creditors in this case, with the

9    debtors, alone.  We invited the ACC.  They chose not to

10   participate in those discussions.  That plan compared very

11   favorable to the same plan that was approved by Judge

12   Silverstein in _Paddock_, approved by the ACC in _Paddock_ on which

13   the Maune Raichle firm sits.  It's a better plan than that plan

14   because it concerns a very, very different product.

15        Your Honor, as you know, a mediation order's been

16   entered and you heard the update from Mr. Erens about we're

17   going to have initial conversations.  To get Mr. Semian the

18   relief he wants, the ACC needs to come to the table and

19   negotiate a confirmable plan.  That will get him the relief he

20   wants.

21        Thank you, your Honor.

22        THE COURT:  Thank you.

23        Who else did we have?

24        MR. MASCITTI:  Your Honor, just briefly.  The Non-

25   Debtor Affiliates join the opposition to the motion --

```
 1              THE COURT:  Right.

 2              MR. MASCITTI:  -- on the grounds stated on the record.

 3              THE COURT:  Okay.

 4              MS. RAMSEY:  Your Honor, thank you.  Natalie Ramsey

 5   for the Committee.

 6              Your Honor, I hadn't intended to speak, but I think

 7   that I feel compelled to just for the record state that the

 8   Committee disagrees with many, maybe most, of the arguments

 9   made today by FCR counsel.

10              We disagree with the characterization of the Paddock

11   case.

12              We disagree with many of the statements that were made

13   about the plan.

14              THE COURT:  Uh-huh (indicating an affirmative

15   response).

16              MS. RAMSEY:  We disagree that the FCR can vote on a

17   plan.

18              We disagree about the interpretation and proper use of

19   Section 524(g) of the Code.  The Court may recall with respect

20   to the plan that the Committee had specifically asked in

21   connection with the debtors' motion for estimation that the

22   estimation be held within the context of a plan process so that

23   the other objections that we have to the plan could be raised

24   at the same time.  So we have not attempted to stand in the way

25   of, of addressing that plan.
```

1          We disagree with the proposition that there is any

2   record support that Aldrich or Murray are at a financial risk

3   of not being able to pay timely and fully all of their asbestos

4   claimants.

5          We disagree that the Garlock Trust has worked in the

6   perspective of the claimants against that trust.

7          We disagree that the FCR speaks for the best interests

8   of the current claimants.

9          And finally, your Honor, I will add that the Committee

10  does not oppose Mr. Semian's motion, which is a motion that is

11  specifically the proper procedure for individual claimants to

12  bring their individual requests before this Court.

13         Thank you.

14         THE COURT:  Okay.

15         Reply?

16         MR. THOMPSON:  Yeah.

17         So the suggestion that the Fourth Circuit does not

18  have a financial distress requirement is not true.  Both the

19  Carolin and Premier Automotive cases make clear that financial

20  distress is the starting point for any analysis.  Carolin,

21  quoting Coastal Cable, specifically states that the entire

22  purpose of objective futility is to ensure that the petition

23  furthers the purpose of the Code which is the resuscitation of

24  a financially troubled debtor, which is not this case.

25         Financial distress.  There's no financial distress and

1   the argument that's being made by Murray is you don't need to

2   be in financial distress to file for bankruptcy.  The Third

3   Circuit didn't reach 524(g) 'cause it didn't need to.

4   Company's not in distress.  Before you get to 524(g), you got

5   to be in chapter 11 and to be in chapter 11 you got to be in

6   financial distress.

7          The policy arguments that Mr. Guy makes were made 20

8   years ago and they failed in Congress.  Justice Rehnquist

9   invited Congress to pass laws in the Ortiz case.  Congress -- I

10  briefed all this.  I don't need to regurgitate it.  I know you

11  read everything.

12         THE COURT:  Uh-huh (indicating an affirmative

13  response).

14         MR. THOMPSON:  But these are policy arguments that

15  failed and to suggest that Mr. Semian -- Mr. Semian cannot

16  control thousands of other claimants.  Mr. Semian was not on

17  Paddock.  My law firm may have had a client on Paddock, but

18  Mr. Semian was not on Paddock, who, by the way, did not seek a

19  preliminary injunction and hasn't made an asbestos product

20  since 1958.  Mr. Semian's remedy here is to quantify his claim

21  and you can, you control the barn door.  And so what it seems

22  to be is that I'm supposed to get Mr. Semian to convince all

23  other claimants to not file motions to lift the stay so I can

24  guarantee this will be the only one, you know.  That's

25  ridiculous.  And/or to go and lean on everybody else to agree

1  to a plan.

2        And so the problem here in all these two-step cases is

3  that they, they require, New Trane and Murray acting in

4  concert, and will only accept a global resolution.  Your Honor

5  spoke to this last March about, you know, I recall it was after

6  the, Judge Kaplan's <u>LTL</u> ruling and you had said there's going

7  to be appeals in all these cases.  Is this one that we can't

8  work out, meaning, meaning Aldrich.

9        THE COURT:  This case, uh-huh.

10       MR. THOMPSON:  You recall, you recall saying that.

11       And I appreciate you saying that and I, I relate to

12  that and I, as, as the FCR noted, most of these cases in the

13  tort system settle before the -- and that's all we're trying to

14  do, is the opportunity to quantify his claim.  The problem is

15  and the reason why there's not a settlement is because Murray

16  and New Trane require and will only accept a global resolution

17  that caps damages and bars access or limits access to the tort

18  system.  The plan that's proposed does not provide for optouts.

19  Therefore, it's unconstitutional.

20       So Mr. Semian is not going to negotiate with his hands

21  behind his back or going to go try and argue with other

22  claimants about, "Let's vote for a plan that caps our state

23  remedies."  That's not what he needs to do.  He has a right to

24  a jury trial and we ask you to lift the stay.

25       Thank you.

1          THE COURT:  All right.

2          That got it?

3          It will not, probably, surprise anyone that I feel

4    compelled to deny the motion basically for the reasons stated

5    by the debtor and, and the FCR, if not going back to the

6    preliminary injunction and the reasons I stated then.  I have

7    no doubt, I don't think anyone could have any reasonable doubt

8    that if I grant relief from stay to one creditor to liquidate

9    the claim, all of the claimants will -- not all -- but a

10   substantial number of the claimants, enough to wreck the

11   bankruptcy case, will seek like measure and that effectively

12   precipitates a *de facto* dismissal of the case.  It will be

13   unable to go forward and even more so than at the time of the

14   preliminary injunction, now we've got some of these claims that

15   are estate claims under the first-crack doctrine that would be

16   asserted by individual claimants elsewhere as against New Trane

17   and the new entities, the "good" companies, if you will, and

18   it's even stronger in this case because now I have the ACC

19   bringing those causes of action.  And so we would be

20   undermining our own lawsuits if we did that.

21         I don't think anything's really changed.  I'm

22   appreciative of the fact that, that the underlying claim here

23   may be somewhat different than the norm, but the circumstance

24   of the case and the relationship of the claimants to the

25   reorganization has not changed in any material way.

1          So rather than belabor this and go through all the

2     points, I go back to the Findings of Fact and Conclusions of

3     Law that were entered, I guess, August 23rd of '21 and

4     particularly picking up around the last third of the, of the

5     ruling, Pages 56 and on, both with regard to relief from stay

6     and with regard to the preliminary injunction.  I don't think

7     anything has, has changed in that scenario.

8          I am appreciative of what the Third Circuit has said.

9     Frankly, I kind of hoped that would address head-on the

10    question of the twostep for whatever information that might

11    provide all of us.  Perhaps, if *cert's* granted, the Supreme

12    Court will talk about those issues as well as what we have.

13    But the reality is this, if, if I were, in fact, the Wizard of

14    Oz and had the ability to decide all things for you, we would

15    have long ago decided on the propriety of the, of the twostep,

16    but we're trying to get there and we're going through the

17    procedural mechanisms that would take us there.  If there were

18    some way to do a grand motion *in limine* to decide if you're

19    going to use 524(g), how much of your entity you have to bring

20    in, and how much pre-bankruptcy planning you can do to get

21    there, that would be swell.

22         But the reality is I think the Fourth Circuit ruling

23    in Carolin, even with Premier following it, has not really

24    changed.  The balance has been struck in this Circuit against

25    dismissals of cases early on until the cases play out.  That

1  was a policy choice that was made there.  We have the, the fact

2  that what we're doing here and even now -- and once we did at

3  the time of the original preliminary injunction hearing -- what

4  we're effectively doing is indirectly seeking a dismissal of

5  the case without addressing those matters head-on.

6         I have not had a motion to dismiss filed in these

7  cases.  I'm not encouraging that, but as I opined before,

8  there's a good reason to think that they would be unsuccessful

9  given where the Circuit is on this.  Hopefully, in Bestwall

10  some of these issues will be taken up sooner rather than later

11  and we'll get some answers.

12         But in the meantime, I think I have to, if I'm going

13  to maintain the case and I feel I'm obliged to do so at

14  present, then I have to keep the stay in effect for the

15  claimants.  I am very sympathetic and I share a lot of

16  Mr. Guy's feelings, frustration here.  I wonder if we got all

17  the claimants or their representatives in a room whether they'd

18  feel quite as strongly about the principles, but I do

19  understand the law firms and why they feel strongly about the

20  principles and whether the divisive merger procedure works or

21  not.

22         It does bother me a little bit that Judge Silverstein

23  seems to be able to get these types of cases confirmed and, and

24  Judge Beyer and I have not been able to.  Maybe I won't send

25  her the Christmas card this year, but -- or perhaps, I should

1  ask her whether she's got any free time to come to North

2  Carolina and iron out your differences.

3      But the point is I, I understand why there's a

4  difference between Paddock and here and we've got some

5  heartfelt differences of opinion, but on the current motion the

6  bottom line is that I cannot find cause.  I don't think the

7  Robbins test, Robbins with one "b," and the, and the Tweetsie

8  Railroad connection, I don't think those criteria are met.  I

9  can't protect the estate.  That was one domestic case and in an

10  area where the court, federal courts are beholden to the state

11  court to grant a great deal of deference to their, their

12  procedures and rulings in the field of domestic relations and

13  that's not us.  We've got thousands of claims.

14      So regrettably, I will have to say no.  I will just

15  ask the debtors to draw an order consistent with those remarks

16  and what's been previously stated.  I think that should give

17  you enough between the adoption of the briefs, brief arguments,

18  and the reference back to the reasoning that's in the

19  preliminary injunction findings to keep it short.

20      But at the same time, if, if there's a desire to seek

21  review on appeal on that, then I understand where you're coming

22  from and I, I'd love to be enlightened by a higher court.  So

23  for now, no, okay?

24      All right.

25      MR. THOMPSON:  Thank you, Judge.

1          THE COURT:  Thank you.

2          We'll take about a ten-minute recess and then we'll

3   come back.  I think what I'd like to do next is to, is to clear

4   out that last matter on the docket, if it works for all of you,

5   on the Plaintiffs' Motion on Discovery Procedures, and get that

6   out of the way, okay?

7          All right.

8      (Recess from 10:58 a.m., until 11:11 a.m.)

9                          AFTER RECESS

10     (Call to Order of the Court)

11         THE COURT:  Have a seat.

12         Okay.  Ready to pick up with No., what I have as No.

13  11, Plaintiffs' Motion on Discovery Procedures.

14         Okay.

15         MS. CALVAR:  Morning.  Cristina Calvar on behalf of

16  the Committee.

17         THE COURT:  All right, Ms. Calvar.

18         MS. CALVAR:  And we have another exciting and fun day

19  of discovery for you.  So we are here on -- I thought that

20  would follow -- we are here on the Committee's motion on

21  discovery procedures.

22         THE COURT:  Right.

23         MS. CALVAR:  This motion is raised in the context of

24  the parties' joint discovery plan --

25         THE COURT:  Right.

1           MS. CALVAR:  -- which will govern the discovery in the

2   two active adversary proceedings, the substantive consolidation

3   proceeding, and the fraudulent transfer proceeding.  And for

4   further context, the proposed discovery plan is based on the

5   very same plan that was negotiated and entered in DBMP.

6           And if I may approach, I'd provide, I'd like to

7   provide you a copy of our --

8           THE COURT:  Sure.

9           MS. CALVAR:  -- proposed discovery plan.  That's also

10  highlighted and tabbed with the disputed issues.

11          THE COURT:  You may.

12      (Document presented to the Court)

13          THE COURT:  Thank you.

14          MS. CALVAR:  So after extensive negotiations we've

15  agreed on all issues except two.  The two issues are (1) the

16  number of depositions that the Committee should be able to take

17  across two adversary proceedings and (2) whether defendant

18  should provide very basic employment information about their

19  own officers, directors, and employees identified on their own

20  privilege logs and for the very limited time period that's

21  covered in those privilege logs.

22          And so turning to the first issue, the number of

23  depositions.  As I'm sure your Honor will recall, these cases

24  involve numerous defendants, more than double the number in

25  DBMP; complex financial transactions, once again double the

1    number in DBMP; claims sounding in fraud and fraudulent intent

2    that's going to require a fact-intensive inquiry, information

3    that is exclusively within the control of the defendants,

4    including the two debtors; and billions of dollars.  And given

5    these factors and circumstances that are present in these two

6    proceedings, the Committee as plaintiff in both of the two

7    adversary proceedings are seeking to take collectively 30

8    depositions across both proceedings.  As a matter of right, we

9    are entitled to 20 depositions and that's 10 depositions for

10   each proceeding.  And to be clear, the fact that these two

11   cases are proceeding on the very same discovery track does not

12   mean that our discovery is somehow limited to ten depositions.

13        So what we're really arguing about here is the

14   additional ten depositions and in practical terms, that's five

15   additional depositions in the fraudulent transfer proceeding

16   and five additional depositions in the substantive

17   consolidation proceeding.  And this request, as we'll talk

18   about, is reasonable, necessary, and proportional to the needs

19   of these two cases.

20        So as for need, we think 30 depositions is the bare

21   minimum that we will need and even then we're taking a risk

22   because we're only relying on the information that we got from

23   the preliminary injunction proceeding.  But just looking at the

24   information that we were able to gather from that earlier

25   preliminary injunction proceeding, we've identified 36

1   individual fact witnesses in our -- and we -- we've served it

2   in our Rule 26(a) disclosures.

3         THE COURT:  Uh-huh (indicating an affirmative

4   response).

5         MS. CALVAR:  In addition to those 36 individual fact

6   witnesses, there are 9 corporate defendants that we would also

7   want to depose.  So that brings our total to 45.  We've

8   identified 45 potential deponents and for the purposes of our

9   motion we are only requesting 30, which is more than a

10  reasonable compromise.

11        Now courts routinely hold that there's no need to

12  exhaust the default deposition limit, which here is 20, when

13  the facts and legal issues are complex and multiple parties are

14  involved and that's exactly what we have here and no one

15  disputes that.  So let's talk quickly about each of those

16  considerations in assessing the reasonableness and

17  proportionality of our request.

18        The complexity of the facts.  These cases involve

19  complicated and novel financial transactions.  There's not,

20  there's one corporate restructuring that includes not one

21  divisional merger like we have in DBMP, but two.  As part of

22  that, there are also numerous agreements that entities within

23  the Trane organization entered into for the purposes of

24  effectuating the corporate restructuring that we would also

25  want to depose.  So we're -- those agreements include the

1    funding and support agreements.

2            The number of parties is also a relevant

3    consideration.  This is not a single plaintiff-single defendant

4    case.  There are, as I mentioned before, nine corporate

5    defendants.  There are also other affiliates, again within the

6    Trane organization, that we would want to depose, given their

7    involvement in these transactions.  And assuming, let's say for

8    argument's sake, we take nine 30(b)(6) depositions of each of

9    the corporate defendants.  That eats up a significant chunk of

10   our requested number of depositions.  That's one-third and

11   we're only left with about 21 individual fact witness

12   depositions.

13           The claims here also sound in fraud and fraudulent

14   intent.

15           THE COURT:  Uh-huh (indicating an affirmative

16   response).

17           MS. CALVAR:  And intent is an essential element of the

18   Committee's asserted claims, for example, the fraudulent

19   transfer claims.  And for discovery purposes this is going to

20   be a very fact-intensive inquiry which is, again, further

21   compounded by the fact that we have nine corporate defendants.

22   All of the information that we're seeking is within the purview

23   and control and custody of the defendants, including the two

24   debtors.

25           And finally on this issue, this is not a single

1   damages case.  The amount of controversy is significant.  We're

2   talking about billions of dollars and if the Committee is

3   successful, then the avoidance of those complex financial

4   transactions.

5        So when cases are this complex and sophisticated,

6   involve complicated and legal issues, numerous parties, fact-

7   intensive inquiries focused on a party's intent, and the amount

8   of controversy is significant and the party has demonstrated a

9   need for the depositions, courts routinely grant additional

10  depositions.  We have not located a single case in this Circuit

11  and neither have defendants that when all of these factors are

12  present a court should not grant a request for additional

13  depositions.

14       The request is especially reasonable when you're

15  looking at it comparing to the facts of DBMP.  And again, in

16  DBMP we negotiated 30 depositions.  When you look at the facts

17  in Aldrich and you compare them to DBMP, you have twice as many

18  defendants, twice as many financial transactions, and twice as

19  many debtors.  And so the inquiry here is based on, and focused

20  on, reasonableness and proportionality and that's exactly

21  what's driving the Committee's request.

22       Now defendants try to paint a picture that we are

23  seeking what they call overlapping or duplicative discovery

24  from what was obtained in the preliminary injunction

25  proceeding.  We have said it before and I'm happy to say it

1  again.  We are not.  And to the extent that this was a concern,

2  we've already addressed it in the proposed discovery plan.

3           So in the first tab, your Honor, there's actually a

4  provision in Paragraph 6(c)(3) which says, "Prior to the

5  commencement of any depositions, the parties will agree to meet

6  and confer to discuss the parameters of a deposition protocol."

7  So to the extent there really are concerns about overlapping or

8  duplicative discovery, they can be addressed then or at a time

9  that the Rules contemplated.

10           Defendants also argue that the number of depositions

11  requested by the Committee here should take into account the

12  number of depositions that occurred in the preliminary

13  injunction proceeding, but there's three problems with that

14  argument because it fails to take into account three critical

15  facts.

16           One, the preliminary injunction proceeding is an

17  earlier and separate proceeding.  That proceeding was limited

18  to the relief in that proceeding, which was preliminary.  The

19  discovery was, therefore, targeted to that limited relief and

20  the parties during that process made compromises to enable a

21  speedier process and none of that should prejudice --

22           THE COURT:  That may be the first time I've heard that

23  referred to as a "speedy" process.

24           MS. CALVAR:  I'll take it.  I'll take it.

25           THE COURT:  That's great optimism.

1          MS. CALVAR:  But none of that should prejudice the

2     defendants in these two adversary proceedings.

3          The substantive consolidation proceeding and the

4     fraudulent transfer proceeding were also filed months after the

5     Court entered its, you know, Findings of Fact, Conclusions of

6     Law in the preliminary injunction proceeding.  Those complaints

7     involve distinct causes of action.  It -- during the

8     preliminary injunction proceeding there were also numerous

9     privilege challenges and instructions not to answer that

10    limited the Committee's lines of inquiry.  In these two

11    proceedings discovery has not yet commenced.  When it does, new

12    documents will be produced, new evidence will be obtained, and

13    there's going to also be a need to redepose some of the

14    individuals that were deposed in the preliminary injunction

15    proceeding.

16         So the mere fact that depositions occurred in the

17    preliminary injunction proceeding should not carry the day.  It

18    should not deprive the Committee of its right to seek the

19    necessary discovery that it needs.

20         And from an efficiency standpoint, your Honor, the

21    Committee's request of an additional ten depositions for two

22    proceedings is going to minimize the need for future disputes

23    before this Court.  While I am sure your Honor loves a good

24    discovery dispute, as we can tell from today's agenda, we do

25    not want to waste the Court's time and resources seeking court

1    relief every time we need a deposition above the default

2    deposition limit, particularly when there's a need for it now.

3    It's only going to incur arbitrary delay and our request for

4    additional depositions will also inform our litigation strategy

5    as we move forward.  With these additional depositions, we'll

6    be able to make informed decisions on who we need to depose.

7          So on balance, the request for 30 depositions, which

8    is really a request for 10 depositions, while reserving our

9    right is reasonable, proportional, and necessary to the

10   efficiency of this case.

11         Now the second issue before you, your Honor, concerns

12   basic employment information about the defendants' officers,

13   directors, and employees identified on the defendants'

14   privilege logs.  And that's the second tab, your Honor, on Page

15   13.

16         For context, the parties have agreed that the

17   defendants will create a document called the Players' List.

18   The purpose -- that document is part and parcel of the

19   privilege log and the purpose of that Players' List is to

20   provide basic employment information about the individuals that

21   appear on their own log so we can meaningfully evaluate the

22   defendants' privilege assertions.  As part of that Players'

23   List and similar to what DBMP negotiated, we're just asking the

24   defendants to provide information about their own folks.

25         This is not an all-encompassing request.  This request

1   is limited to the time period on the privilege log which, based

2   on our review of the communications in those logs, spans only a

3   few years.  The request is limited, again to just the

4   defendants' officers, directors, and employees.  We do not ask

5   for information about every Trane organization employee.  And

6   again, the requested information is limited to simply the

7   titles of those defendant employees and the dates of those

8   positions.  Now defendants have proposed to offer only the

9   current titles and roles of their own officers, directors, and

10  employees and we're talking about 2023.  And your Honor,

11  respectfully, that's useless to our analysis.  So as I

12  mentioned before, the Players' List is part and parcel of the

13  privilege log.

14          So the privilege log concerns an earlier time period

15  around the corporate restructuring which occurred years ago.

16  When reviewing the privilege log, we need to know who these

17  individuals are and what titles they had at the time these

18  purportedly privileged communications were made.  Someone's

19  title in 2023 is just not going to help us with respect to

20  privilege assertions concerning a document that's created

21  earlier in time, for example, 2019.  And apart from the time

22  period gap, the reality is that the defendants either engaged

23  in or were a product of the corporate restructuring which

24  involved the formation of new entities and many of their

25  employees also held or continue to hold dual or multiple roles

1  across the defendant entities.

2          So to assess their privilege claims, it's vital to

3  know what the titles and dates that they had of, of what those

4  individuals are.

5          You know, again, defendants claim that the requested

6  information is burdensome because they've identified more than

7  250 Trane organization employees.  That overstates our

8  position.  We're not asking for every employee within the Trane

9  organization, only those that have a relationship or

10 affiliation with the defendants.  It is black letter law that

11 when a party asserts a claim for privilege each element of

12 privilege must be met.  Given the complicated facts in these

13 proceedings, the time period, the numerous parties involved,

14 and the scope, the scope of empliment -- sorry -- the scope of

15 employment at that time of the transactions is critical in

16 assessing their privilege assertions.  And the fact that

17 hundreds of employees received confidential or privileged

18 information, your Honor, is worrisome as it suggests that

19 confidentiality and privilege assertions may not be valid.  In

20 the corporate context, confidentiality is usually on a need-to-

21 know basis.  The involvement of hundreds of employees suggest

22 that that is not the case.

23         And as to defendants' burden argument, we have yet to

24 receive a logical explanation as to why this exercise -- again,

25 it's very basic employment information for a limited and recent

1    time period -- will be so burdensome.  But giving the, the

2    defendants the benefit of the doubt and assuming it is somehow

3    burdensome, the need and reasonableness of our request

4    outweighs the burden.

5            Defendants also argue that the Committee's request is

6    premature.  It is not.  We have reviewed the privilege logs

7    produced in the preliminary injunction proceeding.  Those logs

8    are, from our perspective, deficient and we have communicated

9    those concerns, including the lack of information regarding

10   employment.  Those privilege logs are also admissible in these

11   proceedings.  And I'm talking about the privilege logs from

12   the --

13           THE COURT:  Uh-huh (indicating an affirmative

14   response).

15           MS. CALVAR:  -- preliminary injunction proceeding.

16   Because in the Case Management Order that the parties agree to,

17   any prior discovery that was conducted in that prior proceeding

18   is now deemed to have been conducted in these proceedings.  So

19   this is very much a ripe issue.

20           And finally, from an efficiency perspective, there's

21   no need to entertain another arbitrary delay for information

22   that we know now will be critical and necessary to meaningfully

23   evaluate the privilege logs, particularly given the defendants'

24   statement that, you know, it's burdensome and may take some

25   time to gather.

1            So we respectfully request that our motion be granted.

2            THE COURT:  Okay.  Thank you, Ms. Calvar.

3            Who's got it for the debtor?  Mr. Hirst.

4            MR. MASCITTI:  Morning, your Honor.  Greg Mascitti,

5   McCarter & English, on behalf of the Non-Debtor Defendants in

6   the adversary proceedings.

7            As you've heard, your Honor, despite reaching an

8   agreement on nearly all of the terms of the discovery plan, two

9   issues remain, (1) the initial number of depositions each side

10  will be able to conduct and (2) the initial level of detail

11  that the parties will be required to include as part of a

12  privilege log.  I think you've heard me say this before, your

13  Honor, but in my experience courts generally seek the answers

14  to three questions in determining how to resolve a discovery

15  dispute:  What does the party want, why don't they have it, and

16  do they need it?

17           But before providing the answers to those questions in

18  this context, I think it's important and critical, in fact, to

19  respond to the Committee's assertions that the discovery taken

20  in the preliminary injunction adversary proceeding was somehow

21  limited to different issues.  As the Court may recall, one of

22  the primary arguments the Committee made in opposition to the

23  preliminary injunction was its argument that the corporate

24  restructuring was a fraudulent transfer.  As a result, the vast

25  majority of the discovery obtained by the Committee in that

1    adversary proceeding centered on its contention.  The Committee

2    and its special counsel, litigation counsel, engaged in a

3    lengthy, wide-ranging discovery process in an effort to support

4    its contention that the transactions at issue were fraudulent.

5          The discovery process in the preliminary injunction

6    proceeding -- I'm not sure what compromises counsel refers

7    to -- but it occurred over an eight-month period between August

8    of 2020 through April of '21 and included multiple requests for

9    documents, interrogatories, and depositions.  The document

10   requests served by the Committee in the preliminary injunction

11   adversary proceeding included broad requests for the following

12   documents.  And I'm going to go through this.  I'm going to

13   paraphrase some of them, your Honor, but, your Honor, it is in

14   the details of these discovery requests and given counsel's

15   representation that these were different issues and limited and

16   narrow in scope, I think it's important for us to make the

17   record clear.

18         First request:

19         "Any versions of the funding agreements not attached

20         to the first day declaration, organizational charts

21         for each of Old Trane and its subsidiaries, Old IRNJ

22         and its subsidiaries, the debtors, TTHI," which is a

23         holding company, "New Trane and its subsidiaries, New

24         Trane Technologies and its subsidiaries, all prior to

25         and after the corporate restructuring.

1          All documents relating to the statement that the

2          debtors became solely responsible for the Aldrich-

3          Murray asbestos claims pursuant to the corporate

4          restructurings.

5          All documents that are in or part of the closing

6          binder for the corporate restructuring.

7          All board materials and documents pertaining to the

8          corporate restructuring.

9          All documents related to the transfer of any rights,

10         obligations, claims, funds, or assets as a result of

11         the corporate restructuring.

12         All documents relating to the purpose of, rationale

13         for, motivation for, or reason behind the transfer or

14         distribution of any rights in connection with the

15         corporate restructuring.

16         Documents sufficient to identify all decisionmakers

17         and professionals that participated in the corporate

18         restructuring.

19         All documents evidencing any transfer of assets or

20         liabilities of New Trane or New Trane Technologies

21         exceeding a hundred million dollars.

22         All documents purporting to substantiate the assertion

23         that the debtors' aggregate value is approximately 70

24         to $75 million.

25         All documents pertaining to or substantiate the

1        assertions as to the value of 200 Park and

2        ClimateLabs.

3        Documents pertaining to all paid, planned, or future

4        dividend distributions or repurchases of stock or

5        similar equity interests.

6        All documents related to the debtors' decision to seek

7        bankruptcy relief.

8        All documents that reflect the debtors' plans,

9        objectives, or goals for its bankruptcy

10       reorganization.

11       All documents regarding any and all assets held by the

12       debtors.

13       Any and all documents that relate to the funding of

14       the debtors' bankruptcy case.

15       Any and all documents that refer or relate to the

16       valuation of Aldrich or the valuation of Murray, the

17       valuation of 200 Park, or ClimateLabs.

18       All documents related to any intercompany financial

19       transactions.

20       Any documents reflecting or relating to the cost

21       methodology and detailed estimates of projections

22       under each of the services agreements.

23       All documents that refer to or include any appraisals

24       or valuations of Old Trane, Old IRNJ, New Trane, or

25       New Trane Technologies in 2015 to present.

1              Any and all documents that refer to or include any

2              fairness or solvency opinions, appraisals, or

3              valuations.

4              Documents sufficient to identify any restructuring

5              involving the debtors, New Trane, or New Trane

6              Technologies other than the corporate restructuring.

7              All documents reflecting secured indebtedness.

8              All documents reflecting the net profit.

9              All documents reflecting tax-sharing agreements.

10             All documents that refer or relate to federal tax

11             returns.

12             Documents that evidence the basis of the asbestos

13             insurance receivable.

14             Documents that establish the basis for any

15             intercompany receivables."

16        Your Honor, that's not all of them, but I think that

17   makes the point.

18        In response to the Committee's document requests, the

19   debtors and the non-debtor affiliates conducted an extensive

20   review of hard-copy documents and electronically stored

21   information and produced over 92,000 pages of documents in

22   response.  After the document production was complete, the

23   Committee and its special litigation counsel conducted 22

24   depositions over a three-month period between February '21 and

25   April '21.

1         The Committee deposed Heather Howlett in her position

2    as Vice President and Chief Accounting Officer for Trane PLC.

3    She was deposed for 6-1/2 hours.

4         And I'm going to give times, your Honor, but those are

5    approximate.  I didn't try to break out any times that were

6    taken for breaks, things like that.

7         Manlio Valdes was deposed in his position as member of

8    both the debtors' Boards of Managers.  Now he was the debtors'

9    President.  He was the President and Director of 200 Park and

10   ClimateLabs.  He's President, Vice President of project

11   management, The Americas for Trane Commercial HVAC.  He was

12   deposed for over eight hours.

13        Robert Zafari in his position as a member of Aldrich's

14   Board of Managers was deposed for over five hours.

15        Marc Dufour in his position as a member of Murray's

16   Board of Managers was deposed for over 5-1/2 hours.

17        Cathy Bowen in her position as Global Legal Controller

18   for Trane Technologies was deposed for over six hours.

19        Richard Daudelin in his position as Vice President and

20   Treasurer for Trane PLC was deposed for eight hours.

21        Robert Sands in his position as Associate General

22   Counsel, Product Litigation was deposed for 5-1/2 hours.

23        David Regnery in his position as President and Chief

24   Operating Officer for Trane PLC and New TTC was deposed for

25   over six hours.

1          Amy Roeder in her position as a member and officer of

2    both debtors and Finance Director of Information and Technology

3    and Legal at Trane Technologies and as a director of 200 Park

4    and ClimateLabs and as Chief Financial Officer and Treasurer

5    for both of the debtors was deposed for over 6-1/2 hours.

6          Ray Pittard in his position as Vice President and

7    Chief Restructuring Officer of the debtors was deposed for over

8    8-1/2 hours.

9          Mark Majocha as, in his position as Vice President,

10   Finance for Commercial HVAC Americas was deposed for over seven

11   hours.

12         Chris Kuehn in his position as Senior Vice President

13   and Chief Financial Officer was deposed for over eight hours

14   and Mr. Kuehn was deposed again as a 30(b)(6) witness for over

15   six hours.

16         Allan Tananbaum as a fact witness in his position as

17   Chief Legal Officer and Secretary of debtors and Deputy General

18   Counsel was deposed for over 8-1/2 hours.  Mr. Tananbaum was

19   again deposed as a 30(b)(6) fact witness for over nine hours.

20         Sara Brown as a fact witness and 30(b)(6) witness in

21   her position as Vice President and Deputy General Counsel was

22   deposed for over seven hours.

23         Evan Turtz as a fact witness and a 30(b)(6) witness in

24   his position as Senior Vice President and General Counsel was

25   deposed for 7-1/2 hours.

1        In total, your Honor, the Committee and special

2   litigation counsel obtained approximately 119 hours of

3   deposition testimony from 20 fact witnesses with over 4800

4   pages of deposition transcripts and conducted an additional 2

5   depositions of the expert witnesses, Charlie Mullin for Bates

6   White and Laureen Ryan for Alvarez & Marsal.

7        I participated in a majority of those depositions and

8   the general format for each of the fact witness depositions was

9   essentially the same.  Those depositions covered the deponents'

10  background; prior experience; dates of employment; title and

11  role with the company; the origin of Project Omega; the purpose

12  of Project Omega; the Project Omega team; Project Omega

13  meetings, including who attended, when they occurred, where

14  they occurred, how many occurred, and topics discussed; the

15  decision to implement the corporate restructuring; the

16  execution and structure of the corporate restructuring; the

17  decision by the debtors to file bankruptcy; and multiple

18  questions related to the documents that had been produced.

19       Committee's 30(b)(6) notices served in the preliminary

20  injunction adversary proceeding further evidence the broad

21  scope of the subject matters covered by the Committee and its

22  special litigation counsel.  Those topics included the genesis,

23  planning, and implementation of the corporate restructuring;

24  the genesis, planning, and implementation of Project Omega; the

25  plans of divisional merger; the negotiation and operation of

1  the funding agreements; the negotiation and operation of the

2  support agreements; the negotiation and operation of the

3  services agreements; the negotiation and operation of the

4  secondment agreement; all documents included in the corporate

5  restructuring binder; the purpose, rationale, motivation for,

6  and reason behind any transfer in connection with the corporate

7  restructuring; the role, job description, and responsibilities

8  of key personnel and the organization and management of the

9  non-debtor affiliates and the debtors; the debtors' decision to

10 file for chapter 11; the decision of New Trane Technologies

11 Company and New Trane to not file for chapter 11; treatment or

12 payment of the non-debtor affiliates' creditors in the ordinary

13 course of business; any dividend or distribution made; any

14 purchase or redemption made; any loans or extensions of credit;

15 any dividends or distributions to be made; any loans or

16 extensions of credit to be obtained; any transfers or

17 transactions outside of the ordinary course of business;

18 compensation of officers, managers, management team, and key

19 employees; current operations, activities, assets and

20 liabilities of the new entities and each of their direct and

21 indirect subs; the financial performance of the new entities

22 and the old entities for the five years immediately preceding

23 the corporate restructuring; financial statements pertaining to

24 the old entities for the five years immediately preceding the

25 corporate restructuring; financial statements, books, and

1    records, general ledgers, and trial balances related to the new

2    entities and each of their direct and indirect subs; financial

3    projections, forecasts, plans, budgets applicable to the new

4    entities and each of their direct and indirect subs; any

5    secured indebtedness of the new subs; any funded debt of the

6    new entities; any estimates, projections, or forecasts of the

7    estimated liability for asbestos claims; and indemnification

8    obligations, insurance coverage, coverage-in-place agreements.

9            I know that was a long list, your Honor, but again, I

10   think it's important that the Court understand the scope of

11   discovery that's previously occurred.  This factual background

12   provides the important context for assessing the Committee's

13   current requests and in particular, your Honor, I think you'll

14   recognize the overlap between what has previously occurred and

15   what the Committee now seeks in connection with the discovery

16   plan that has been proposed.

17           In this case, with respect to the initial disclosures

18   that have been filed and the discovery plan that's been

19   proposed by the Committee, the Committee now seeks to conduct

20   30 additional depositions on the following subjects:

21           The facts and circumstances surrounding the decision

22   to engage in the corporate restructuring; the planning and

23   implementation of the corporate restructuring; the facts and

24   circumstances surrounding debtors' decision to file bankruptcy;

25   the drafting, execution, and amendment of the funding

1    agreements and other intercompany agreements relevant to the

2    corporate restructuring; the asbestos litigation history; the

3    formation and corporate history of the defendants, their

4    predecessor entities, and other entities within the Trane

5    organization; corporate business and financial records of the

6    defendants; the upstreaming of cash to affiliates; the payment

7    of ordinary course creditors; communications with ordinary

8    course creditors; and other matters relating to the allegations

9    in the subcon complaint and defendants' defenses.

10            As the Court may recognize, there's a pretty

11   substantial overlap between what has occurred and what the

12   Committee now seeks as disclosed in the initial disclosures.

13   Of the 30 witnesses that are identified by the Committee in its

14   initial disclosures, 16 have already been deposed by the

15   Committee, more than half, and the remaining individuals

16   include the General Counsel's administrative assistant, former

17   General Counsels who had left the company prior to the

18   corporate restructuring, employees who the Committee knows had

19   only limited involvement in the corporate restructuring based

20   on ancillary issues such as tax or accounting or licensing

21   issues, and debtors' expert witness.

22            In summary, your Honor, the, the discovery conducted

23   by the Committee in the, in the preliminary injunction

24   adversary proceeding was not narrow, it was not limited, and

25   covered most, if not all, of the same subjects identified by

1   the Committee in its initial disclosure.  I wanted to take the

2   time to present that background to the Court in order to rebut

3   the Committee's characterization of discovery that's occurred

4   and to provide what I believe is the context that the Court

5   needs in order to assess the Committee's request today.  To be

6   clear, your Honor, we're not seeking to limit discovery and

7   although there's duplication, this is not an effort at this

8   time to ask the Court to, to rule on any duplication issues.

9   We think those issues will arise in the future.  We hope they

10  don't, but we expect based on our prior conversations with the

11  Committee that they will.  Today, your Honor, we're here to

12  oppose the Committee's request to prematurely expand the scope

13  of discovery in the discovery plan.

14          So starting with the first issue, your Honor, the

15  initial number of depositions each party will be allowed to

16  take.  And looking at the three questions that I posed earlier,

17  what does the Committee want?  Committee has requested

18  authority to conduct 30 depositions, in addition to the 22

19  depositions Committee has already taken.  That'd be a total of

20  52 depositions, your Honor.

21          Why doesn't the Committee have what they want?  Well,

22  in the first instance, the Rules don't allow for it.  First,

23  Federal Rule of Civil Procedure 30 establishes a limit of ten

24  depositions for each proceeding.  Given the two proceedings,

25  the Rule establishes an initial deposition limit of 20.

1 | Defendants proposed what the Rules provide, 20 depositions, and

2 | we agreed to meet and confer in the future if, for whatever

3 | reason the Committee at that point, after they completed those

4 | 20 depositions, thought that additional depositions would be

5 | necessary, and agreed that all parties would reserve their

6 | rights to seek relief from the Court if they couldn't reach an

7 | agreement.  The purpose of that Rule, your Honor, is for the

8 | parties to be thoughtful as to who they depose and to try to be

9 | efficient.  The mere fact that a party may have discoverable

10 | information does not mean that a party should be entitled to

11 | depose that particular witness.

12 |        Second reason why the Committee does not have what it

13 | wants is that in order to exceed the limit established by Rule

14 | 30 party is generally required to exhaust the allowed

15 | depositions before seeking additional depositions and as part

16 | of that request for additional depositions in excess of what's

17 | allowed by the Rule, party must make a particularized showing

18 | to justify the need to exceed that number.

19 |        In the initial motion filed by the Committee the

20 | Committee argued that defendants were trying to limit

21 | Committee's discovery.  In the Committee's reply, though, the

22 | Committee for the first time requests leave to exceed the

23 | number of depositions established by Rule 30, but has not yet

24 | exhausted any of the depositions provided by the Rule and made,

25 | has made no particularized showing today as to why the Court

1  should grant such relief.

2          In the absence of exhausting the Rule, the limit

3  provided by the Rule, and in the absence of a particularized

4  showing, the Committee should not be authorized to expand the

5  limit under Rule 30, particularly where the Committee has

6  already conducted 22 depositions on the same or substantially

7  similar topics.

8          Does the Committee need 30 depositions?  Well, your

9  Honor, the question is really does the 30 -- does the -- does

10  the Committee need the Court to decide today that it needs 30

11  depositions?  Committee doesn't make a particularized showing

12  today as to why it needs an additional 30 depositions on top of

13  the 22 it previously took.  First, your Honor, with respect to

14  the 45 witnesses that the Committee identified, 9 of those

15  corporate defendants, many of them are holding companies.  The

16  Committee knows this from the discovery it obtained in the

17  preliminary injunction proceeding.  Six of those individuals

18  are attorneys for Jones Day, typically would not be deposed,

19  and the list, as I had previously indicated, includes the

20  General Counsel's administrative assistant, a former, former

21  General Counsel who left before the corporate restructuring,

22  and 16 individuals who had previously been deposed.

23          Committee argues, in part, that the Court should grant

24  the relief today because this is a complex case, but the basic

25  facts of this case are not complex.  Two entities underwent a

1    divisional merger that resulted in the creation of four new

2    companies with an allocation of assets and liabilities between

3    them and two of them filed bankruptcy to resolve their asbestos

4    liability under a 524(g) plan.  The transactions were disclosed

5    and detailed in first day pleadings and public filings and in

6    any event, even if one were to consider the case complex, the

7    discovery the Committee and its litigation counsel obtained in

8    the prior adversary proceeding, the 92,000 pages of documents

9    and the 22 depositions, provided a complete understanding of

10   whatever complexities may exist, as is evident from the 25-page

11   factual background in the Committee's opposition to the

12   preliminary injunction, its 19-page factual background in the

13   substantive consolidation complaint, and its 45-page factual

14   background in the fraudulent transfer complaint.  The Committee

15   has not today identified any area of complexity where its

16   knowledge is purportedly lacking or any new ground that has yet

17   to be covered or could be covered by the proposed 20 additional

18   depositions.

19          In addition, your Honor, the Committee has argued that

20   it should be allowed to exceed the Rule 30 limit because this

21   case involves intent.  Committee again ignores that it's

22   already conducted 20 depositions of fact witnesses and

23   thoroughly explored the motive and intent behind the corporate

24   restructuring with respect to each of those witnesses.  With

25   the additional 20 depositions under Rule 30, Committee will

1   have the benefit of over 40 depositions to explore intent and

2   motive issues, to the extent they haven't already.  Committee

3   has not identified any reason why those 40 depositions will not

4   provide a sufficient opportunity to fully explore the motive

5   and intent issues or how additional depositions would in any

6   way be beneficial.

7          Your Honor, the Committee also argued that there were

8   two divisional mergers so there's twice the work.  As the Court

9   knows, the transactions were done simultaneously by the same

10  individuals as part of the same process.  So this litigation

11  doesn't require twice work, twice the amount of work because

12  there were two divisional mergers.

13         Third, your Honor, the Committee argues that this case

14  involves billions of dollars without offering any explanation

15  as to how it arrived at this conclusion.  Despite nearing the

16  three-year anniversary of this case, the Committee has not once

17  offered any allegation, much less any evidence, as to what the

18  Committee believes is the amount of the debtors' estimated

19  asbestos liability.  Further, the subcon and fraudulent

20  transfer complaints, despite conclusory allegations of

21  insolvency, are devoid of any allegation as to the amount of

22  the estimated asbestos liability.  The only evidence of

23  estimated asbestos liability that has been presented to the

24  Court is the estimated asbestos liability contained in Trane's

25  SEC reporting of approximately $540 million.  And as the

1  Committee has previously acknowledged, its constituency, the

2  current asbestos claimants, represents approximately 20 percent

3  of the asbestos liability.  Thus, based on the only estimate

4  that's ever been presented to the Court the Committee

5  represents holders of approximately $108 million of claims, not

6  billions, and it holds those claims against entities that

7  currently have at least $540 million of assets and an uncapped

8  funding agreement.

9       Your Honor, the, in short, the Committee has not at

10  this time established any need to take an additional 10

11  depositions or any need to conduct a total of 52 depositions in

12  these proceedings.  We respectfully request that the Court

13  approve the discovery plan as modified by the defendants to

14  establish the initial limit of 20 depositions for each party

15  with an obligation to meet and confer if a party thinks

16  additional depositions are necessary and with a reservation of

17  rights to seek authority from the Court for additional

18  depositions if that need arises.

19       Turning to the second remaining open issue, your

20  Honor, the Players' List to accompany a privilege log.  The

21  Players' List, your Honor, is a, a list of names of individuals

22  who are listed in the privilege log and it's designed to

23  provide some basic information so that parties can assess the

24  privilege.  That basic information generally is a person's

25  name, e-mail address, company, and whether or not the person

1    was an attorney or paralegal.  That's the type of Players' List

2    that we provided in connection with the preliminary injunction

3    proceeding and the Committee having received that list never

4    complained that the Players' List was insufficient, never

5    requested additional information as to the individuals

6    identified on that list, and never moved to challenge that the

7    Players' List didn't provide sufficient information to assess

8    the assertions of privilege.

9            In an effort to reach an agreement, the defendants

10   agreed to provide, in addition to the information that had

11   previously been provided, dates of current, dates of employment

12   -- I'm sorry -- current employment titles for each of the

13   employees and with respect to professionals, the date that they

14   were engaged and the parties they represented.  Despite our

15   willingness to provide this information, the Committee has

16   insisted, though, on further detail for each employee

17   identified on the Players' List.

18           So what does the Committee want?  The Committee asks

19   the Court to direct the defendants to include for each employee

20   on the, on the Players' List the dates of employment and/or

21   affiliation to each defendant and the relationships, titles

22   and/or roles to each defendant.  I'll just note in passing the

23   ambiguity of affiliation and relationships and will assume that

24   we may at some point be able to figure out what those mean.

25           Why don't they have it?  Well, first, the Rules and

1   the case law don't require that information in a privilege log.

2   The typical information that's required in the privilege log

3   would satisfy the standards under Federal Rule 26.  If, even if

4   it's not detailed, it identifies the nature of each document,

5   the date of its transmission or creation, the author and

6   recipients, the subject, and the privilege asserted.

7        So in the first instance, your Honor, it's just not

8   required by the Rules.  Secondly, your Honor, the information's

9   not readily available.  If we could push a button and provide

10  that information, we wouldn't be here today.  The fundamental

11  problem in complying with this request, your Honor, is that it

12  requires a manual search through employment records and

13  corporate records to obtain that information with respect to

14  each employee and if there's any indication, we're talking

15  about 250 employees based on the privilege log and the Players'

16  List that was provided in connection with the prior proceeding.

17       THE COURT:  Why can't you just send an e-mail to the

18  employees and say, "What were your titles at these times,

19  points in time?"  Wouldn't that give you half the information

20  right out of the gate?

21       MR. MASCITTI:  Your Honor, I -- I -- it may.  I don't

22  know about the accuracy of that information, but --

23       THE COURT:  Double check it, but in terms of searching

24  all the records is, it seems to me there would be some easier

25  ways to obtain that information than, than a top-to-bottom

1   review of all employment records.

2          MR. MASCITTI:  Well, your Honor, in the first

3   instance, the Committee already has this information with

4   respect to the individuals that have already been deposed.

5          THE COURT:  Okay.

6          MR. MASCITTI:  So, so to the extent they're looking

7   for dates of employment, roles, and positions and the key

8   players, they have that.  It was provided as part of the

9   preliminary injunction proceeding and the depositions they

10  conducted.  And, and, your Honor, in addition, the Committee

11  hasn't identified any need for this information.

12         So the third issue as to whether or not the Committee

13  needs it, it's well settled, your Honor, that a corporate

14  client includes not only the corporation for whom the attorney

15  is employed or retained, but also the parent, sub, and

16  affiliates of that corporation.  So whether a employee at issue

17  was in one particular role for, for Subsidiary ABC and in a

18  different role for B, DEF and sat in a different position for

19  XYZ Corporation under the corporate umbella, umbrella doesn't

20  in any way impact the assessment of the privilege.

21         So that information that, that they're asking for

22  doesn't help the assessment of the privilege.  It's not

23  relevant until there's a privilege log that identifies a

24  specific document that's been withheld --

25         THE COURT:  Uh-huh (indicating an affirmative

1    response).

2          MR. MASCITTI:  -- identifies the particular employees

3    at issue, and then maybe in that context whether or not a

4    particular individual held a particular title could be

5    relevant, but it's certainly not in the first instance at, at

6    the stage we're at.

7          So requesting that information now, your Honor, is, is

8    premature, we contend it's burdensome, and most definitely,

9    your Honor, it doesn't provide any benefit to the Committee's

10   assessment of the privilege.

11         THE COURT:  What do you say about Ms. Calvar's

12   argument that they need to know because there was such a wide

13   dissemination of information to, to the various employees?  If

14   you don't know the capacity of that particular employee at the

15   time, how do you evaluate whether it got out to people who had

16   no need to know?

17         MR. MASCITTI:  Well, that was -- that was -- there's

18   two issues there, your Honor.  One, this, this idea that there

19   were documents disseminated to 250 employees.  I don't believe

20   -- I think that's how counsel characterized that.  I don't

21   believe that there was any document in the privilege log that

22   was disseminated to 250 people.  I think what counsel is

23   conflating is there's 250 people on the Players' List --

24         THE COURT:  Right.

25         MR. MASCITTI:  -- who in the course of their

1    employment received a confidential --

2            THE COURT:  A document.

3            MR. MASCITTI:  -- a document, but doesn't mean that

4    there was -- and if there was a document that was disseminated

5    to 250, it would be that document that is at issue and which we

6    could discuss.

7            But I don't think any such document exists and again,

8    the fact that there were 250 people that may have received a

9    confidential document that's protected by the privilege

10   doesn't, doesn't impute a waiver.

11           Secondly, your Honor, on the need to know, that may

12   become an issue in, in terms of did a particular employee need

13   to know the information that's at issue, but again, we're not

14   there today.  That information isn't required to, to satisfy

15   the, the obligation that we have in the first instance to make

16   a *prima facie* case for the assertion of privilege.  It may

17   become an issue down the road and as we've proposed in our

18   discovery plan, if the Committee identifies a specific document

19   that's been withheld and they, they contend that they need that

20   employment information for that, for the individuals who are

21   part of that dissemination of that document, we can have that

22   discussion and if we can't reach an agreement, they can seek

23   relief.  But we're just not there today, your Honor.  And, and

24   again, given what we perceive to be the burden and given the

25   little benefit that the Committee would get from it at this

1  stage, we don't think it's appropriate, your Honor, for, for

2  that relief to be granted.

3         In closing, your Honor, I wanted to emphasize the

4  current context that the Committee has not yet taken the

5  additional 20 depositions provided by the Rules and no

6  privilege log asserting any privilege has been produced in the

7  fraudulent transfer or subcon proceedings.  As your Honor may

8  recall in connection with the Case Management Order hearing,

9  your Honor agreed with the Committee and denied the inclusion

10  of defendants' proposed non-duplication language because your

11  Honor did not want to preemptively limit discovery by trying to

12  articulate a ruling on what would be duplicative.  By the same

13  token, your Honor, defendants now ask that your Honor not

14  preemptively expand discovery unless and until the time arises

15  in the future where the facts establish a need for such

16  expansion.

17         For those reasons, your Honor, defendants respectfully

18  request that the Court approve the modified form of the

19  discovery plan as proposed by defendants.

20         THE COURT:  Thank you.

21         The debtor had joined.  Do you wish to be heard as

22  well?

23         MR. TORBERG:  Yes, your Honor.  If, if I may.

24         THE COURT:  Please.

25         MR. TORBERG:  Good afternoon.  David Torberg from

1   Jones Day on behalf of the debtors.

2           We join, again, in the arguments made by Mr. Mascitti

3   on both issues.  We have a long agenda.  I'll try to be brief

4   and I'm going to focus just on the deposition issue.  I think

5   Mr. Mascitti covered sort of the facts that play into the

6   Court's issue pretty exhaustively.  So I'm going to focus on,

7   on the legal precedent that's out there on this issue,

8   including some of the cases that were dropped by the Committee

9   a couple of days ago that I spent most of yesterday taking a

10  look at, but I want to talk first about this issue of whether

11  they, a requesting party seeking more depositions has to

12  exhaust all their depositions first, okay?

13          Most courts that have considered that question,

14  including all the, the trial courts in this Circuit cited in

15  our briefs, have said that courts generally or ordinarily will

16  not authorize additional depositions until a party uses the

17  initial presumptive limit, even the cases cited by the

18  Committee, Premier, Daily Gazette, Aerojet, and a name I can't

19  pronounce, but it starts with T-H-Y.  It has a lot more

20  consonants than vowels.  There are, there are prudent rules,

21  there are prudent reasons for that Rule and we think they apply

22  here, particularly given the prior discovery that's already

23  occurred.

24          Now I'm not saying that there are no cases out there

25  where a court has authorized depositions at the outset,

1    authorized additional depositions at the outset of the case or

2    required the taking of all ten depositions before additional

3    ones were granted.  There are some cases, but those cases are

4    not this case.  They are not this situation.  Most importantly,

5    those cases involve situations where the party seeking

6    additional depositions made a particularized showing of why

7    specific people needed to be deposed.  For example, in both

8    Aerojet and Lawson, the court went through each of the proposed

9    deponents individually and evaluated whether cause had been

10   made.  None of that has been done here.  The Committee hasn't

11   even told us which 30 people it wants to depose.  We haven't

12   talked about a single individual today and that's telling.

13          Now as we said in our brief, there are, they were

14   digging deep to find 30 people.  I mean, there -- there --

15   there -- they've got accountants who were involved in the

16   implementation of, of this.  They've got an administrative

17   assistant.  They've got General Counsels who've been, who've

18   been gone.  The fact that we don't have specifics is telling.

19          Moreover, we have to consider the prior discovery

20   that's been taken here.  The cases they cited didn't have, you

21   know, 22 depositions where the party got to learn about the

22   facts in the case, already.  As the Archer Daniels Midland case

23   said, you know, it was definitely influenced by the prior

24   discovery in deciding how many depositions were needed.  And I

25   think that's the case here.  I, I think that's, that shouldn't

1  be controversial.  Yeah, you should look at what happened

2  before in deciding what depositions are needed today and the

3  Committee claims that we're making a legally untenable

4  argument, which I don't think that's tenable.

5        Now it's worth noting, you know, one of the

6  Committee's cases that they cited, the Laryngeal Mask case,

7  that, that said, yeah, you might not always have to exhaust the

8  depositions.  Well, in that case the party had already taken

9  nine of the ten depositions and the court actually said, "The

10  more depositions that remain untaken, the harder it will be for

11  a party to show that additional depositions would not be

12  cumulative."  Here, the Committee hasn't taken any of the

13  depositions in these adversary proceedings.

14        And another case, the Premier case, a case that we

15  cite, we, we like that case.  And I would say, just as an

16  aside, you know, we encourage your law clerk to read all these

17  cases because I think we come out on top on all of these --

18        THE COURT:  Be careful.

19        MR. TORBERG:  -- even the ones they cited.

20        THE COURT:  Ms. Cook is within striking distance.

21        MR. TORBERG:  Yeah.  I'm sorry, Ms. Cook.  So I should

22  probably sit down right now.

23        So in that case, this is another case that, that

24  recognized, oh, it's possible.  Maybe you don't have to exhaust

25  all them.  But in that case, the committee, the requesting

1  party had taken five of the ten depositions already and the

2  court denied the motion saying:

3         "Plaintiffs have not met their burden of establishing

4         a particularized showing of the need for compelling

5         depositions of numerous similarly situated deponents,

6         especially in light of the fact that the testimony of

7         the additional five witnesses has yet to be

8         evaluated."

9         So in the Corey Airport case, well, there were, there

10  were 20 named defendants all with, you know, individualized

11  issues.  The nine defendants here, they haven't identified any

12  unique facts and need to question the nine corporate defendants

13  on, most of which are holding companies, as Mr. Mascitti said.

14  The court only allowed one deposition of a non-party witness in

15  that case.

16        And just to respond, you know, they had made the

17  reference that the cases we've, we cited for the exhaustion

18  requirement were all run-of-the-mill, small cases.  That,

19  that's not true.  The Archer Daniel, the Archer Daniels Midland

20  case, it's a large insurance case.  They wanted to take 47

21  depositions.  The Laskin Electrical Pension Fund case, a

22  complex securities case, the requesting party wanted to take 80

23  depositions.  Both cases, the court said, "No, not yet.  It's

24  premature."  Classic Soft Trim, a complex case involving the

25  sealing of a plaintiff's confidential business information.

1          And then finally, I want to touch on the <u>DBMP</u> issue,

2     you know.  That, that seems to be kind of their No. 1 argument.

3     Well, you allowed in -- you know, they agreed to it in <u>DBMP</u>.

4     Why won't you agree to it here?  Why are you being so stubborn?

5     Well, you know, I wasn't involved -- I'm, I'm involved in that

6     case, but I wasn't involved in this issue, but, you know, the

7     firm's involved in the case.  I know what's going on in that

8     case and that case has got, you know, a lot of people who have

9     not been deposed, some in France, okay?  That does not satisfy

10    the particularized showing of why you're taking more additional

11    depositions at the outset of the case here.

12         So unless the, unless you have any questions, that's

13    all I've got.

14         THE COURT:  Thank you.

15         Any rebuttal?

16         MR. PHILLIPS:  Your Honor?

17         THE COURT:  Mr. Phillips.

18         MR. PHILLIPS:  May I be heard very briefly?

19         THE COURT:  Go ahead.

20         MR. PHILLIPS:  Thank you.

21         MR. NEIER:  Your Honor, I, I do this all the time and

22    I'm going to do it again.  I object to anybody speaking who has

23    not filed a pleading on a particular issue.  We've had this

24    before.  The Court has instructed Mr. Guy and he, and it's

25    instructed others not to make speeches when they have not filed

1   a pleading.  It is unfair to the parties that have filed

2   pleadings, taken the time to examine the issues.

3        So to stand up just on a whim and expand wastes the

4   court time and is unfair to the parties that are the movants

5   and the respondents.

6        Thank you, your Honor.

7        THE COURT:  What have you got in mind, Mr. Phillips?

8        MR. PHILLIPS:  Your Honor, while we're not a party to

9   these proceedings, my clients are the people who got deposed at

10  the preliminary injunction stage and are at risk of being

11  deposed again here.

12       THE COURT:  Hang on a second.

13       Mr. Neier, I agree with your concept.

14       If you want the right to be assured the chance to be

15  heard, you should file something, but under the circumstances I

16  want to hear what you say.

17       So go ahead.

18       MR. PHILLIPS:  Your Honor, the nut of our position is

19  reflected in a case that's cited by the non-debtor defendants

20  in their brief at, I think, Page 8.  It's SF Health Plan v.

21  McKesson Corp. where the court was faced with a similar issue

22  and the court said:

23            "The purpose of the limitation and the Rule is to

24            force counsel to think long and hard about who they

25            want to depose and to depose only those who are really

1      important so as to stay within the limit of the rule."

2          That's what I want to see happen here, that the --

3  that the -- that the ACC and the plaintiffs will think long and

4  hard, particularly in light of the fact that we asked for and

5  they refused to include in the discovery plan a sentence that

6  said that the parties would seek to avoid duplication in

7  discovery.  In a worst-case scenario, I am very concerned that

8  my clients are going to be subjected to a series of questions

9  designed to create a "gotcha" moment and I want them to have to

10  think about whether they use those depositions for that and for

11  that reason we support the non-debtor defendants' opposition.

12          Thank you, your Honor.

13          THE COURT:  Thank you.

14          We ready to go back to rebuttal?  Okay.  Whenever

15  you're ready, Ms. Calvar.

16          MR. NEIER:  We're ready.

17          MS. CALVAR:  Just a few points, your Honor.

18          THE COURT:  Do you need a moment?  Whenever you're

19  ready.

20          MS. CALVAR:  As an initial matter, the cases in our

21  reply brief -- and again, there's none that defendants have

22  been able to cite that when all these factors are present --

23  we'll talk about them and I will quickly run through them again

24  -- that there shouldn't be a request for additional depositions

25  granted.

1          Mr. Mascitti tried to argue that these transactions

2     are not complex, then I really don't know why we have so many

3     lawyers here and the bills are high, but we also have numerous

4     parties --

5          THE COURT:  Bankruptcy work is pretty slow right now.

6          MS. CALVAR:  There's numerous parties involved in

7     this, in this case.  Even if they're holding companies, the

8     intent of, of each corporate defendant is critical for our

9     claims.

10         With respect to billions of dollars, again these are

11    complicated financial transactions and the avoidance of those

12    transactions are, in fact, billion-dollar transactions.

13    When -- you know, it's, it's separation of assets.  Again --

14         THE COURT:  Should I read anything into that of what

15    the ACC thinks the aggregate liability is in this case?

16         MS. CALVAR:  I -- you should not.

17         The fraudulent intent, again, is clear and, because

18    our claims, that's, again, where, where they are, and the

19    information, all of which we seek, is within the defendants'

20    control.

21         Again, there hasn't been one issue, one case where all

22    of those factors are present and a court has not granted a

23    request for additional depositions.

24         Mr. Mascitti read into the record a series of document

25    requests that were issued in the preliminary injunction

1   proceeding and again, those are discovery document requests,

2   not depositions, and what he didn't read to you is what, in

3   fact, they produced and what compromises were made or what the

4   responses were to each of those discovery requests.  Again,

5   we're talking about depositions.

6          And, you know, there's an inherent tension between the

7   two issues.  The defendants like to focus for purposes of the

8   depositions a lookback to everything that happened in the

9   preliminary injunction proceeding which, again, is an earlier,

10  separate proceeding.  And then on the second issue, which we'll

11  talk about in a second, "No, Judge.  Don't look at anything we

12  did with respect to privilege logs in that context."  So you

13  can't have it both ways.  It's one or the other.

14         But again, the, we're not saying that there's no

15  overlap between the proceedings.  What we're saying is there's

16  going to be new, new discovery.  Discovery, again, has not

17  commenced.  They made the very same argument in connection with

18  the Case Management Order.  They wanted to include a provision

19  to not have any duplicative discovery and I'm paraphrasing, of

20  course, your Honor, but I, I think where we came out on that is

21  let, issue the document requests, let discovery commence, and

22  as the Rules contemplate, you can object accordingly.

23         But we're not trying to seek the very, exact same

24  information that we sought in the preliminary injunction

25  proceeding.  You know, I, I think we're better lawyers than

1   that and I think we are going to be very careful in, in what we

2   ask during the course of, you know, these discovery requests,

3   negotiations, and getting the information that we really need.

4           So you know, much of the arguments that Mr. Mascitti

5   is making is, is really a premature protective order, cutting

6   us off, again, before discovery has commenced.  Again, for this

7   Court and for the parties here, this is in the context of a

8   joint discovery plan.  We're just trying to start discovery.

9           On this same issue, I'll also turn to what

10  Mr. Phillips said with respect to the Fiduciary Duty

11  Defendants.  In the case that he seems to say it says it all,

12  SF Health Plan, I'd like to inform the Court that in that, in

13  that case they actually were allowed to take 30 depositions.

14  That was across multiple cases and they were seeking leave for

15  an additional 11.  So those numbers are really not comparable.

16          And you know, the claim that we did not agree to

17  incorporate language in the proposed discovery plan about

18  duplication, we did, okay?  Mr. Phillips was part of each of

19  those meet and confers which, again, is, I'm not really sure

20  why as this doesn't really impact his proceeding, but he voices

21  his objections, we propose language, which is what we agreed to

22  in Paragraph 6(c)(3).  And there was no objection from any of

23  the other defendants as to that language saying, "Before we

24  start depositions, we will agree and, and meet and confer with

25  you to try to establish a deposition protocol."

1          As to the second issue, you know, I, I think it's made

2    clear that there really is no burden to pull and collect this

3    information.

4          THE COURT:  What do you say about the suggestion that

5    you already have the information?

6          MS. CALVAR:  We, we don't have and we explained that,

7    that some of it is actually, it wasn't clear from a lot of

8    those depositions.  Some of these individuals hold multiple

9    roles, four or five roles, and we, some of that information we

10   don't have.

11         So if they're just, if they want to talk about

12   excluding those six -- even if we did have the information,

13   your Honor -- and I really have to go back and -- I don't want

14   to misrepresent anything -- but if it's those 16 individuals

15   that we're really arguing about, okay, there's additional, many

16   other employees that we need to know basic employment

17   information.  And your suggestion of a questionnaire, I mean,

18   it was brilliant, Judge, and it, it shows that there's really

19   no burden here and --

20         THE COURT:  First time for everything.

21         MS. CALVAR:  I -- I -- yes.

22         But it shows that there really is no burden involved

23   here.  I mean, these individuals should know what titles they

24   had and when.  And you know, if they want to include a

25   disclaimer that always happens, "We did the best we can,"

1  that's usually all we can hope for in these types of cases.

2          THE COURT:  Couldn't we also do that by -- if you've

3  got 16 that you know based on the depositions that were

4  previously taken, you've got some new folks that you don't know

5  what they do, can we not just ask that question?  It wouldn't

6  seem to me to be that very complicated or very controversial as

7  to what they did when.

8          Is there not a way that we can meet in the middle on

9  this?

10          MS. CALVAR:  So the problem is how.  So we're not gong

11  to take depositions of 250 employees.

12          THE COURT:  Right.

13          MS. CALVAR:  If you put it in an interrogatory, that,

14  arguably, could be, you know --

15          THE COURT:  Well, I'm, I'm thinking --

16          MS. CALVAR:  -- ten different interrogatories.  So --

17          THE COURT:  All right.  We get the log.  You've got a

18  bunch of documents.  You don't know -- you've got various

19  people in, individually who you're not sure what they did when.

20  Can we not ask at that point?

21          MS. CALVAR:  That's exactly what we're doing now.  We

22  have the privilege logs from the preliminary injunction

23  proceeding.

24          THE COURT:  Right.

25          MS. CALVAR:  Those cases -- that -- I'm sorry -- those

1    logs are admissible in these proceedings.

2              THE COURT:  Right.

3              MS. CALVAR:  So we're asking for the information right

4    now.

5              THE COURT:  Uh-huh (indicating an affirmative

6    response).

7              MS. CALVAR:  So --

8              THE COURT:  But, but are you asking for everyone that

9    they have or are we only asking for the people who are on the

10   logs as --

11             MS. CALVAR:  Only for the people that are on the logs

12   and only for defendants' --

13             THE COURT:  Right.

14             MS. CALVAR:  -- officers, employees, and directors.

15             THE COURT:  And are we backing out the 16 people that

16   were already deposed that we --

17             MS. CALVAR:  If it turns out we, you know, we need

18   clarification on that, we'll ask.  But sure, we can --

19             THE COURT:  Yeah.

20             MS. CALVAR:  -- we can take out the 16.  The problem

21   is we still need that basic employment information because we

22   don't really know who was acting in what capacity and for what

23   entity.

24             THE COURT:  Okay.

25             MS. CALVAR:  And I think that's it, your Honor.

1                THE COURT:  Okay.  That it?

2                Mr. Mascitti?  This is the point in the proceeding

3    where I say there's no premium paid to being the last speaker,

4    but --

5                MR. MASCITTI:  I will be brief, your Honor.

6                With respect to the, counsel's argument that there's

7    no case where all of the factors have been presented and, and

8    the court didn't grant the additional depositions, I don't

9    believe any of those cases involved a proceeding where the

10   party had had 22 prior depositions on the exact same subjects.

11               In terms of cutting off discovery before it occurs,

12   we're not trying to cut any discovery off.  We're try, we're

13   talking about the initial requirements.  And again, if we get

14   to a point in the future where 20 isn't enough, everyone has

15   the right to come to the Court and make that point if we can't

16   reach an agreement.  If the privilege logs identify a specific

17   document at issue, we can talk about the employment information

18   for those employees.

19               And your Honor, just wanted to also mention this, this

20   idea that, the footnote on the, the deposition protocol.

21   That's apples and oranges.  We asked for that footnote because

22   your Honor had declined to put in the duplication language we

23   had requested.  And we --

24               THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. MASCITTI:  If, if the Committee is going to depose

2    the same witness again, we recognize there's going to be a

3    problem when we get to the Committee asking the same question

4    again.  And that protocol is designed to figure out, well, what

5    are we going to do when we get to that point.  That has nothing

6    to do with whether or not there's going to be 30 depositions,

7    in addition to the 22 that have already occurred.

8          And -- well, I don't want to suggest that your idea

9    wasn't brilliant.

10         THE COURT:  Go ahead.

11         MR. MASCITTI:  You know, not every employee will

12   necessarily recall what position they held.

13         THE COURT:  Sure.

14         MR. MASCITTI:  But perhaps more importantly, this,

15   this idea that they need basic employment information to assess

16   some type of privilege assertion is just not supported in a

17   vacuum.  In other words, that need arises in the context of a

18   specific document at issue and it doesn't -- your Honor had

19   asked the question before about the need to know.  Did an

20   employee need to know certain information?  Having the person's

21   title doesn't answer that question.  It doesn't -- knowing that

22   someone was a, you know, whatever the title is, Treasurer or

23   whatever of the particular entity, doesn't answer the question

24   as to whether or not that individual needed to know the

25   information that was conveyed as part of a document that had

1 | been subject to the assertion of privilege.

2 | So your Honor, again, that -- it's just -- even if

3 | there were an easy way to gather that information, the

4 | Committee hasn't identified in any way how it helps them today

5 | when we are talking about the hypothetical scenario of a

6 | privilege log that hasn't even been produced.

7 | Thank you, your Honor.

8 | THE COURT:  I'm asking the question, not expressing an

9 | opinion.

10 | Since we're talking about privilege logs, and starting

11 | with the preliminary injunction privilege log, do we really

12 | need to know all of the dates of employment and affiliation and

13 | relationships, or do we just need to know at the dates of the

14 | documents?  Is that what you're really asking for?

15 | MS. CALVAR:  Your Honor, and I'm sorry if I wasn't

16 | clear.  It's just the time period that's in the privilege log.

17 | THE COURT:  Right.

18 | MS. CALVAR:  And we are really focused on the

19 | communication, you know, the e-mail communications going back

20 | and forth.

21 | THE COURT:  But when that particular individual

22 | was -- has -- receiving --

23 | MS. CALVAR:  Exactly.

24 | THE COURT:  -- the communication?

25 | MS. CALVAR:  Exactly.

1          THE COURT:  So you're not necessarily asking the five-

2    year or four-year period that all of this --

3          MS. CALVAR:  Correct.

4          THE COURT:  -- was transpiring?

5          MS. CALVAR:  It would probably make things easier.

6          THE COURT:  Yeah.

7          MS. CALVAR:  Because otherwise either the burden would

8    be on us or them, probably them because they're asserting

9    privilege, to figure out which dates they need.

10         But respectfully, they, they should have done this,

11   already.  If you're making an assertion of privilege, you

12   should know what title and role and who, what entity you're

13   working for at that time.

14         THE COURT:  Okay.

15         All right.  Well, I think this one, I'm, I've got a

16   split decision for you.

17         I believe we should let, let this play out when it

18   comes to the number of depositions.  I don't think you're going

19   to need to come back one at a time.  I think I can batch those.

20   If we get towards, later in the point where we've identified

21   the, the Rule-based number of depositions and you think you've

22   got the need to depose five more, I think you can come in and

23   say, "I need five.  I need ten."  But I don't like deciding

24   things in a vacuum 'cause you never have all of the facts and I

25   believe we ought to stick with the way the Rule proceeds in

1  this and take that number first and when you get towards the

2  end where those are all identified and, perhaps, noticed out

3  and you need to come back and you see a need that, you can tell

4  me what you need.  Obviously, we did a very expansive version

5  of this in the preliminary injunction and that does change the

6  context that we're all sitting in, but there may be a need to

7  ask other questions of other parties and I don't want to

8  prejudge that.

9       So on that part of it, I, I'm inclined to agree with

10  the affiliates and the debtor and deny the request.

11       As to the Players' List, on the other hand, I believe

12  that given the number of documents we're going to be talking

13  about in this context and also in -- in -- not just the

14  preliminary injunction log, but what comes out when we start

15  doing discovery overall, it's going to be necessary to know who

16  the party was at the time of the communication.

17       So to that extent, I am granting the motion.

18       Let me, Ms. Calvar, ask you to take the laboring oar

19  of trying to, to craft an order to that effect and bounce it

20  back between the opposing parties for their comments and, and

21  let's see if we can't get that entered and get you on the way.

22  Otherwise, of course, the proposal is fine, all right?

23       MS. CALVAR:  Thank you.

24       MR. NEIER:  Your Honor, may we be excused from the

25  hearing at this point?

1          THE COURT:  Well, I can't imagine you're not having

2     fun, Mr. Neier, but --

3          MR. NEIER:  Fun, yes, but --

4          THE COURT:  Well, yes, you -- unless Mr. Mascitti

5     needs to say something else about this matter.

6          MR. MASCITTI:  No.  I, I was just going to say thank

7     you, your Honor.

8          THE COURT:  Yes, you may be.

9          It's now 12:30.  So a little housekeeping.  We are

10    going to need to take a break at, sometime between now and 1:00

11    for lunch and this might be a good time to stop, but I think we

12    ought to revisit again what we're going to be doing when we

13    resume.

14         And as to the remaining matters, I think the, the most

15    efficient thing to decide what we're going to do would be to

16    talk about the debtors' motion to strike in 303, but if the

17    parties have a strong feeling otherwise, I'd like to hear you

18    on what, what you think would be the next logical batting

19    order.  It would seem to me that if we're, if the debtors'

20    motion is granted there, that reduces the arguments that would

21    be made afterwards.  But y'all may have a different viewpoint

22    and I'd like to hear it.

23         Mr. Evert?

24         MR. EVERT:  Your Honor, here, here would be my

25    suggestion.  There are -- and, and I've got a little slide on

1    this, but you don't need the slide.  What, what we have is we

2    have the, the New Jersey proceeding that has the, the Verus

3    motions in there, then we have the Delaware proceeding.

4              THE COURT:  Uh-huh (indicating an affirmative

5    response).

6              MR. EVERT:  Verus has filed a motion for adjournment

7    in the Delaware proceeding, but they've also referenced --

8              THE COURT:  Right.

9              MR. EVERT:  -- the, the Verus proceeding.

10             So I think your -- I, I agree -- another brilliant

11   idea.  I agree with you.

12             THE COURT:  I'm just full of myself today.

13             MR. EVERT:  Oh, my goodness, your Honor.  It's -- it's

14   -- it's somewhat overwhelming for us down here, but --

15             THE COURT:  Until the appeals get filed and then the

16   ideas will have dissipated.

17             MR. EVERT:  Just the, you know, the whole, the whole

18   stream, it's, it's hard to comprehend.

19             So, so my thinking would be let, let's hear the motion

20   to strike, let's hear Verus' motion to adjourn --

21             THE COURT:  Uh-huh (indicating an affirmative

22   response).

23             MR. EVERT:  -- and, and, and then query whether we

24   also hear DCPF's motion to adjourn or we go, depending upon the

25   Court's ruling, we go from there to the underlying motions.  So

1    the -- that, that's the way we thought about it when we set up

2    the, tried to set up the agenda.

3          So just, just to be clear, motion to strike, which

4    affects the Matching Claimants in all filings.

5          THE COURT:  Right.

6          MR. EVERT:  The motion to adjourn for Verus, they

7    could either argue only the part that applies to their New

8    Jersey proceeding or they can argue the part that applies to

9    the Delaware proceeding as well.  What I had in my mind I

10   thought would be most, easiest for your Honor is for them to

11   argue the part that applies to New Jersey.  If the Court rules

12   we're, you want to hear argument in New Jersey, we take the New

13   Jersey matters, then, when that's concluded, we argue DCPF's

14   and Verus' motion to adjourn in the Delaware matters --

15         THE COURT:  Uh-huh (indicating an affirmative

16   response).

17         MR. EVERT:  -- and if the Court rules they want to

18   hear it, we go forward with the motion for rehearing.

19         That, that, I think, is the most logical way to do it,

20   but obviously, with the effusive brilliance that's coming from

21   the bench, I -- I'll just -- I'll wait and see what the Court

22   thinks.

23         THE COURT:  Let me remind you folks.  I've been

24   married for three decades.  I have no illusion as to my

25   brilliance.

1         MR. EVERT:  But you're here, not at home, Judge.

2         THE COURT:  Right.

3         Mr. Guy?

4         MR. GUY:  Your Honor, I only have one modest request

5    and that is I, we heard at the very beginning that the motion

6    for rehearing is tied to the sampling issue and I'd love to be

7    able to get to that at some point today.  And I understand that

8    there are witnesses for that.  So that might -- if we can do

9    that, that would be great.

10        The other issues are for the other parties.

11        Thank you.

12        THE COURT:  Mr. Houston?

13        MR. HOUSTON:  Your Honor, Andy Houston for the Verus

14   Trusts.

15        I, I think -- I heard Mr. Evert say that we would take

16   up after lunch with Matters 6 and 7 on the current calendar.

17   We are very much in agreement with that and we will describe,

18   discuss and describe how we think the New Jersey proceeding

19   fits in there.  We, we don't think that's really properly heard

20   today, but we'll, we'll deal with that.

21        I think we're in agreement that Matters 6 and 7 are

22   the way to start after the break.

23        THE COURT:  Anyone feel differently?

24      (No response)

25        THE COURT:  Okay.  That's what we'll do.

1        How much time do you need for lunch?

2        MR. EVERT:  It's really 6, 7, and 8, but yes.  Sorry.

3        Whatever, whatever the Court --

4        THE COURT:  Now you just said something different.

5        Anyone feel that differently about No. 8?

6        MR. GUY:  No, your Honor.

7        THE COURT:  I had looked at them and, and was thinking

8    5 -- excuse me -- 6 separately, and then, then the 7 and 8, but

9    we'll, let's do them all, okay?

10        How about 9?  Do we need the motion?  Because it's got

11   a continuance request.  That's the Delaware Claims Processing

12   Facility.

13        MR. EVERT:  Oh.  I'm sorry, your Honor.

14        THE COURT:  Do, do we hear all the requests for

15   continuances --

16        MR. EVERT:  I'm -- I'm -- I'm --

17        THE COURT:  -- at the same time?

18        MR. EVERT:  Yeah.  I'm sorry, your Honor.  You're

19   right.  6, 7, 8, and 9.

20        THE COURT:  That's the way I thought it might work

21   best, but in any event.

22        Okay.  How much time you need for lunch?  An hour?

23        MR. EVERT:  An hour?

24        THE COURT:  Everyone good with that?

25     (No response)

1          THE COURT:  Let's try to cut it just a little bit.

2   We'll pick back up at 1:30, okay?

3          MR. EVERT:  Thank you, your Honor.

4          THE COURT:  Thank you.

5      (Lunch recess from 12:33 p.m., until 1:29 p.m.)

6                         AFTER RECESS

7      (Call to Order of the Court)

8          THE COURT:  Have a seat, all.

9          Okay.  Well, we've thinned the crowd a little, but --

10         Are we ready to proceed with the, the next matter?

11         MR. EVERT:  Yes, your Honor.

12         THE COURT:  Okay, very good.  If I can find my page

13  here.

14         All right.  Are we going to take these all at once and

15  just hear whatever arguments are, are coming along from --

16         MR. EVERT:  Your Honor, I would suggest that we take

17  them in, in, in three small parts.  Take the, No. 6, which is

18  separate and apart.  That involves the Matching Claimants.

19         THE COURT:  Right.

20         MR. EVERT:  No. 7 and 8, which involve the Verus

21  entities, take that as the second one.  And then No. 9, which

22  involves the DCPF entities.

23         THE COURT:  Other thoughts?  Does that work for

24  everyone?

25      (No response)

1          THE COURT:  All right.  Let's try it.

2          MR. EVERT:  All right, your Honor.  So No. 6, next up

3   -- Michael Evert for the debtors.

4          No. 6, next up, the Debtors' Motion to strike the

5   Pleadings filed by the Non-Party Certain Matching Claimants.

6          THE COURT:  Right.

7          MR. EVERT:  I'm going to try to start a trend for the

8   afternoon here, this Honor, your Honor, and I think we're, I'm

9   going to try to do this in two minutes.  This one's pretty

10  simple.

11         The Court ruled that the Matching Claimants needed to

12  identify themselves and the Court denied their motion to

13  proceed anonymously.  The Court entered an order that said,

14  "Tell you what I'll do.  I'll give you guys 30 days to go to

15  the District Court and see if you can get a stay of my ruling

16  in the District Court so you don't have to identify yourself to

17  be heard in this Court."  On, depending upon which particular

18  Matching Claimant group you're talking about, on about the 27th

19  or 28th or 29th day, they filed a motion for stay in the

20  District Court which still sits pending at the District Court.

21         So what we have is is we have a pending motion to stay

22  and no order on that motion to stay and the debtors have moved

23  to strike the Matching Claimants because, inconsistent with the

24  Court's order, they've not identified themselves and the 30

25  days has since expired.  Pretty much it.

1              THE COURT:  Okay.

2              MR. EVERT:  Thank you, your Honor.

3              THE COURT:  All right.

4              MR. HOGAN:  Good afternoon, your Honor.  Daniel Hogan

5    of Hogan McDaniel on behalf of the Non-Party Certain Matching

6    Claimants.  Your Honor, thanks for your time today.  I

7    appreciate it.

8              THE COURT:  Sure.

9              MR. HOGAN:  Your Honor, this motion is predicated on a

10   hearing that happened before your Honor on November 30th of

11   last year.  The order was entered on February 6th, the order

12   denying the anonymity.  We appealed that order on February 20th

13   and we filed the motion to stay with the District Court on

14   March 8th.  Interestingly, curious timing, the debtors filed

15   their motion for rehearing on March 9th.  We find that curious,

16   your Honor.  Debtors are essentially attempting to relitigate

17   the motion to quash.  At the time that we argued the motion to

18   quash you had not ruled on the anonymity order.

19             THE COURT:  Uh-huh (indicating an affirmative

20   response).

21             MR. HOGAN:  So we have a temporal disconnect here,

22   your Honor.  We are essentially going back in time to argue the

23   motion to quash, yet we're being prevented, or the debtors are

24   attempting to prevent us from participating in rearguing the

25   motion to quash predicated on an order that we've appealed and

1   for which we have moved to stay that order pending the appeal.

2          Your Honor, I don't relish having to point to the

3   language of your order.  I've made this argument to you

4   before --

5          THE COURT:  Uh-huh (indicating an affirmative

6   response).

7          MR. HOGAN:  -- but I have to create a record, as you

8   know.

9          THE COURT:  Sure.  Go ahead.

10          MR. HOGAN:  Your order provides that we had 31 days,

11   30 days to seek a stay and we did that.  And so all we are

12   looking to do, your Honor, by participating in this motion for

13   rehearing is to be heard, like we were heard initially when the

14   motion to quash was argued before your Honor on November 30th.

15   That's what the debtors are seeking by their rehearing motion.

16   They want to go back in time and let's hear it again.  Let --

17   give you everything again, maybe make some new arguments, maybe

18   point to some different factors --

19          THE COURT:  Uh-huh (indicating an affirmative

20   response).

21          MR. HOGAN:  -- and from our perspective, they should

22   not be permitted to allow for our pleading to be struck.  We

23   should be heard if this matter's going to be heard again.  Your

24   Honor, they're really looking to silence us, as we see it, and

25   they've really demonstrated no basis.  The courts see this type

1    of relief as a drastic type of relief, your Honor, and the

2    courts typically disfavor these type motions to strike.  And so

3    from our perspective, your Honor, we should be heard.

4          We see this as, essentially, a Groundhog-Day argument

5    where we're going back to November 30th now, except they're

6    trying to quiet us.  They're trying to silence us from making

7    arguments counter to their arguments on the sampling.  And so

8    we believe that you should deny the motion to strike.

9          You have any questions for me, your Honor?

10          THE COURT:  No thank you.

11          MR. HOGAN:  Thank you.

12          MS. JOHNSON:  Good afternoon.  Diana Johnson with

13   Waldrep Wall Babcock & Bailey.  We are local counsel to Joe

14   Lemkin, who is on the phone.

15          In his pleading he has joined the arguments Dan made

16   and I just wanted to clarify the dates for his -- his -- in the

17   Miscellaneous Proceeding.  Their order denying the motion to

18   proceed anonymously was entered on February 22nd.  The appeal

19   to the District Court was on March 7th.  They filed their

20   motion for stay on March 24th and that matter is not yet fully

21   briefed.

22          So we also ask that the motion to strike be denied.

23          Thank you.

24          THE COURT:  Okay.

25          Any response to that?

1          MR. EVERT:  Your Honor, just a couple of quick points

2   just so I can satisfy any curiosity.

3          We filed the rehearing motion on March 9th 'cause that

4   was the deadline in order for the March 30th omnibus hearing.

5   So that was the --.

6          THE COURT:  Uh-huh (indicating an affirmative

7   response).

8          MR. EVERT:  -- reasoning behind that filing date.

9          And, and your Honor, look, our only point is the Court

10  said to the anonymous claimants, "Look, for you to be here,

11  heard, we got to, you got to identify yourselves so I can

12  understand exactly who you are and what you're doing and where,

13  what your perspective is," and all those kinds of things.  And,

14  and so, that's, that's the premise of our motion.

15         THE COURT:  Okay.

16         That got it?

17         Well, I, I appreciate what you're saying, but unless

18  you want to identify your clients, I can't let you participate.

19  I, I thought I was stretching a point to, to give any sort of

20  stay at all.  I didn't see grounds for it.  The motion to

21  proceed anonymously, to me, looked very clear and we didn't

22  have facts that would justify the apprehensions that give rise

23  to anonymous proceedings and, of course, the general rule is

24  quite the opposite that, that parties are be known on the

25  record.

1    I understand you disagree with that, but I was,

2    effectively, saying I don't think I could have granted the stay

3    myself and rather than waste time filing the motion with me, I

4    wanted to give you a little bit of an opportunity to see if the

5    District Court thought there was egregious error here, perhaps,

6    that they would intervene.  But frankly, I just don't see it

7    and the bottom line is while they may be talking -- and I don't

8    know yet whether I'm going to reconsider the earlier ruling on

9    sampling -- but the bottom line is it's a question of

10   participating in the case after the 30 days and without knowing

11   who your clients are, I don't think I'll allow you to do that.

12       So with all respect for what your clients have argued

13   and what they want to do, I, I think the fact that there's a

14   reconsideration motion is no different than any other kind of

15   motion that you might have an interest in in the case.

16       So I'm going to have to ask you.  Do you wish to, to

17   identify or do you want to stand down for today's purposes?

18       MR. HOGAN:  Your Honor, Daniel Hogan of Hogan McDaniel

19   on the record.

20       We are not prepared at this time to identify the

21   12,000 plus to your satisfaction.  I think the, the record

22   would be, would take, you know, the remainder of the day even

23   if I, you know, was Evelyn Wood at this point, your Honor.

24       THE COURT:  Well, I was just trying to anticipate that

25   there might have been a written document that just in case and

1   I wanted to ask the question.  I understand.

2            MR. HOGAN:  Thank you, your Honor.

3            THE COURT:  All right.  Thank you.

4            Motion granted.  I'll ask the debtor for a proposed

5   order.

6            MR. EVERT:  Thank you, your Honor.

7            I do commend the Evelyn Wood reference, though, your

8   Honor.  That's, that's taking us a ways back.

9            So up next, your Honor, is Docket No. 7 and 8, Third

10  Party Asbestos Trusts' Motion for Adjournment and Related

11  Relief and Motion of Third Party Verus Claim Services for

12  Adjournment and Related Relief, your Honor.

13           THE COURT:  Uh-huh (indicating an affirmative

14  response).

15           Who would like to lead off?

16           MR. HOUSTON:  Good afternoon, your Honor.  Andy

17  Houston for the Verus Trusts.  And I've got Lynda Bennett, my

18  co-counsel from Lowenstein Sandler, here with me this

19  afternoon.

20           MS. BENNETT:  Good afternoon --

21           THE COURT:  All right.

22           MS. BENNETT:  -- your Honor.

23           THE COURT:  Good afternoon.

24           MS. HOBSON:  Good afternoon, your Honor.  Anna-Bryce

25  Hobson here for Verus Claims Services.  I've got Zach Wellbrock

1    with me as well --

2           THE COURT:  All right.

3           MS. HOBSON:  -- and Andrew Anselmi on the phone.

4           MR. WELLBROCK:  Afternoon, your Honor.

5           THE COURT:  Very good.

6           All right.

7           MR. HOUSTON:  Your Honor, and Mr. Evert said that he

8    was going to break trend and try to speed things up.  I was

9    hoping we were going to read 12,000 names into the record so

10   we, so we would get our filibuster and, and effectively make

11   sure that our motion to adjourn is granted.  So unfortunately,

12   I don't have anything more than this to read into the record.

13   So I'll, I'll probably lie somewhere in between.

14          Your Honor, on behalf of the Verus Trusts, we would

15   ask you to do one of two things.  The first would be to adjourn

16   all the matters related to the rehearing motion until the

17   debtors can articulate as to the Verus Trusts what their

18   position is.  They did not file a motion or any other pleading

19   in our Miscellaneous Proceeding and we believe that that is

20   something that could be accomplished very quickly.  If the

21   answer is,  "We're making the same arguments against you that

22   we are against DCPF," a one-page kind of response.  If they are

23   putting something in the record that is more expansive, for

24   instance, explaining why the 10 percent agreement which caused

25   us to consent to the case being moved here applies or doesn't

1 | apply and there's more information that's needed, then we would

2 | have the opportunity to respond to that.

3 | Short of moving all the matters on the rehearing

4 | motion, your Honor, we would ask the Court that if you are to

5 | allow the rehearing motion to proceed today, then we would ask

6 | you to reserve ruling on it to give us the opportunity to have

7 | that basic due process, to have notice of what the charges are

8 | against the Verus Trusts and the opportunity to respond to

9 | those very specific charges and to argue our motion.

10 | And as I mentioned, that's not something that needs to

11 | be protracted.  I think we're talking about moving these

12 | matters out to your next hearing date in April.  I know there

13 | are some matters that Mr. Guy has on that also would be

14 | related.  He's got a sampling motion on that was also

15 | continued, I believe, to that day.  And from our standpoint,

16 | that is necessary to avoid the potential deprivation of due

17 | process.  The debtors are certainly going to take the position

18 | that the Verus Trusts are bound by a ruling in this

19 | Miscellaneous Proceeding --

20 | THE COURT:  Uh-huh (indicating an affirmative

21 | response).

22 | MR. HOUSTON:  -- which is Matter, I think, 303, but

23 | yet we have not really had the opportunity to have notice and

24 | to be heard and don't want the Court to rule, whereby when we

25 | do get the opportunity to argue that, effectively, that ruling

1  is, the matter has already been ruled on.

2        THE COURT:  Uh-huh (indicating an affirmative

3  response).

4        MR. HOUSTON:  It's a fait accompli, as my counsel

5  refers to it as.

6        By way of some limited background for the record,

7  August 19th of last year, the Verus Trusts filed motions to

8  quash the subpoenas in New Jersey and in September of this past

9  fall the debtors moved to transfer the matters to the

10  bankruptcy court here.  Neither of those motions were heard and

11  the reason they weren't heard is because, from the Verus

12  Trusts' standpoint, we had an agreement on what was to be

13  produced and that included having the case transferred here, to

14  North Carolina, and that started on about November 30th when

15  Ms. Bennett, my co-counsel -- excuse me.  That, that was when

16  you ruled in the DCPF matter that the production would be

17  limited to a 10 percent claimant sampling with the parties to

18  work out the logistics of, of how that would play out.

19        -- December 19th, in reliance on your Honor's ruling,

20  contacted the debtors and proposed a resolution, whereby the

21  Verus Trusts would consent to the matters being moved from New

22  Jersey and for the parties to follow your 10 percent sampling

23  ruling and to work out, of course, the logistics and compliance

24  and production details here.

25        The debtors responded that very next day, December

1   20th, and said that they agreed to be bound by the rulings that

2   you have made and that they would also be bound by those

3   matters of compliance and production that you would make post

4   transfer.  And so in reliance on those statements and that

5   agreement the parties negotiated a consent order in January

6   that transferred the cases from New Jersey here on the terms

7   that I outlined.

8           In January and February, it's my understanding that

9   the ACC and the debtors were attempting to negotiate how that

10  10 percent sampling would be accomplished in accordance with

11  your ruling and then on or about February 10th of this past,

12  this year the debtors advised you that they were making

13  progress towards reaching an agreement on how to conduct the

14  sample, but then also advised you that they were at least

15  considering moving to reconsider your 10 percent sampling

16  ruling.  Verus Trusts were not served with a motion at that

17  time, did not participate in any of those hearings.

18          On February 14th, only a few days later, debtors

19  informed the Court of their intention to then move for

20  reconsideration of the sampling ruling.  The Court, your Honor,

21  asked specifically how this cut with the Verus Trusts and

22  expressed concern about the Verus Trusts' due process rights

23  since we were not participating and you set a March 9th

24  deadline for the debtors to file whatever motion they were

25  going to file related to the sampling issue and seeking

1   reconsideration.

2          So March 9 happens.  The debtors only file a motion as

3   to DCPF Trusts and the DCPF entity.  Verus is not mentioned, or

4   Verus Trusts, they're not mentioned anywhere in those motions.

5   There's no motion that is filed in the Verus Trusts'

6   Miscellaneous Proceeding, which I think is Proceeding No. 300.

7          March 16th, my co-counsel, Ms. Bennett, contacted the

8   debtors seeking confirmation that our 10 percent sampling

9   agreement remained intact post transfer.  The next day, she was

10  told that there was no deal on the matter and that Verus agreed

11  to be bound by whatever happens in the DCPF matter, which is

12  certainly not our belief or understanding, and that we were

13  then invited to show up today and argue, even though there's no

14  motion, there's no filing in our matter, and the like.

15         Right after that happened, we filed this motion -- I

16  think that was March 20th -- asking for an adjournment of, of

17  our matter for the reasons that I mentioned so that we could

18  have some kind of motion filed targeted at the Verus Trusts,

19  have the opportunity to respond appropriately, and have a

20  hearing on it as due process would require.  The debtors

21  rejected that request as well.

22         We filed the motion to intervene -- excuse me.  There

23  was a correspondence March 10th.  We filed our motion to

24  intervene, this motion, the next day, on the 21st.  Trying to

25  be proactive, I contacted Chambers after contacting the only

1  parties who are actually of record in this case, who are the

2  debtors' counsel --

3          THE COURT:  Right.

4          MR. HOUSTON:  -- and then Mr. Martin and his firm, who

5  represents the DCPF.  I, I did not reach out more broadly.  The

6  next day, a number of parties chimed in and said we had not

7  contacted them.  I assure you that was purely inadvertent.

8  They just hadn't made appearances in the case and I claim, very

9  accurately, ignorance of this case.  I have not been heavily

10 involved in this.  I did not know everything that's going on.

11 We were offered or discussed having a hearing on this motion to

12 adjourn on Monday only to be told that the debtors would not

13 consent.  So they were just pushing forward.  From our

14 standpoint, all of this, to me, just looks like a whipsaw.

15 Usually, whipsaws seem a lot more subtle than this, to me.

16 This is kind of a, "No, we're just going to push and, and we're

17 going to try to bind you to a ruling in another case."

18          So our argument is a very simple one, from my

19 standpoint.  It's basic due process, but even more than due

20 process I think it really is just timing.  I think all of these

21 matters really should be teed up at one time.  And so what we

22 are asking the Court to do is to allow, perhaps order, the

23 debtors to at least identify their position as to the Verus

24 Trusts on the docket in our matter and to give us an

25 opportunity to respond as due process requires and then we

1   could have a hearing on whatever those issues are, whether they

2   are these same issues between DCPF or whether they are the DCPF

3   issues, plus others.

4          That is all we are asking the Court to do, which is to

5   have this lined up appropriately so that my clients, Verus

6   Trusts, have their day in court and the opportunity to respond

7   without arguing about whether they're bound by something that

8   happened vis-à-vis other parties in another case.

9          Thank you.

10          THE COURT:  Okay.  Thank you.

11          Now did the Trusts also have a argument?  Am I

12   imagining things?

13          What did we do in No. 7?  Are we going to hear those

14   in turn or are we going to do them together?

15          MS. BENNETT:  Yeah.  Your, your Honor, Lynda Bennett

16   from Lowenstein Sandler for Verus Trusts.

17          The additional pleading we put in was on the motion

18   for rehearing.  It's a limited objection.  So I think it makes

19   sense to hear this first and then we can address the substance

20   if need be.

21          THE COURT:  Any opposition to that?

22          MR. HOUSTON:  Are you saying -- I'm sorry, your Honor.

23          Were you saying to hear Matters 7 and 8 sort of

24   concurrently so that --

25          MS. HOBSON:  I think it -- yeah, I think it makes

1   sense.

2        MR. HOUSTON:  The, the adjournment matters, I think

3   that's what we're talking about, right?

4        THE COURT:  That's what I thought --

5        MR. HOUSTON:  Yeah.

6        THE COURT:  -- was being proposed.

7        MS. HOBSON:  Yeah.

8        MR. HOUSTON:  Yes.  Great.

9        THE COURT:  7 and 8 together.

10        So I'm, I'm ready to hear --

11        MS. HOBSON:  8 is very brief.

12        THE COURT:  Okay.

13        MS. HOBSON::  I will tell you that -- Anna-Bryce Hobson

14   for Verus Claims Services.

15        And I would just echo everything that Andy just said

16   as it relates to Verus Claims Services.

17        And we would also request an order, but at, directed

18   to Verus Claims Services.  They, the debtors have to put

19   something on the record that tells us what it is we're

20   responding to.

21        Thank you, your Honor.

22        THE COURT:  Okay.

23        Anything more on, on the debtors' side of this?

24        MR. EVERT:  Yes, your Honor.  Michael Evert for the

25   debtors

1          So the, the request here today is a little different

2     than the requests that were made in the motion.  So let -- let

3     me -- let me try to unpack it as best I can.

4          THE COURT:  Okay.

5          MR. EVERT:  And there were two things requested in the

6     motion.  The, the first was an opportunity to be heard in the

7     DCPF rehearing matter to which the debtors do not object.

8          THE COURT:  Uh-huh (indicating an affirmative

9     response).

10         MR. EVERT:  We have -- we -- we have perceived since

11    the very beginning that the Verus parties would be able to be

12    heard in any matters before this Court to, in regard to the

13    DCPF sampling issues or the DCPF production issues in their

14    entirety, which we understood, maybe mistakenly, but which we

15    understood that Verus had agreed to be "bound," is, is the term

16    that they used.  I would say that they've agreed to abide by

17    what happens in that, those matters with the right and

18    opportunity to be heard.  So we have no objection to that.

19         The second is continuance.  And yes, they did reach

20    out to us and asked if we would agree to continue.  We said no

21    and we said no because, as the Court knows -- and Mr. Houston's

22    not burdened with this history -- the Court knows we've been

23    fighting this battle for a long time.  So let me -- let's --

24    let's talk about the notice that they did receive and we'll see

25    whether or not the Court views that as something that is, that

1 | was appropriate.

2 | So the Verus motions to quash that were transferred to

3 | this Court were on the agenda for the January omnibus hearing

4 | for a status conference.  That agenda was served on the Verus

5 | parties, on all of the parties in the Verus matter.  I do not

6 | know whether they attended that conference or not.  Four days

7 | prior to the February 14th conference we sent an e-mail -- and

8 | this is part of Ms. Bennett, the exhibits to the Verus motions

9 | -- we sent an e-mail to the Verus parties that said:

10 | "In addition to the extent Verus, its related Trusts,

11 | and its related Matching Claimants seek to prosecute

12 | their motions to quash or motions to proceed

13 | anonymously that have been transferred to Judge

14 | Whitley, we will ask the Court to set them for hearing

15 | for the same March 30 omnibus hearing."

16 | Four days later, well, I guess, really, two days

17 | later, the agenda for that hearing, which included the Verus

18 | motions to quash on for status, was served on the Verus

19 | parties.

20 | Then at the hearing on February 14th we inquired of

21 | the Court, we discussed the fact that a motion for

22 | reconsideration would be filed, as Mr. Houston said.  The Court

23 | said, "Okay.  Get it on file by March 9th," as Mr. Houston

24 | said, and we discussed with the Court the issue of the fact

25 | that the Verus motions to quash were still pending.

1           THE COURT:  Uh-huh (indicating an affirmative

2    response).

3           MR. EVERT:  And, and I said to the Court, "So does the

4    Court just want to hear it all on the 30th?"  And the Court

5    said, "Well, wait a minute.  I thought there was a consent

6    order" --

7           THE COURT:  Uh-huh (indicating an affirmative

8    response).

9           MR. EVERT:  -- and reading from the transcript --

10   "entered in New Jersey that basically said these motions would

11   stand or fall based on the way that they had been handled in

12   the earlier DCPF hearing."  I said, "That's what we understand,

13   your Honor.  However, the Verus parties have always continued

14   to reserve all rights."  And, and the reason I was able to call

15   that to my mind when I was standing before the Court on

16   February 14th was because I remember being perplexed when I got

17   the last e-mail that's included in Ms. Bennett's motions where

18   we agreed to this compromise and we agreed to the cases coming

19   back to, to this Court and the last sentence was, "The Verus

20   parties continue to reserve all their rights," and I thought

21   that was odd in an e-mail where you'd agreed to compromise some

22   rights.  But the point was, didn't matter.  I remembered it.  I

23   didn't want to misrepresent to the Court.

24          The Court on the phone said, "Hey, anybody from Verus

25   on the line?"

1        THE COURT:  Uh-huh (indicating an affirmative

2   response).

3        MR. EVERT:  There was no attendance from Verus,

4   notwithstanding that the motion was up for status.  So the

5   Court says, "Well, why don't we put everything on the 30th,

6   then, and just go ahead and knock it out and try to get us

7   moving again."  I said, "Well, we'll put them all on.  We'll

8   move to rehear on the sampling issue and then the Verus papers

9   are there and the Court can, can seek whatever information from

10  us that would be helpful for the Court."

11       So on the issue of notice, your Honor, if the question

12  is did we send them a Notice of Hearing for their motion to

13  quash on March 30 and if that's dispositive, we lose.  If,

14  conversely, the purpose of the monthly omnibus hearings and

15  the, and the purpose of the agendas being served on all the

16  parties and the purpose of calling a motion up for status is to

17  inform all the parties what the Court intends to do with those

18  motions, then, then adequate notice here, in fact, should have

19  been given.

20       Now those were the two requests in the, in the motion.

21  Today, Mr. Houston said that the Verus parties would like for

22  the debtors to articulate their position.  Now I'm not exactly

23  sure what that means, but I'll -- I'll -- I'll give it a shot.

24  And that is, as the Court saw from the motion and the e-mails

25  that were attached to the motion, which I know how diligent the

1    Court is about reading everything, I, I will say in my years of

2    practicing law I'm not sure I've ever had a dispute over a meet

3    and confer, but I know I've never had a dispute over a meet and

4    confer that occurred 100 percent in writing.

5        So this -- there were no other conversations other

6    than the e-mails that was attached to the Verus motions.  This

7    is *de novo* review on steroids, okay?  You, you can read the e-

8    mails.  You can read the order.  We believed what we thought

9    happened is that they had agreed that whatever happens in DCPF,

10   "We'll stand by it and we want an opportunity to be heard."

11   And we agree they should, in fact, be heard.

12       So our position is if they want to argue their motion

13   to quash today in which, in which, presumably, all of these

14   issues are preserved, please argue.  If, conversely, they want

15   to simply argue in the DCPF matter on sampling, please argue.

16   But regardless of what happened before, all those are still

17   before the Court and we don't, we're not, we're not arguing

18   waiver of any of those.  So if they want to argue them, argue

19   them.

20       THE COURT:  Uh-huh (indicating an affirmative

21   response).

22       MR. EVERT:  So at the end of the, end of the day, your

23   Honor, our view is the Verus motions to quash should be up.

24   They seemed to have indicated in past communications that what

25   they're really worried about is the sampling issue.  So they

1    may not have anything new to add on the motion to quash, but

2    they may want to be heard on the sampling issue.  All of that

3    is acceptable to the debtors.

4           But we believe notice was appropriate, given the way

5    these cases are run, and we'd like to get this process, well,

6    to say we'd like to get this process moving seems to be so

7    inadequate.  We, we've been at this for a while and we're,

8    we're trying to get to closure.

9           Thank you, your Honor.

10          THE COURT:  Anything else?

11          Ms. Bennett?

12          MS. BENNETT:  Yeah.  Just very briefly, your Honor.

13   Lynda Bennett from Lowenstein Sandler for the Verus Trusts.

14          To, to the Verus Trusts, it's a very simple question,

15   which is if the debtors wanted to bind the Verus Trusts on the

16   rehearing motion, why didn't they file something on March 9th

17   and articulate, even if it is, as Mr. Houston said, a one-page

18   document that says, "Everything we just said for DCPF and DCPF

19   Trusts applies with equal measure to Verus and Verus Trusts,"

20   we would understand what we were responding to.

21          THE COURT:  Uh-huh (indicating an affirmative

22   response).

23          MS. BENNETT:  The fact is March 9th came and went and

24   there was no filing.

25          So referring back to the original motions to quash

1  that were fully briefed that were then resolved by the consent

2  order bringing us here --

3          THE COURT:  Uh-huh (indicating an affirmative

4  response).

5          MS. BENNETT:  -- where the Verus Trusts relied upon

6  the 10 percent sampling agreement to talk about the, the

7  motions to quash, that's old news.  We now have a new motion

8  here and we need to know what is the debtors' basis for walking

9  back from that 10 percent agreement in relation to Verus.

10  Again, it may be for exactly the same reasons that they're

11  doing with DCPF.  The simple thing to do on March 9th is to

12  make that clear and we would have known and we would have put

13  our arguments in and, and stated our positions.

14          Thank you.

15          THE COURT:  So --

16          Yes.  Counsel?

17          MR. WELLBROCK:  Your Honor, good afternoon.  Zachary

18  Wellbrock from Anselmi & Carvelli on behalf of Verus.

19          Just to add very briefly, I would actually like to

20  agree, to an extent, with two things that debtors' counsel

21  said, one about agendas in the DCPF matter.  I don't doubt, I

22  have no position to doubt that agendas were circulated to

23  counsel in that matter.  However, they didn't make their way to

24  the Verus parties who are not a party to that matter.

25          The other thing that counsel mentioned, correctly,

1   this was a discussion that happened exclusively via e-mail.

2   It's all in writing, that is, until, up and until the e-mail

3   that said, "We're thinking about filing a motion for

4   reconsideration," after which, at the time that the motion

5   actually was filed, we have a sudden cessation of all e-mail

6   correspondence.  It would have been very simple to e-mail that

7   motion to us, put us on notice, paper it in the correct way,

8   tee everything up.  That never happened, your Honor.

9           Thank you.  That's all I have.

10          MR. EVERT:  Your Honor, just, just one point.

11          Sampling is raised in their motion to quash.

12          THE COURT:  Uh-huh (indicating an affirmative

13   response).

14          MR. EVERT:  So, so I, I'm still confused about the

15   procedural confusion.  The fact that we are seeking rehearing

16   in the oral ruling that the Court made in DCPF on sampling

17   doesn't affect Verus' filings.  They've already said, "We ought

18   to sample."  So if they want to argue about sampling, they're

19   on record.  Let's do it.

20          MS. BENNETT:  Your Honor, just very briefly on that.

21          We detrimentally relied that we had an agreement on

22   sampling and there's nothing in the record from Verus to

23   address that.  I mean, we're happy to put those papers in.

24          But you can't keep going back to the motion to quash

25   that was fully briefed and the facts have changed since.

1        Thank you.

2            THE COURT:  Right.

3            And I take it from the parties' perspective culling

4    out the, the Verus hearing from the other motion to reconsider

5    the, the Delaware proceeding if you will, that's not a, an

6    answer to this.  Everyone's afraid that I'll rule on the, the

7    other and thereby set.  Now these, these cases are getting

8    complicated because of the amplification of a decision in one

9    and on the other case and on the other parties within a case.

10   So it, it's a little bit problematic there.  I'm just wondering

11   whether I ought to wait and hear requests for reconsideration

12   itself.

13           Let me ask -- changing gears to, to the next motion,

14   the Debtors' Motion for Reconsideration.  I know there's

15   opposition to it.  Is there opposition to having a hearing on

16   reconsideration or is it please don't change your mind?

17           MR. EVERT:  There's two.  One, yes.  DCPF has filed a

18   motion to adjourn --

19           THE COURT:  Right.

20           MR. EVERT:  -- on the basis of, essentially, that they

21   didn't get to take Dr. Mullin's deposition.

22           THE COURT:  Right.

23           MR. EVERT:  And then they filed a separate opposition

24   to the substance of the motion for rehearing.  And look, I --

25   your Honor, I'll, I'll just say to the Court.  In addition to

1    what you've just said -- and I'm -- I'm -- I'm not, you know,

2    I'm not looking for a knife back here, people go, "Why'd you

3    say that," but I'm going to say it, anyway -- it would -- if,

4    if you're going to continue it as to Verus, it, frankly, makes

5    sense from an efficiency perspective to continue it as to

6    everybody and just do it all in April, if that's what the

7    Court's inclined.to do.  We think adequate notice was given

8    here and we really think all these issues have been in front of

9    the Court almost more times than we can count.

10         But, but if, if that's the Court's inclination, then I

11   see no reason from a judicial efficiency perspective -- even

12   though we're all here and all that good stuff --

13         THE COURT:  Yeah.

14         MR. EVERT:  -- I see no reason to go forward on one

15   and not the other, in addition to the reasons the Court raised.

16         THE COURT:  Well, I'm not sure what I'm inclined to do

17   at the moment.  The -- what I am inclined to do is try to make

18   sure that I don't make an announcement right this moment that

19   adversely affects the next two or three matters.

20         So the request by the Delaware Facility to strike,

21   etc., are we ready to go on that one as well?

22         MR. GUERKE:  We're ready, your Honor.

23         THE COURT:  And you had an adjournment request in that

24   motion as well?

25         MR. GUERKE:  It's a motion to strike, your Honor, and,

1   in the alternative, to adjourn.

2          THE COURT:  Uh-huh (indicating an affirmative

3   response).  Maybe I need to consider that and, and then give

4   you an answer on, on both of them.

5          But why don't we just hold right there.  I, I'd like

6   to be able to take these in order, but one bleeds into the

7   other.

8          So let's, let's stand down on the Verus motion and,

9   and the Trusts' motion and go ahead and talk about the Delaware

10  case.

11         MS. BENNETT:  Thank you, your Honor.

12         MR. HOUSTON:  Thank you, your Honor.

13         MS. HOBSON:  Thank you, your Honor.

14         THE COURT:  And that would be helpful to me.

15         For the other parties, my earlier question is there

16  opposition to even having a rehearing as opposed to me

17  reconsidering and changing the decision, anything you can

18  illuminate on your positions there would be helpful, all right?

19         Counsel?

20         MR. GUERKE:  Thank you, your Honor.  Good afternoon.

21  Kevin Guerke from Young Conaway on behalf of Delaware Claim

22  Processing Facility.

23         Your Honor, you may recall from our last hearing, or

24  at least my last time I addressed the Court that I had a

25  scheduling conflict today --

1          THE COURT:  Uh-huh (indicating an affirmative

2     response).

3          MR. GUERKE:  -- and I asked the Court if it could push

4     off this hearing --

5          THE COURT:  Right.

6          MR. GUERKE:  -- till next week or, possibly, to the

7     next omnibus hearing.

8          THE COURT:  Right.

9          MR. GUERKE:  I've rearranged my schedule to be here,

10    given that the debtors have repeatedly attacked me personally.

11    I thought it was important to show up and I don't want my

12    personal schedule to be viewed in any way as my client trying

13    to delay this matter.

14         THE COURT:  Sure.

15         MR. GUERKE:  And I'd be happy to answer any questions

16    about my schedule, your Honor, or I'm prepared to move on.

17         THE COURT:  I'll take your word for it.  I'm -- and

18    I'm sorry I couldn't accommodate it.  We try to do what we can

19    to make it possible to practice here.  It's just, you can see

20    the group.  I'm, I'm sure we'd have a hard time finding a day

21    where someone didn't have a problem, so.

22         MR. GUERKE:  Yes, your Honor.

23         On to DCPF's motion to strike.  The declaration of

24    Charles Mullin.  The motion to quash was filed in Delaware last

25    July 25th.  The debtors filed a response August 22, 2022.

1              THE COURT:  Uh-huh (indicating an affirmative

2    response).

3              MR. GUERKE:  There was no declaration from Dr. Mullin,

4    no declaration from any witness.  Briefing was completed in the

5    Delaware matter September 6th.  The motions to quash were then

6    transferred to this Court.  A hearing was held November 30th.

7    The Court made its sampling ruling.  Again, the debtors didn't

8    provide any evidence at that hearing or any witness at that

9    hearing.  Debtors didn't counter our motion to quash facts and

10   at the end of the hearing the Court ordered a 10 percent sample

11   granting our motion.  Dr. Mullin was nowhere in sight.

12             The parties then turned to the sampling methodology to

13   comply with the Court's order.  The debtors consulted with

14   Bates White and then on December 19th of last year debtors

15   proposed a sampling protocol after consulting with Bates White.

16   The debtors specifically proposed a stratified random sampling

17   protocol that, according to the debtors, would be a

18   representative and efficient sample that can be, that can

19   provide a, a reliable cross-section of the data.  Again, at

20   that time nothing from Dr. Mullin.  No declaration from anyone.

21   No indication from the debtors that there was newly discovered

22   evidence.

23             On March 9th, debtors filed a motion to reconsider,

24   over three months after the Court's ruling.  The motion was

25   prompted by the, by comments that the Court made in a different

1  case.  For the first time, debtors submitted a declaration from

2  Dr. Mullin.

3         Attaching a new declaration to a motion to, to

4  reconsider is improper.  It's very clear that a party can't

5  introduce new evidence or new arguments at the reconsideration

6  stage in all the cases that we cite in our, in our papers, your

7  Honor.  The two cases that the debtors cite don't support

8  submission of a declaration under these circumstances, either.

9  The debtors have no legal support for what they're trying to do

10  and there's no justification for waiting three months after the

11  Court's ruling to lob in a new declaration.  Dr. Mullin's

12  generic opinion on sampling not being precise enough is not new

13  evidence recently discovered.  It could have been presented in

14  response to the motion to quash and the Gallardo-García

15  declaration that Dr. Mullin discusses at length was attached to

16  the Trusts' motion to quash filed in July in Delaware.

17         Both Dr. Mullin and Dr. Gallardo-García are partners

18  in Bates White.  Bates White has been debtors' consultant since

19  June 2020.  Both were on the Aldrich payroll in July and in

20  August during the briefing in the Delaware matter on the

21  motions to quash.  Both have worked on the sampling issue in

22  this case.  The debtors could have submitted a declaration last

23  year, but they chose not to.  They're precluded from doing that

24  now after the fact.

25         So for that basis alone the entire declaration should

1  be struck.

2         The debtors argue there's new evidence since the

3  November 30th hearing that necessitates rehearing.  According

4  to the, according to the debtors, the new evidence is the

5  relatively modest costs in DBMP and the Court's February 9th

6  comments, but Dr. Mullin doesn't discuss the February 9th

7  hearing.  That's not the basis for a new declaration.  It's not

8  evidence, anyway.  Dr. Mullin only mentioned the $86,000 in

9  invoices in a single paragraph, Paragraph 24, of his 30-

10 paragraph expert opinion declaration.  There's hardly any

11 mention of the $86,000 in the declaration.

12        Turning to the invoices.  There are two, your Honor,

13 and I, I have copies.  If, if you're interested in seeing them,

14 I can -- I could -- I could hand them up, or I could just run

15 through what I have to say.

16        THE COURT:  Go ahead.

17        MR. GUERKE:  The first invoice, your Honor -- it's

18 attached to our papers, our opposition to the motion for

19 reargument -- the first invoice is dated November 2, 2022.

20 That's four weeks before the November 30th hearing.  The second

21 invoice is dated January 18th.  We had a hearing in this case

22 January 26th, a little more than a week after they received

23 that, and we heard nothing about the, the invoices.  We heard

24 nothing about the relatively modest costs in DBMP, certainly

25 nothing about a declaration.  If the costs were really the

1    reason that prompted the declaration and the motion, why, why,

2    why weren't they attached?  I mean, we, we had to attach them.

3    We don't need a 30-paragraph declaration from an expert to

4    comment on two invoices, anyway.  That's a contrived argument

5    and completely inconsistent with the facts.

6          In truth, the Mullin declaration is not limited to

7    just the invoices, as, as the debtors suggest, or the costs.

8    Most of the Mullin declaration is dedicated to sampling and

9    critiquing Dr. Gallardo-García.  Neither have anything to do

10   with the invoices.  Dr. Mullin states in his declaration his

11   credentials and then it's followed by an additional 23

12   paragraphs of opinions.  He covers a variety of topics, all of

13   which existed before the November 30th hearing.  Dr. Mullin's

14   opinions are summarized in four paragraphs in a section of his

15   declaration titled Summary of Opinions.  They don't say

16   anything about the DCPF invoices.  Dr. Mullin's position on

17   sampling already existed.  It's not new and it's mostly

18   theoretical, but the alleged lack of precision in sampling is a

19   new argument in this case.  Debtors didn't argue that before in

20   their papers or at the hearing.  It also conflicts with the

21   debtors' position, with the debtors' proposal that they made to

22   us with a sampling protocol back in December.

23          As for Dr. Gallardo-García, Dr. Mullin talks about him

24   in his declaration.  That's not new, either.  The declaration

25   was attached to the filings in Delaware last July.  The fact is

1   Dr. Mullin's declaration is extensive and not focused on the

2   costs as, as the debtors suggest.  Debtors' argument that the

3   motion was prompted by the DBMP invoices or newly discovered

4   evidence is simply not, not credible.

5        Dr. Mullin is also not qualified to testify about many

6   of the subjects in his declaration.  What's his area of

7   expertise?  What are his qualifications for the opinion he's

8   trying to render?  He's not qualified to give an opinion on the

9   innerworkings of DCPF.  He's attempting to, to critique

10  arguments that we made November 30th and that the Trusts made

11  November 30th and in our briefing in Delaware last, end of the

12  summer and last fall, but he's not qualified to make legal

13  arguments.

14       He also lacks personal knowledge as a fact witness.

15  Commenting on what your partner said in a declaration in a

16  different case is completely improper and Mullin's lay opinion

17  on what someone else did or said is not helpful to the Court or

18  relevant.  He's not an expert in reading someone else's

19  declaration and his opinions about the debtors' filing are

20  irrelevant.  The Court can read Dr. Gallardo-García's

21  declaration attached to the Trusts' motion.  The Court can read

22  the motions and the pleadings in Bestwall and all that existed

23  before November 30th.

24       This has gone on too long, your Honor.  The, the

25  motion for reconsideration never should have been filed.  The

1  declaration is too late.  It does not contain newly discovered

2  evidence.  The declaration lacks foundation and Dr Mullin lacks

3  personal knowledge and is unqualified to give many of the

4  statements that he makes in his declaration.  The declaration

5  should be struck.  The last thing we want, your Honor, is

6  discovery on discovery.  We shouldn't have to take the

7  deposition of an expert four months after the fact or ever as a

8  non-party third-party motion to quash, but if the Court's

9  inclined not to strike the declaration -- and we hope that the

10  Court does strike the declaration -- we simply ask to depose

11  Dr. Mullin and his, his declaration should be severely limited

12  to Paragraph 24 and the DBMP invoices.

13          Thank you, your Honor.

14          THE COURT:  Thank you.

15          Others?

16          MR. EVERT:  I guess that's me, your Honor.

17          First, let me say --

18          THE COURT:  Is there a joinder in that?  I thought the

19  Trusts had joined in with this one.

20          MS. MOSKOW-SCHNOLL:  Your Honor, there is a joinder.

21          MR. EVERT:  Oh, sorry.

22          THE COURT:  All right.

23          MR. EVERT:  Maybe it's not me.

24          MS. MOSKOW-SCHNOLL:  I, I'm just going to let

25  Mr. Guerke speak, though.

1         THE COURT:  Okay.

2         MS. MOSKOW-SCHNOLL:  I, I think he did a great job and

3    I have nothing to add.

4         THE COURT:  Okay.  Thank you.

5         All right.

6         MR. EVERT:  Thank you, your Honor.  Michael Evert for

7    the debtors.

8         First of all, I want to say, to the extent that we

9    personally attacked Mr. Guerke, we certainly didn't mean to do

10   that.  So my, my apologies for whatever that, that was.

11        So you asked, your Honor, to, for a little bit of

12   discussion of this motion for rehearing versus motion for

13   reconsideration.

14        THE COURT:  Right.

15        MR. EVERT:  You may recall that we, we brought this up

16   to you at the February 14 hearing and, and I will admit we, we

17   took from the Court your view that it, since no order had been

18   issued, no, no, no final, final order had been signed, it was

19   only an oral --

20        THE COURT:  That's not really what I was saying.

21        MR. EVERT:  Oh.

22        THE COURT:  What I wanted to find out was -- I

23   understand that everyone but the debtor and the affiliates and

24   FCR don't want me to reconsider the order, not to change the 10

25   percent sampling requirement, specifically.  What I'm trying to

1   figure out is are there people procedurally who are opposed to

2   even talking about whether there's a motion to reconsider or a

3   motion for rehearing, two different things, the substantive

4   decision or whether or not grounds exist, and that's the part

5   that I'm hoping you're about to get to, is that -- what I was

6   trying to find out is who wants to be heard on what's,

7   effectively, the next matter coming up and never mind about --

8   'cause it strikes me we've got like three or four issues now

9   teed up, one of which would be do we strike on, on the

10  deposition; one's going to be whether we continue this to next

11  month to have a hearing; one's going to be whether I should

12  change the ruling at all; and then the last one is are grounds

13  existent to decide to have a, a reconsideration/rehearing.  And

14  that's the one I'm really interested and the rest of the room

15  and their perspectives.  'Cause I already have an opinion and I

16  don't want to announce it until I, I get some, get everyone a

17  chance to, to weigh in.

18          Quite -- kind of a different thing.  I understand all

19  versus 10 percent.  Everybody's got an opinion on that.  We've

20  got an opinion on whether or not the Mullin's deposition or --

21  excuse me -- affidavit should be allowed or whether he should

22  be deposed, but what I'm really wanting is that one little bit

23  before I blab and say something that's going to affect the next

24  matter.

25          So if there are some of you who want to weigh in on

1    the topic of is it appropriate to reconsider at all, we're

2    moving into, what is it, No. 10, but I'd like to know that

3    before I announce any rulings on the rest of that to this.  If

4    you've got other arguments on this motion, I'd be happy to hear

5    them now, but that's the next thing I'm going to do, is ask the

6    room if anyone else has anything they want to say about whether

7    I should have a rehearing/reconsideration --

8            MR. EVERT:  Well --

9            THE COURT:  -- not whether I should change the

10   decision.

11           MR. EVERT:  I, I think I'm hearing you, your Honor, at

12   least I'm going to try.  And please, as you did a moment ago,

13   correct me if I'm not going in the right direction.

14           So in our view, because there's no written order, this

15   is a motion for rehearing.

16           THE COURT:  Right.  And I --

17           MR. EVERT:  And the motion --

18           THE COURT:  -- said as much at the last hearing.

19           MR. EVERT:  You did.  And, and in our view, in a

20   motion for rehearing it, it's entirely in your discretion to

21   get to a just result in the bankruptcy court.

22           THE COURT:  Uh-huh (indicating an affirmative

23   response).

24           MR. EVERT:  The other side has argued that it should

25   be judged under the motion for reconsideration standards.

1           THE COURT:  Right.

2           MR. EVERT:  Is -- am I, am I talking about what you

3    want me to talk about or am I missing it still?

4           THE COURT:  Yeah, but I'm still more interested what

5    the other side is saying.  The -- the rest -- the rest of it,

6    Mr. Evert, what I'm really interested in as to the motion to

7    strike aspects of this motion.  Why don't you hit that first,

8    then I'll hear what these other folks have to say about whether

9    No. 10 should, we should have a hearing at all, and then I'll

10   get your opinion on that.

11          MR. EVERT:  Okay.

12          THE COURT:  Okay?

13          MR. EVERT:  Okay.

14          So the motion to strike aspect.  The argument

15   essentially is that they use the motion to reconsider, the

16   other side uses the motion for reconsideration factors to say

17   there's no -- there -- there -- we can't meet those factors for

18   reconsideration and, therefore, the affidavit or declaration

19   should be struck because it could have been entered earlier --

20          THE COURT:  Right.

21          MR. EVERT:  -- is essentially what the argument is.

22          What changed in this case, your Honor, were two

23   things.  The first was at the hearing where the Court ruled the

24   10 percent sample there were substantial arguments made about

25   the quantity of the burden to DCPF in order to review the

1   individual --

2           THE COURT:  Right.

3           MR. EVERT:  -- fields.  We now can quantify that

4   burden.  We could not until there was a hearing, although,

5   although I'm sure Mr. Guerke is right.  The invoices were

6   issued to DBMP at a certain time.  That was not transparent to

7   us until the hearing in DBMP or counsel for DBMP stood up and

8   said $86,000.

9           THE COURT:  Uh-huh (indicating an affirmative

10  response).

11          MR. EVERT:  And that, to us, is not nearly as material

12  as, in the scheme of this case, is not nearly as material as at

13  least we understood it to be.

14          So that, to us, is a monstrously key piece of evidence

15  that helps the Court quantify the burden, which the Court said

16  on February -- on -- not February -- on, on November 30 the

17  Court said, "This is important to me.  This is one of the

18  things I was looking at."  I didn't realize they were going to

19  have to look at those fields individually and the Court said,

20  "That's new to me."

21          THE COURT:  Uh-huh (indicating an affirmative

22  response).

23          MR. EVERT:  Now we believe it wasn't new, but that's a

24  whole different issue, all right?

25          So that's No. 1.

1          And No. 2, one of the other standards is change in,

2     change in the law.  Well, the law hadn't changed, but the Court

3     had the opportunity to look at this issue, not binding on the

4     Court.

5          THE COURT:  Uh-huh (indicating an affirmative

6     response).

7          MR. EVERT:  I certainly think it would be persuasive

8     on the Court, but the Court had the opportunity to look at the

9     issue and that was new.  And that's what prompted us to file

10    the motion for rehearing.  We think we meet all the standards

11    and as a result, the motion should be heard.

12         Now I -- I -- I don't want to get afield, you know.

13    There, there are other arguments being made about Dr. Mullin's

14    declaration.  We believe those all go to the weight, you know.

15    The question is whether he's, he can opine about this or opine

16    about that or whether it's in his field of expertise.

17    Dr. Mullin is here and we intended to, if we go forward,

18    present him today on, on the sampling issue so the Court could

19    get all the information that the Court would like to have.

20         We, we have taken the position since Day 1 that

21    sampling is inappropriate in this particular context.

22         THE COURT:  Uh-huh (indicating an affirmative

23    response).

24         MR. EVERT:  And I think we've made that very clear to

25    the Court.  So the idea that we couldn't give the Court

1  information on the sampling issue, it's an issue we've raised.

2  It's an issue that's been out there.  So the idea that we

3  couldn't do that, to us, doesn't seem to make any sense.

4        Oh.  And then on the last point.

5        Thank you.

6        On the last point, your Honor, this question of they

7  never, they didn't have an opportunity to take his deposition.

8  I think we're in agreement on this.  Nobody ever asked.  So, so

9  from, from March 9 when the declaration was filed until,

10  really, today, although we could count their reply, I guess,

11  that was filed last Thursday.  Maybe you can count that as an

12  ask.  Nobody ever asked.

13        So we, we feel like it's incumbent on a party before

14  they complain about no depo to at least ask for one.

15        THE COURT:  Okay.

16        MR. EVERT:  Thank you, your Honor.

17        MR. GUERKE:  Umm --

18        THE COURT:  Anything else?

19        MR. GUERKE:  Yes, your Honor.

20        We shouldn't have to take the deposition of an

21  improper witness.  The, the Court already ruled on this issue.

22  And if we asked to take his deposition, they would surely be

23  arguing that we waived our motion to strike.  No harm no foul.

24  "You already took the deposition.  Let's just have the hearing.

25  Let Dr. Mullin testify."

1    We also needed the, the Court's ruling on the motion

2    to strike before we wanted to proceed in, into a deposition.

3    If the declaration is stricken, there would be no need to take

4    the deposition.  We wouldn't have to waste our time and money

5    doing it.  And if it is allowed, in what capacity is it, is it

6    allowed and is it chopped down at all?  A, a deposition of

7    Dr. Mullin is a burden.  Another hearing is a burden.  The, the

8    debtors' motion for reconsideration is a burden.  We're trying

9    to minimize the burden and by -- we don't want to jump

10   headfirst into more burden, more expense, more costs, more

11   effort and we shouldn't be forced to do so by taking a possibly

12   unnecessary deposition.

13   On the quantity of the burden and the change in law,

14   the two, the two triggers to the motion for reconsideration,

15   are, are not valid.  They don't meet the standard.  They don't

16   come close.

17   To answer your, the question I think your Honor was

18   posing, does, did the debtors meet the threshold, you know, as

19   a threshold matter, do they have the ability to have a

20   reargument motion, a reconsideration motion?  The answer's no.

21   No matter what standard you look at, they fail to meet it.

22   They can't, they can't articulate it.  The quantity of, of

23   burden, how can they say they didn't know about the quantity of

24   burden?  They, they made a presentation.  Their co-counsel made

25   a presentation in DBMP and included extensive testimony from --

1    from -- I should say transcripts from the, from the other

2    hearings.  And if this evidence, if this is a monstrous key

3    piece of evidence, why isn't it addressed more in Dr. Mullin's

4    declaration?  That's -- it's simply -- that's simply not the

5    case.

6         And the change of law, your Honor, respectfully, your

7    decision in one case isn't a change in law.  It's, you know,

8    different cases, different matters, different facts, different

9    parties, different rulings.  It happens all the time.

10        As far as the weight of the testimony, it, it's not a

11   weight issue now.  It's, it's an admissibility issue.  It's a

12   qualification issue.  Maybe we talk about weight if we're

13   having this discussion last September, last --

14        THE COURT:  Uh-huh (indicating an affirmative

15   response).

16        MR. GUERKE:  -- October, last November, but not now.

17   We already have a ruling.  This is their, their time to, to ask

18   for a re, rehearing and it should be denied.

19        THE COURT:  Okay.  Thank you

20        MR. GUERKE:  And the -- and the -- I'm sorry -- and

21   the declaration struck, your Honor.

22        THE COURT:  All right.  Thank you.

23        Let me repeat my prior inquiry -- I'm going to bleed

24   over into No. 10 -- and just ask succinctly, if you can.  I

25   don't want to argue the entire motion for rehearing.  I want to

1   talk about the question of parties who are opposed for any,

2   whatever call you, reconsideration, rehearing, whatever you

3   want to term it, of another bite at the apple, not the decision

4   of whether we go 10 percent or whether we go full disclosure.

5          If you've got opinions on that, I would like to, to

6   hear what you have to say.  Because as I said, I've already got

7   an opinion on that and I don't want to announce it.  It's

8   needed for this purpose, but I don't want to say anything more

9   until you get a chance to weigh in on it.

10         Counsel?

11         MS. MOSKOW-SCHNOLL:  Your Honor, Beth Moskow-Schnoll,

12  Ballard Spahr, for the DCPF Trusts.

13         THE COURT:  Okay.

14         MS. MOSKOW-SCHNOLL:  And we absolutely don't think

15  there should be a reconsideration of your prior ruling.  I'm

16  not sure I understand the question, though.  I, I wasn't

17  certain if you were asking whether or not your prior ruling or

18  order was actually an order that could be reconsidered or

19  whether it should be a rehearing.

20         Is that the question?

21         THE COURT:  No --

22         MS. MOSKOW-SCHNOLL:  Okay.

23         THE COURT:  -- not quite.  I know that there are

24  differences of opinion on what that is.  I, I said last month

25  that I considered it to be a request for a rehearing since no

1  order had actually been entered.

2          MS. MOSKOW-SCHNOLL:  Well, your Honor, I, I mean, I

3  just pulled up the transcript and what you did is you said,

4  "The motion to quash is granted."  And in our world, my

5  world -- but I'm not a bankruptcy lawyer -- that means that

6  there has been a ruling which you said "and now the parties

7  should work at trying to come up with a sample" in accordance

8  with your ruling.

9          THE COURT:  Right, but technically --

10         MS. MOSKOW-SCHNOLL:  And the parties --

11         THE COURT:  -- an order is not effective until it's

12  docketed in, in writing.

13         MS. MOSKOW-SCHNOLL:  But, but, your Honor, the parties

14  relied on, on that ruling and the parties worked together to

15  try to come up with a sample and they had reached accord on

16  that.

17         THE COURT:  Right.

18         MS. MOSKOW-SCHNOLL:  And, and not only had, had they

19  got to that point in reliance on that, but the Verus Trusts

20  also relied on that in agreeing to come down to this Court.

21  And, your Honor, we certainly relied on it thinking it was 10

22  percent and, therefore, we didn't have to participate anymore,

23  which, no offense to your Court, I would be happier if I was

24  still in Delaware.

25         THE COURT:  I understand.

1          MS. MOSKOW-SCHNOLL:  You know -- so I think,

2     absolutely, it was treated by everyone concerned as though it

3     was an order and you did say the motion was granted.

4          THE COURT:  I did.

5          MS. MOSKOW-SCHNOLL:  Okay.  Thank you.

6          THE COURT:  Yes, ma'am.

7          MS. RAMSEY:  Thank you, your Honor.  Natalie Ramsey

8     for the Committee.

9          Your Honor, we also did object on the basis that we do

10    not believe that the debtor meets the, the debtors meet the

11    legal standard for reconsideration and we understand that that

12    may be a slightly different question than we're hearing, but we

13    think that the applicable legal standard should apply and what

14    we've heard from the debtors is there are, essentially, three

15    reasons that they talk about.

16         One is surprise or new information about the actual

17    burden and cost.  Frankly, you know, we join in the argument

18    that has been made by Mr. Guerke.  It is difficult to accept

19    that argument in light of the extensive amount of litigation

20    that has gone on over trust discovery and the information that

21    is out there and if that was such a crucial aspect, then it

22    should have been a much more focal point of the debtors'

23    initial evaluation and Dr. Mullin's declaration.

24         With respect to a change in the law because of what

25    has happened in DBMP, I also want to join but also expand a

1 little bit on that because we understand that the Court is

2 interested in consistent rulings, but the fact patterns in

3 cases often differ.  And so, for example, in the Bestwall case

4 there are two very distinct sample, claim file samples that are

5 going to be pursued there.  No decision has yet been reached in

6 DBMP, but it's tending toward that.

7      In this case, what the parties have been discussing is

8 one claim sample that both parties would use.  Different facts

9 drive different types of analyses.  And similarly, it's our

10 position that here the decision to limit trust discovery to 10

11 percent made a lot of sense and, and that it would expedite the

12 ability to move forward in this case.  It would put all parties

13 on a much more even platform.  And, and so again, we do not see

14 that that is a change in the law because something was done

15 under different facts in a different case.  Legal standard is

16 important when the same facts apply and the same law should

17 apply, but here, we don't believe we have that.

18      And the third was Dr. Mullin's declaration.  And we

19 did not move to strike, but we did object in Footnote No. 5 on

20 Page 8 of our objection to certain paragraphs of Dr. Mullin's

21 declaration on the basis that we contend that the declaration

22 is argument, that there are opinions that are expressed that

23 are beyond his expertise, and, and on the basis that there are

24 assumptions embedded within some of the statements that are

25 portrayed as fact.  And so we do believe that with respect to

1   Dr. Mullin's declaration if there was going to be testimony in

2   the other cases, there was a declaration that was submitted in

3   connection with the motion for trust discovery.  Here, the

4   debtors determined not to do that.

5          And again, we believe that having gone through the

6   hearing, having had the Court reach the determination it did,

7   we do object to rehearing on the motion.

8          THE COURT:  Anyone else?

9          MR. GUERKE:  May I add one point, your Honor?

10          THE COURT:  Please.

11          MR. GUERKE:  On the, on the quantity burden argument

12   that the, the debtors didn't know, two points.  One, they

13   argued extensively about DBMP at the November 30th hearing, in

14   their briefing.  They were well aware what was going on in that

15   case.

16          The other point I want to make, your Honor, is, as I

17   stated earlier, the first invoice is dated November 2, 2022,

18   like four weeks before.  How can that be a surprise?

19          Thank you.

20          THE COURT:  Okay.  Let me, let me jump in at this

21   point, folks, because I do have an opinion and it's no one's

22   fault, but my own.  So I'm going to just tell you that I think

23   I've created some confusion based on the two cases and what I

24   may have said in this one and then, of course, this issue got

25   raised in DBMP.  And I want to make sure that we have a good,

1  clean record and that the decisions are properly made, to the

2  extent I have the ability to, to do so, and that the District

3  Court on appeal gets a clean record.

4         So I have an opinion on the idea of whether we should

5  have a rehearing on the issue of sampling and that backs you

6  into the quash motions, to a certain extent.  I think we

7  should.  The reason is that I think I've contributed to some

8  confusion in all this and there is one fact that may not change

9  anything.  I'm not at all convinced that I need to change the

10 ruling.  I do think I need to have a rehearing of the motion

11 and the bottom line is, as was pointed out in the DBMP case,

12 and the parties were speculating as to what the Court knew and

13 what the Court was thinking and why it was different between

14 Aldrich and DBMP and all that.

15        First thought.  It is not humanly possible to do the

16 same thing in two different cases as much as they are alike.

17        I'm, I'm with you, Ms. Ramsey, on that.

18        You will notice that Judge Beyer and I always don't

19 rule the same way and you folks learn from an experience in a

20 case and the next case you give us a slightly different look

21 and a different tactic, a different method, different motion.

22 Judge Beyer's had, I guess she's on her third motion to

23 dismiss.  I haven't seen any.  I seem to draw relief from stay

24 motions, but whatever.

25        The cases are slightly different.  I cannot humanly --

1   and three months ago, I guess it was, I had parties from this

2   case showing up in the DBM [sic] case fearing that I was going

3   to decide a motion in DBMP that would practically decide it in

4   this case.  Now if y'all want to, to really be bodacious, let's

5   just consolidate both cases and we'll just have three-or-four

6   day hearings at a time and we'll, we'll try to be more

7   consistent.

8          But absent that, there are going to be differences in

9   the decisions and I don't apologize for that.  Just as you

10  learn from the experience, I'm probably learning more.  This is

11  my first estimation exercise.  I picked up Garlock after

12  estimation.  So I'm, I'm learning along the way and I'll have

13  to change my tactics.

14         But the, the confusion I think I've created in this

15  was what I said in this case and that was I didn't say quite

16  enough, I guess.  Several things were happening here and as

17  the, I guess it's the Facility's response points out, there was

18  a demonstrative given to me in the November hearing in this

19  case and the demonstrative showed the, the details of what the

20  narrative portions of these, these documents might reflect.

21         And that, I may have seen that earlier, Mr. Evert, but

22  I don't recall seeing it in, in DBMP.  That was the first time

23  I, I think I've ever noticed that.

24         The second thing that was moving me in this case was

25  Mr. Guy getting through to me on, on costs, seeing the charts

1    of how much these cases are costing, and watching in the two

2    cases I have as we seem to go farther and farther from getting

3    to a resolution with more litigation and more discovery and

4    more expense and the thought that maybe we can start reining

5    some of that in with sampling.

6          Now I won't argue about sampling or not at the moment,

7    but the thing that I forgot in this case on November 30th was

8    that in DBMP we had put in the PII scrubbing mechanism.  That

9    was not on my mind.  I knew it.  I just didn't think about it.

10   Y'all, by the end of a day, y'all have me in knots, anyway.  So

11   I have to, have to say that that just didn't occur to me that

12   we had done that.  And that's why I think I need a rehearing.

13   If for no other reason, is I want to know more about why

14   sampling doesn't work for the debtors' side, why sampling

15   wouldn't reduce the risk of just even human error missing some

16   of that stuff.  And so I'm inclined to have a further hearing

17   on that.

18         With that being the case, I'm not inclined to strike

19   the declaration of Dr. Mullin's yet, but you can raise that at

20   the next hearing if it's here.  And now the question is when do

21   we do all that.  But I'm inclined to hold that one until I hear

22   all the arguments, the substantive arguments on whether I

23   should adopt sampling.

24         So that's kind of the -- the -- where I've got it at

25   this point.

1          That, then, begs the question of do we do the

2     rehearing today or do we do it next month and that, I guess I'm

3     announcing the Verus motion at this juncture.

4          I've read those e-mails that y'all had and it looks

5     like you were ships passing in the night as to what you're

6     saying.  I can see from what the debtors said that they assumed

7     that there -- if future days we were going to talk about

8     reconsideration in, in this case, then, then we were, but I

9     don't get the sense that Verus understood that was on the

10    table.  And again, I believe in full and fair hearings for all

11    of you and I don't want to foreclose anyone from having that

12    chance.

13         So I am inclined to grant the request for a

14    continuance and do all of this at one time next month and get

15    it all on the table.  I think, if nothing else -- now maybe

16    procedurally you might want to clean that up a little bit in

17    terms of, of either a consent order or a stipulated order or

18    one that just says the Court says that the Verus situation is

19    going to be heard along with the Delaware Miscellaneous

20    Proceeding and we're going to talk about all these issues next

21    month.  I don't know how you want to say it, but the, the

22    bottom line is that if Verus thinks that they need more

23    clarification of why they're not bound by this, well, you

24    hadn't asked me to send you back to New Jersey.  So I guess

25    that's not part of the --

1          I look at you, Ms. Bennett and Mr. Houston.  That's

2  not part of the relief that you want at this juncture?

3          MS. BENNETT:  Your Honor, that's correct.  We know

4  we're not going back to Jersey, but we will want the

5  opportunity to supplement the record.  If it's just a "me too"

6  of what's been said against DCPF, we'll put in a supplemental

7  submission --

8      (Extraneous talking on telephone)

9          THE COURT:  Hang on one second.

10          Folks, we got someone who's, who's talking and has

11  unmuted their receiver.  Unless it's really spicy, we don't

12  want to hear it.

13          Yes, ma'am.  The -- I don't know.  Y'all might be able

14  to work out -- and we're about due for a lunch or a mid break,

15  anyway -- y'all might want to talk about how we put the

16  procedural deadlines for filing any additional documents.

17          Similarly, if you want to, on this end, depose

18  Dr. Mullins, then you can get that done.  And frankly, if there

19  are other declarations that need to be filed, then we need to

20  go ahead and set a time period for all that.

21          Do you think we might be able to take about a 10-or-20

22  minute break and, and get some of that squared up?

23          MR. EVERT:  Let's give it a shot, your Honor.

24          THE COURT:  Everyone good?  Okay.

25          Yes?

1    MR. HOGAN:  Your Honor, I don't mean to complicate the

2  record at all, but I just -- and I know your earlier ruling on

3  the motion to strike.  I get that and --

4    THE COURT:  Mr. Hogan, we're not getting it clear

5  enough.  Either get near a microphone or --

6    THE AUDIO OPERATOR:  Yes, please.

7    MR. HOGAN:  How about if I speak up?  Is that fine?

8  Can you hear me now?  Can you hear me now?

9    THE COURT:  Okay.  Go ahead.

10    MR. HOGAN:  Thank you.

11    So I understand your order on the motion to strike.  I

12  understand your order on anonymity.  We're standing down.  I

13  get all that.

14    But what I'm hearing you say, effectively, is that

15  we're going to have another hearing in April on the motions to

16  quash.  Our motions to quash have not been stricken.  We filed

17  motions to quash.

18    THE COURT:  Uh-huh (indicating an affirmative

19  response).

20    MR. HOGAN:  They were opposed.  And so I'm left in a

21  bit of a quandary about whether I can or should participate in

22  a hearing on my motion when it hasn't been stricken, but you've

23  ordered on the anonymity that we can't participate.  So I'm in

24  a box and I need some, some guidance.

25    THE COURT:  Well, the bottom line is, again, I don't

1    think it's a question of which motion.  I think it's a question

2    of can you participate in the case without identifying your

3    clients and while I respect why your clients don't want to give

4    that information up, I believe it's, it's legally required if

5    they're going to be heard in these cases.

6           So, so bottom line -- and the exception being the

7    District Court.  They can make their own decisions about what

8    they want to do -- but yes, I'm afraid they're going to have to

9    identify if they want to be heard on those motions.

10          MR. HOGAN:  Understood, your Honor.  That's crystal

11    clear.  I appreciate that.

12          And so with regard to the motion to quash that the

13    Matching Claimants filed --

14          THE COURT:  Uh-huh (indicating an affirmative

15    response).

16          MR. HOGAN:  -- absent a motion to strike by any of the

17    parties, what -- will the disposition of that motion be

18    commensurate with the other determinations?  Is that what I'm

19    left to believe?

20          THE COURT:  Well, the bottom line is we're not going

21    to let the other parties prosecute your motion, but if the

22    relief is the same, then the relief is the same.  Whatever

23    disposition is made probably will be applicable to every

24    claimant in the case, so.  Right?  Okay.

25          MR. HOGAN:  Thank you.

1      THE COURT:  Let me know.  I'm going to ask the clerk

2  to, to sit in the courtroom.

3      THE COURTROOM DEPUTY:  Uh-huh (indicating an

4  affirmative response).

5      THE COURT:  Or can they just buzz you at a number or

6  something so you don't have to sit here?  Okay.

7      All right.  Well, we'll take a recess until you're

8  ready to go.

9      MR. EVERT:  Thank you, your Honor.

10     (Recess from 2:46 p.m., until 3:41 p.m.)

11                          AFTER RECESS

12     (Call to Order of the Court)

13     THE COURT:  Have a seat.

14     All right.  What was arrived at during the break?

15     Mr. Hirst.

16     MR. HIRST:  Your Honor, Morgan Hirst for the debtors.

17     Mr. Evert got to do all the fun argument.  I got to

18  announce an agreed schedule.  So --

19     THE COURT:  Okay.  Well, you're one up.

20     MR. HIRST:  -- exciting, exciting for me.

21     So, your Honor, we did, I think, reach an agreement.

22  We have one tiny disagreement, which we'll raise at the end.

23     THE COURT:  Okay.

24     MR. HIRST:  It is a, maybe a lengthier schedule than

25  your Honor originally may have suggested.

1          THE COURT:  Uh-huh (indicating an affirmative

2    response).

3          MR. HIRST:  The other side would like to retain an

4    expert to rebut, or attempt to rebut Dr. Mullin.  We have no

5    issue with that.

6          So June 6 is what we decided on for a hearing date --

7          THE COURT:  Okay.

8          MR. HIRST:  -- if that works for the Court and we --

9          THE COURT:  It does.

10         MR. HIRST:  -- -- I think, understand that it does.

11   And then there's some interim dates in the middle.

12         First of all, here's what we understand and I think

13   the other side understands what this hearing is.  We want to

14   make sure your Honor is -- is --

15         THE COURT:  Okay.

16         MR. HIRST:  -- agreeing with this.  The, the issue at

17   the hearing is whether or not there's going to be compliance

18   with a subpoena in full; in other words, a response concerning

19   all the claimants or all the Matching Claimants, or whether

20   it's going to be a sampled compliance with a subpoena.

21         THE COURT:  Okay.

22         MR. HIRST:  That's what we understand the hearing to

23   be about.

24         With that in mind, here's kind of some interim dates

25   that we've agreed to.  This is more for your Honor's

1  information, but we'll --

2          THE COURT:  Please.

3          MR. HIRST:   -- make it for the record.

4          The other side's going to retain an expert.  They're

5  going to submit some expert report or a declaration or some

6  form of expert submission by April 25th.  They will then have

7  the opportunity to depose Dr. Mullin up until May 5th.

8          THE COURT:  Okay.

9          MR. HIRST:  We -- I'm sorry.  They will then submit

10  their brief.  Verus will submit a brief in opposition to our

11  motion for rehearing.  DCPF can supplement their opposition to

12  the motion for rehearing.  Those briefs from the objectors to

13  the motion for rehearing will be done by May 12th.

14          THE COURT:  Right.

15          MR. HIRST:  We will have the right to depose the

16  expert they're going to put up and Mr. Eveland, who is the

17  Verus President, I believe, who submitted an affidavit, and

18  then, potentially, Mr. Winner, who's the DCPF President, though

19  that's our area of disagreement, but those depositions have to

20  take place by May 19th.  And then our reply brief is due May

21  26th.

22          THE COURT:  Okay.

23          MR. HIRST:  And there'll be no -- yeah -- there'll be

24  no further briefing after May 26th.  One issue of minor

25  disagreement for your Honor, I think, can decide today is

1  Mr. Winner.

2          So Mr. Winner is DCPF's President.

3          Is that right, Kevin?

4          MR. GUERKE:  I believe he's COO.

5          MR. WINNER:  Or COO.  He submitted a declaration in,

6  in support of their motion to quash --

7          THE COURT:  Right.

8          MR. HIRST:  -- last summer.

9          THE COURT:  Uh-huh (indicating an affirmative

10  response).

11          MR. HIRST:  They have -- DCPF -- and Mr. Guerke'll,

12  Mr. Guerke'll tell me if I got this wrong -- they've indicated

13  they will at least rely on his old declaration.  They may

14  submit a supplemental declaration.  We would like to take his

15  deposition, regardless.  DCPF has indicated they would only

16  agree to a deposition of Mr. Winner in the event they provide a

17  supplemental declaration.  And so our view is if they're going

18  to rely on his declaration, we should get to depose him whether

19  it's a new declaration or an old declaration.  That, I think,

20  is the only issue in dispute.

21          THE COURT:  Okay.

22          MR. GUERKE:  That is in dispute, your Honor.  Again,

23  Kevin Guerke on behalf of DCPF.

24          We object to a deposition of Richard Winner at this

25  point.  The, the declaration was filed in July.  The debtors

1    chose not to depose him and the motion to -- so the first we

2    heard about the deposition, that they want to take his

3    deposition after all these months was just now out in the

4    hallway, but struck a, a, a reasonable balance that if we're

5    going to supplement with new information, they'd have a chance

6    to depose Mr. Winner on the new information, but don't get a

7    chance to go back and, and start all over again.

8          DCPF is not a party to this case.  You've heard us

9    argue burden and expense probably more than you, you want to

10   hear.  We shouldn't have that burden magnified by additional

11   discovery directed at us.  I know we're going down on this path

12   on sampling --

13         THE COURT:  Uh-huh (indicating an affirmative

14   response).

15         MR. GUERKE:  -- and additional expert discovery, but,

16   you know, your Honor, we had a sampling ruling.  We thought it

17   was great.  The debtors proposed a sampling that worked for the

18   debtors.  The parties talked about it and reached agreement on

19   a sampling protocol, at least a 99 percent agreement, and, and

20   this all could be avoided with the 10 percent sampling, your

21   Honor and -- but if we have to go down this path, it's going to

22   be a, a longer, more drawn-out, burdensome, expensive process.

23         Thank you.

24         THE COURT:  And what is it you want to ask him about,

25   generally?

1        MR. HIRST:   If they're going to rely on him -- they

2    have his affidavit -- if they're going to rely on that

3    affidavit on June 6th, we'd like a chance to ask him questions

4    about his affidavit and the factual underpinnings behind it.

5    If they're not going to rely on his affidavit on June 6th at

6    the hearing or in their papers, we don't have any reason to

7    bother.

8        THE COURT:   So why now and not before?

9        MR. HIRST:   Why now?  'Cause they're going to rely on

10   him in a hearing in --

11       THE COURT:   Okay.

12       MR. HIRST:   -- two months where they're now going to

13   have an expert who, presumably, is going to rely, in part, on

14   some of Mr. Winner's factual underpinnings to his testimony.

15   So that's, that's why.

16       THE COURT:   Well, I got to tell you.  What I was

17   envisioning more was talking about the need for sam, for full-

18   blown production versus sampling, not as much on, on burden to

19   that.  But if we're going to argue about burden, then, you

20   know, if we're going to use him, that's fine.  We probably need

21   to, to depose him.

22       But from my vantage point, the questions I have,

23   primarily, in my mind that made me want to have a further

24   hearing is, given that we got down the road so far about

25   sampling, why is that not sufficient?  I mean, the bottom line

1    is what are the likelihood that, that, if we do full

2    production, that there's a risk, now that I can remember that

3    we were doing these hand scrubbing.  But if we're going to

4    fight about the, you know, how much other cost there is to the,

5    the Facility, then yeah, I think I'd be inclined to, to allow

6    it.

7          The question is how, how broadly are y'all planning to

8    argue.

9          MR. HIRST:  That's actually to my colleagues.  'Cause

10   we're happy to take the issue of burden off of the table,

11   essentially.  If they're going to simply argue -- if the entire

12   hearing's going to be about -- I mean, their basis for a

13   sampling -- their, their motion requesting sampling was 'cause

14   it was burdensome.

15         MS. MOSKOW-SCHNOLL:  That is not the only reason.

16         THE COURT:  No, no, no.  It was also about

17   confidentiality.

18         MR. HIRST:  Confidentiality as well.  No, those were

19   the, the two underpinnings.

20         THE COURT:  Right.

21         MR. HIRST:  If we're going to continue to --

22         THE COURT:  So are we arguing both, or one?  That's,

23   that's all I really think.  'Cause if we're arguing both, I

24   think I'm setting a rehearing and if I'm reconsidering all of

25   that, then fine.  But the bottom line is the -- in that event,

1   I think we need to have full fact presentation there,

2   declaration, and if we're going to get anything else from him,

3   an amended declaration or whatnot, the chance to review.  If

4   we're just going to talk about what the debtors needs are and

5   why they aren't satisfied, then I would say no.

6          MR. GUERKE:  Your Honor, the, the, the same group of

7   people have already taken Mr. Winner's deposition --

8          THE COURT:  Uh-huh (indicating an affirmative

9   response).

10         MR. GUERKE:  -- in DBMP.  He already went through

11  that, that burden in time and effort.  The declaration that we

12  filed in this case is similar to declarations that were filed

13  in past cases -- and I don't want to mix the cases up -- but --

14         THE COURT:  Yeah.  We've done too much of that.

15         MR. GUERKE:  -- it's -- it's un -- it's unfair to DCPF

16  as a nonparty to keep being dragged, dragged into more and more

17  discovery and, and we, we object, your Honor.  Unless we,

18  unless we assert additional facts in a supplemental

19  declaration, we ask that the Court not allow a deposition of,

20  of Mr. Winner.  His, his declaration has been out there and

21  we've argued it for months and months.

22         THE COURT:  If we're going to rehear burden, then I'm

23  going to, to allow them to do the deposition, okay?  All right.

24         I, I appreciate where he's come, where the Facility's

25  coming from and this being nonparties, but they're very

1    interested nonparties and, and effectively, I think the

2    information is very key to what we're doing here.

3            So I, I want a decent record that can go up, if it

4    needs to be, and I believe we need him for that purpose, so.

5            All right.  What else?

6            MR. GUERKE:  Please.

7            MS. MOSKOW-SCHNOLL:  Your Honor, I just wanted to put

8    on the record that we, we believe you did enter an order and

9    that this is procedurally improper.

10           THE COURT:  Understood.

11           MS. MOSKOW-SCHNOLL:  I just want to make sure that was

12   on the record.

13           THE COURT:  Overruled.

14           MS. MOSKOW-SCHNOLL:  Thank you.

15           THE COURT:  Okay.

16           Mr. Guy?

17           MR. GUY:  Your Honor, we weren't asked about these

18   dates, but we will totally work with them, of course.

19           On the sampling motion, I want to be practical about

20   it.  I know I want to move forward, but I think, realistically,

21   we're not going to get progress until this is resolved.

22           So maybe we can continue it until after this hearing.

23   I hate to say that because my predictions have proven to be

24   true again, but that seems like the sensible thing to do.  But

25   I defer to the Court entirely on that.

1          THE COURT:  Anybody else want to weigh in on that?

2          Ms. Ramsey.

3          MS. RAMSEY:  Thank you, your Honor.  Natalie Ramsey

4   for the Committee.

5          Your Honor, we do think that it would be most

6   productive to have the advantage of your Court's ruling and

7   then to have a little time to continue to meet and confer with

8   the debtor.  As we indicated, we were very close before and I

9   think it, depending on how the Court rules, we could either

10  have a, a deal more quickly or more slowly.  But I think, I

11  think it's worth continuing the dialogue after the Court rules

12  on this motion.

13         THE COURT:  Well, if at all possible, I'll try to rule

14  from the bench on that and then let the order follow along

15  behind.

16         What would you have in mind in terms of continuing the

17  motion?  Are you wanting to move it to July or are you wanting

18  to -- we're early in June, anyway.  We were the 8th and I --

19  that was my next question, was are we still doing the omnibus

20  day on the 8th?  We're, we're moving everything to the, to the

21  6th and hoping for the best.

22         MR. EVERT:  That would be our suggestion, your Honor.

23         THE COURT:  I'm sure the clerk's told you.  I've got a

24  summary judgment motion the next morning in another case.  So

25  if we run long, then I may have to have you wait until the

1    afternoon of the 7th to finish.  But we'll try to do what we

2    can.

3             So about the FCR's motion, July?

4             MR. GUY:  Whatever the next date would be, your

5    Honor --

6             THE COURT:  What is the next day?

7             MR. GUY:  -- for the Court's convenience.

8             THE COURT:  The 14th of July.

9             THE COURTROOM DEPUTY:  Yeah, July 14th.

10            MR. GUY:  That works for us, your Honor.

11            THE COURT:  Okay.

12            MR. GUY:  Thank you.

13            THE COURT:  All right.  So ordered.

14            What else?

15            MR. GUY:  Long as it doesn't go past September.

16            THE COURT:  Yes, Counsel.  Mr. Guerke?

17            MR. GUERKE:  Your Honor, I've already stood too many

18   times today and I apologize.

19            But on the Winner declaration, two points.  One, his

20   declaration was already admitted into evidence without an

21   objection back at the November 30th hearing.  And two, your

22   Honor, if you're still going to allow for a, a deposition, we

23   ask that the deposition be limited to new grounds and not go

24   over topics that have already been discussed with the witness

25   in prior depositions.

1          THE COURT:  In the DBMP case?

2          MR. GUERKE:  Yes, sir.

3          THE COURT:  I can't do that.  That's different

4    parties, different cases.

5          Overruled on those.  I, I don't fault you for trying.

6    I know they're similar, but all I would say is try to learn

7    from the other case and use as much of that as we can.  You

8    could simply ask him questions, "Do you have any differences in

9    your opinions than those expressed in the DBMP deposition," and

10   maybe that would speed it up some, but --

11         All right.  Anything else for today's purposes?

12      (No response)

13         THE COURT:  Well, I would -- thank you for your

14   negotiations on trying to get this squared back up.  Unless --

15   I told the law clerk, "Well, when I miss one, I really hit the

16   hornet's nest hard."  And so I'm sorry to the extent that I

17   didn't remember the other.  I think we had some other things we

18   would need to talk about, anyway.

19         And I guess the more encouraging thing is I used the

20   time while you were negotiating to start signing Aldrich fee

21   orders.  So there is some positive benefit for what had

22   transpired.

23         And for those of you who were like witnesses and the

24   like coming in expecting the hearing on this, I'm sorry we

25   couldn't accommodate you today.  This is a very important issue

1   and of great magnitude and it's going to affect discovery by

2   other parties as well, if only by the good for the goose good

3   for the gander arguments.  So I think we need to get this one

4   right.

5         And I'm sorry I've caused as much delay as I have

6   here, but rather than having you speculate as to what the Court

7   was thinking I thought it best just to tell you what the, what

8   the rub was and hopefully, we'll figure out whether we really

9   need, whether sampling's appropriate or whether full-blown

10   discovery is appropriate and get that behind us, okay?

11         If nothing else, travel safely.

12         We're in recess.

13         MR. EVERT:  Thank you, your Honor.

14         MR. GUERKE:  Thank you, your Honor.

15     (Proceedings concluded at 3:56 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2          I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                     April 4, 2023

7    Janice Russell, Transcriber                      Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25